# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| **ED BUTOWSKY** | § | |
| | § | |
| **V.** | § | **Civil Action No.  4:18CV442** |
| | § | **Judge Mazzant/Magistrate Judge Craven** |
| **DAVID FOLKENFLIK; NPR, INC.;** | § | |
| **NPR.ORG; JARL MOHN; STACEY** | § | |
| **FOXWELL; MICHAEL ORESKES;** | § | |
| **CHRISTOPHER TURPIN; EDITH** | § | |
| **CHAPIN; LESLIE COOK; HUGH** | § | |
| **DELLIOS; PALLAVI GOGOI; and** | § | |
| **SARAH GILBERT** | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

The above-referenced cause of action was referred to the undersigned United States Magistrate Judge for pretrial purposes in accordance with 28 U.S.C. § 636.  The following motion is before the Court:

> **Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) for Failure to State a Claim (Docket Entry # 25).**

The Court, having carefully considered the relevant briefing and hearing arguments of counsel February 7, 2019, recommends the motion be **DENIED**.

## I. BACKGROUND

This is an action for defamation, business disparagement, and civil conspiracy filed by Plaintiff Ed Butowsky ("Plaintiff" or "Butowsky"), a Dallas investment advisor, against National Public Radio, Inc. ("NPR"),[1] its senior media correspondent, David Folkenflik ("Folkenflik"), and

---

[1] The Complaint names "NPR, Inc." and "NPR.org" as parties.  Docket Entry # 1. Defendants maintain the correct legal name of "NPR" is "National Public Radio, Inc." Defendants further assert

certain former and current executive editors at NPR.[2]   According to Plaintiff, the defendants published false and defamatory statements about Plaintiff online and via Twitter between August 2017 and March 2018 – statements Plaintiff alleges injured his business and reputation.

Plaintiff claims Folkenflik knowingly and intentionally conspired with Douglas H. Wigdor ("Wigdor") to promote, publish, and republish a demonstrably false and defamatory narrative about Plaintiff. Joint Report of Attorney Conference (Docket Entry # 52) at 2.  Plaintiff alleges Folkenflik actively colluded with Wigdor, Folkenflik knew he was part of Wigdor's "press strategy" to extort money from Fox, and Folkenflik willingly assumed the role of "firecracker" in the scheme.  *Id*. Plaintiff seeks money damages for alleged loss and injury to his business, insult, pain and mental suffering, humiliation, embarrassment, and injury to his reputation sustained as a result of Defendants' publication of allegedly false and defamatory statements. *Id.*

## II. DEFENDANTS' MOTION TO DISMISS

In his Complaint in this case (Docket Entry # 1), Plaintiff originally alleged four causes of

---

NPR.org is a website maintained by National Public Radio, Inc.

Plaintiff has filed a motion pursuant to FED. R. CIV. P. Rule 15(a)(2) for leave to amend his Complaint to correct the misnomers, to clarify that Plaintiff is not suing Defendants for reporting on a lawsuit, and to add claims of defamation that allegedly occurred after the initial filing of the action on June 21, 2018.  Docket Entry # 53. The motion is ripe for consideration.

Prior to the filing of Plaintiff's motion for leave to amend, there had been extensive briefing on Defendants' motion to dismiss Plaintiff's original complaint, and the Court had heard oral argument on the fully ripe motion to dismiss.  Considering this, and further considering the proposed amended complaint would not alter the analysis in a meaningful way, the Court advised the parties it would consider the motion to dismiss the original complaint before ruling on Plaintiff's motion for leave to amend.

[2] On December 5, 2018, District Judge Mazzant dismissed this action as to Defendants Mohn, Foxwell, Oreskes, Turpin, Dellios, and Gilbert without prejudice, and denied as moot these defendants' Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Federal Rule of Civil Procedure 12(b)(2). *See* Docket Entry # 37.

action: (1) defamation *per se* (¶¶ 161-168); (2) business disparagement (¶¶ 169-174); (3) civil conspiracy (¶¶ 175-179); and (4) intentional infliction of emotional distress (¶¶ 180-185).[3] On October 16, 2018, Defendants NPR, Folkenflik, Edith Chapin, Leslie Cook, and Pallavi Gogoi (collectively "Defendants") filed their Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) for Failure to State a Claim. Docket Entry # 25. As a general matter, Defendants contend Plaintiff is suing them for accurately reporting on a publicly filed lawsuit, which was itself a matter of significant public concern.[4] Defendants argue Plaintiff's Complaint fails to state a plausible claim for relief for two primary reasons.

First, Defendants allege that both Texas law and the First Amendment to the United States Constitution protect Defendants' reporting on judicial proceedings and about matters of public concern. Defendants argue the statements in the NPR articles at issue in this case are subject to statutory and common law privileges and defenses that preclude civil liability – namely the fair report privilege, the fair comment privilege, and the "third-party allegation" rule.   Second, Defendants argue many of the statements are not "of and concerning" Plaintiff, are not defamatory or capable of a defamatory meaning, or are protected expressions of opinion and should be dismissed for these reasons as well.

---

[3] In his response to Defendants' motion to dismiss, Plaintiff voluntarily dismisses his claim for intentional infliction of emotional distress without prejudice.  Docket Entry # 32 at 15, n. 11. Plaintiff's proposed Amended Complaint removes the claim for intentional infliction of emotional distress.

[4] According to Defendants, Plaintiff brought this action following NPR's reporting on a 2017 lawsuit filed by Fox News contributor Rod Wheeler against Fox News. *See* Complaint, *Wheeler v. Twenty-First Century Fox, Inc., et al.*, Case No. 1:17-cv-05807 (S.D.N.Y. Aug. 1, 2017) ("*Wheeler* Complaint"), attached as Exhibit A to the Declaration of Olga Marshall ("Marshall Decl.") accompanying Defendants' motion.

According to Plaintiff, this action is not a critique of NPR's reporting of the *Wheeler* lawsuit. Docket Entry # 32 at 3, n. 3; *see also* Docket Entry # 41 at 5. Plaintiff asserts this case is about collusion: that Folkenflik knew Plaintiff, a "Dallas investment manager," was part of Wigdor's "press strategy" and he willingly assumed the role of "firecracker" in the scheme to extort money from Fox News. Docket Entry # 41 at 5.  Plaintiff asserts he suffered "permanent harm to his name, reputation and business as a registered investment advisor because of a false and vile narrative published with actual malice by David Folkenflik and Douglas Wigdor, acting in concert." *Id*. at 1.

## III.  LEGAL STANDARD

The Federal Rules of Civil Procedure require each claim in a complaint include a "short and plain statement . . .  showing that the pleader is entitled to relief." FED. R.CIV. P. 8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint."[5] *Lone Star Fund V (U.S.), L.P. v. Barclays*

---

[5] The Court finds the *Wheeler* Complaint, attached as Exhibit A to the Marshall Decl. filed in support of Defendants' motion, is central to the claim and referenced by the Complaint.  Thus, the Court will consider the *Wheeler* Complaint.  The Court also considers the NPR publications attached as Exhibits B-F to the Marshall Declaration, because they are also central to the claim and referenced

4

*Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The Court must then determine whether the complaint

states a claim for relief that is plausible on its face.

"'A claim has facial plausibility when the plaintiff pleads factual content that allows the

[C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"

*Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009)). "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere

possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is

entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of

a complaint in the context of a Rule 12(b)(6) motion. First, the Court should identify and disregard

conclusory allegations, for they are "not entitled to the assumption of truth." *Id.* at 664. Second, the

Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest

an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable

expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v.

Hubert*, 335 Fed. Appx. 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a

context-specific task that requires the reviewing [C]ourt to draw on its judicial experience and

common sense." *Iqbal*, 556 U.S. at 679.Thus, "[t]o survive a motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

Generally, a court should not dismiss an action for failure to state a claim under Rule 12(b)(6)

---

in the Complaint.

without giving the plaintiff an opportunity to amend. *Walker v. Beaumont Indep. Sch. Dist.*, No. 1:15-CV-379, 2016 WL 6666828, at *16 (E.D. Tex. Mar. 11, 2016), *report and recommendation adopted*, No. 1:15-CV-379, 2016 WL 1156852 (E.D. Tex. Mar. 24, 2016) (citing *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000) (plaintiff's failure to meet the specific pleading requirements should not automatically or inflexibly result in dismissal of the complaint with prejudice to refiling); *accord Goldstein v. MCI WorldCom*, 340 F.3d 238, 254 (5th Cir. 2003)). Where, however, a claim is frivolous or the "complaint alleges the plaintiff's best case," a further factual statement from the plaintiff need not be allowed. *Jones v. Greninger*, 188 F.3d 322, 327 (5th Cir. 1999); *see also Spiller v. City of Tex. City*, 130 F.3d 162, 167 (5th Cir. 1997).

## IV. THE FACTS

**A.      Plaintiff's background allegations regarding the investigation of Seth Rich's murder**

Plaintiff resides with his family in Plano, Texas and is an "internationally recognized expert in the investment wealth management industry." Docket Entry # 1 at 7. He has been in the financial services industry for over twenty-nine years and has made hundreds of appearances on national television and radio shows. *Id.* at 7-8.

In early 2017, Plaintiff contacted the family of Seth Rich to help the family investigate their son's unsolved murder.[6] *Id*. at 39, ¶ 58. Plaintiff offered to pay for a private investigator. *Id.*

On February 23, 2017, Plaintiff contacted Rod Wheeler via text message to see if Wheeler would be interested in investigating the murder. *Id*. at 39, ¶ 59. Plaintiff did not know Wheeler, but he had seen him on television and Wheeler appeared to be a competent investigator. *Id.* Plaintiff

---

[6] Seth Rich was a DNC staffer who was murdered. Docket Entry # 1 at 12, ¶ 9.

alleges the family of Seth Rich engaged Wheeler to help solve Seth's murder. *Id*. at 18, n. 5.

Wheeler entered into a contract with the Rich family (specifically with Aaron Rich, Joel Rich and Mary Rich) to investigate the murder. *Id*. at 39, ¶ 60. Plaintiff was not a party to the contract between Wheeler and the Rich family, and his role and involvement in the investigation of Seth's murder were limited. *Id*. at 39-40, ¶¶ 57, 61. According to Plaintiff, Wheeler investigated the matter and came up with the theory that Seth's murder was not the result of a botched robbery. *Id*. at 18, n. 5.

On March 31, 2017, Wheeler appeared on Fox 5 DC and claimed he had been investigating Seth's murder over the "past three weeks." *Id*. at 42, ¶¶ 67-69. After the interviewer pointed out to Wheeler that people were "hinting at the fact that perhaps Seth Rich may have given some documents [to WikiLeaks]," Wheeler stated as follows:

> Well a lot of people have made that same observation and you have to ask yourself what is the motivation behind a person wanting to get involved and offer reward money, maybe he's just a good guy and he has a lot of money laying around so this how he wants to spend his money, but you have to be careful though when you start throwing out these conspiracy theories, they actually don't help the investigation at all … I haven't found one shred of evidence at all that indicates that Seth's death is the result of any Russian hacking or anything like that. I do think it's possible and I underline the word possible that it could have been related to his job to some degree or relationships with the job, don't know that for sure but for investigators we have to go down every path until we can determine who was responsible for his death.

*Id.* at 42, ¶ 69.

According to the Complaint, after Wheeler appeared on Fox 5 DC, he updated Malia Zimmerman, an "award-winning investigative reporter" employed by FoxNews.com, concerning his investigation. *Id*. at 43, ¶¶ 71-72. Wheeler was actively and extensively in contact with Zimmerman. *Id*. at 43, ¶ 73. In one of his texts to Zimmerman, Wheeler stated, "I'm ready to say that Seth's [sic]

Death was not a botched robbery and there appears to be a coverup within the D.C. Govt related to his death." *Id.* at 43, ¶ 74; *see also id.* at 18, n. 5.   Zimmerman, who knew Wheeler worked for the Rich family, asked Wheeler if the family was letting him talk.  *Id.* at 43, ¶ 75.   Zimmerman expressed interest in doing a story on the murder investigation, if Wheeler was "up to it."  *Id.*

As part of the murder investigation, Wheeler was also in direct contact with the "lead detective," Joseph Dellacamera, and information Wheeler obtained from Detective Dellacamera supported Wheeler's belief and his public statements to Zimmerman and others that Seth had been in contact with WikiLeaks and had sent emails to WikiLeaks. *Id.* at 46, ¶¶ 83-84. On May 15, 2017, Wheeler told Fox 5 DC reporter, Marina Marraco, on camera that he had sources at the FBI who said there was information that could link Seth to WikiLeaks. ("Absolutely, yeah, and that's confirmed."). *Id.* at 48-50, ¶¶ 87-91; *see also id.* at 18, n. 5.

On May 15, 2017, Wheeler was in contact with Zimmerman multiple times about an article Zimmerman was writing.  *Id.* at 51, ¶94. Zimmerman provided Wheeler several "drafts" containing quotes attributed to Wheeler. *Id.* at 51-57. At no point in time did Wheeler ever deny making the statements quoted by Zimmerman; instead he offered further quotations.  *Id.* at 55, ¶¶ 114-117.

On May 16, 2017, in the early morning, Fox published Zimmerman's story entitled, "Seth Rich, slain DNC staffer, had contact with WikiLeaks, say multiple sources." *Id.* at 58, ¶ 131.  The article included the statements Wheeler had made and approved.  *Id.*  On May 16, 2017, after publication of Zimmerman's article, Wheeler appeared on Fox News and was interviewed by Sean Hannity, where Wheeler again confirmed Seth had communicated with WikiLeaks.  *Id.* at 59, ¶¶ 133-135.  On May 16, 2017, Wheeler appeared on Fox Business with Lou Dobbs to discuss the Seth Rich murder investigation.  *Id.* at 62, ¶ 139.

8

On May 16 or May 17, 2017, one or more members of the Rich family, or a spokesman for the Rich family, threatened to sue Wheeler for violating the terms of his contract with the Rich family by speaking with Marraco, Zimmerman, Hannity, and Dobbs.  *Id.* at 64, ¶ 141.  According to Plaintiff, the threats from the Rich family provided Wheeler with a motive to lie, backtrack, and distance himself from the quotes and statements he had made to Marraco, Zimmerman, Hannity, and Dobbs.  *Id.* at 65, ¶ 144.  Wheeler then "flip-flopped on virtually all the essential facts."  *Id*. at 67, ¶ 149.

On May 23, 2017, Fox retracted Zimmerman's article with the following explanation:

On May 16, a story was posted on the Fox News website on the investigation into the 2016 murder of DNC Staffer Seth Rich.  The article was not initially subjected to the high degree of editorial scrutiny we require for all our reporting.  Upon appropriate review, the article was found not to meet those standards and has since been removed.

We will continue to investigate this story and will provide updates as warranted.

*Id*. at 70, ¶ 158.  Plaintiff alleges Fox pulled Zimmerman's article at Kathryn Murdock's request and for political reasons.  *Id.* at 69-70, ¶ 157.

On June 5, 2017, Wheeler denied "back-tracking on Fox and Zimmerman."  *Id*. at 70, ¶ 159. He told the hosts of YouTube channel, "Crowdsource The Truth," the following:

I haven't walked back anything.  As a matter of fact, in my statement that I released a week ago . . . I said . . . in writing that **I do believe that there was some communication between Seth and WikiLeaks and I believe that based on common sense.**

*Id.* (emphasis in Complaint).  Wheeler also confirmed that he had hired an "attorney."  *Id*.

## B.   Allegations in the *Wheeler* Complaint (attached to Defendants' motion and referenced in Plaintiff's Complaint)

On August 1, 2017, Wheeler, a former Washington D.C. Police homicide detective and

private investigative consultant, crime analyst, and Fox News contributor, filed the *Wheeler*

Complaint. Docket Entry # 25-2 at 3, ¶ 6. Wheeler's counsel of record was Douglas H. Wigdor, and

others, from Wigdor LLP. *Id*. at 33.

Wheeler asserted a defamation *per se* cause of action against Twenty-First Century Fox, Inc.,

Fox News Network, LLC, Zimmerman, and Plaintiff. *Id.* at 30, ¶¶ 114-120.  Wheeler also asserted

a 42 U.S.C. § 1981 discrimination claim against Twenty-First Century Fox, Inc. and Fox News

Network, LLC. *Id*. at 31, ¶¶ 121-125.  Specifically, Wheeler alleged Zimmerman, an investigative

journalist at Fox News, *id*. at 11, ¶ 41, published an article on May 16, 2017 on the Seth Rich murder

investigation and included two false quotations from Wheeler in the article.  *Id.* at 6, ¶ 20 & 21, ¶¶

79-81.

Wheeler alleged the motivation behind the Zimmerman article was to establish that Seth

Rich, a murdered Democratic National Committee ("DNC") staffer, provided WikiLeaks with the

DNC emails "to shift the blame from Russia and help put to bed speculation that President Trump

colluded with Russia in an attempt to influence the outcome of the Presidential election."  *Id*. at 1-2,

¶ 2.   According to the *Wheeler* Complaint, to lend support to this "shift the blame story,"

Zimmerman, with the knowledge and support of Butowsky, fabricated two quotations and attributed

them to Mr. Wheeler:

- "'My investigation up to this point shows there was some degree of email exchange between Seth Rich and WikiLeaks,' said Wheeler."

- "'My investigation shows someone within the DC government, Democratic National Committee or Clinton team is blocking the murder investigation from going forward.' Wheeler said. 'That is unfortunate. Seth Rich's murder is unsolved as a result of that.'"

*Id.* at 3, ¶ 3.  Wheeler alleged he did not make those statements and was subsequently forced to

"correct the false record and, as a result, lost all credibility in the eyes of the public." *Id.* at 2, ¶ 4.

Among other things, Wheeler alleged Plaintiff and Zimmerman told Wheeler on May 10, 2017 (the day after President Trump fired FBI Director James Comey) "they had supposedly secured a source at the FBI who confirmed that emails were sent between Seth Rich and WikiLeaks." *Id.* at 5-6, ¶¶ 16-17. Wheeler alleged this "anonymous source was cited in Zimmerman's May 16, 2017 article." *Id.* at 6, ¶ 17. According to Wheeler, on May 11, 2017, Zimmerman sent Wheeler a draft of the article, but the draft "did not contain any quotes from Mr. Wheeler to the effect that Seth Rich had sent any emails to WikiLeaks, nor did the draft quote Mr. Wheeler as saying that the DNC, Democratic Party or Clintons were engaged in a cover-up." *Id*. at 6, ¶ 18.

Wheeler received a text message from Plaintiff on May 14, 2017, stating the President had read Zimmerman's article, which was published by Fox News less than thirty-six hours later, and wanted it "out immediately." Docket Entry # 25-2 at 1, ¶¶ 1-2. The text further stated "It's now all up to you. But don't feel the pressure." *Id.* at ¶ 1. Wheeler alleges Zimmerman published the story with the false quotations from Wheeler. *Id.* at 6, ¶ 20. According to Wheeler, "very shortly after the article was published," Plaintiff told Wheeler the quotes were included because that is the way President Trump wanted the article. *Id*. at 4, ¶ 13. Even though Fox retracted Zimmerman's article on May 23, 2017, Wheeler alleged Fox did not clear his name and never admitted Zimmerman misquoted him. *Id*. at 7, ¶¶ 21-22.

## C.    Plaintiff's allegations regarding the claims in this lawsuit

### 1.    Generally

Plaintiff filed this case on October 16, 2018. Docket Entry # 1. According to the Complaint, this is a "case about an unethical and reckless journalist [Folkenflik], who was spoon-fed a false

narrative about President Trump and Fox News with instructions to leak the fake story online and in social media in the early morning hours of August 1, 2017." *Id.* at 2. Plaintiff alleges Folkenflik – "a journalist renowned for his bias against the Fox News Network ('Fox') – knowingly, intentionally and recklessly violated every principle of ethical journalism when, acting in concert and conspiracy with Douglas H. Wigdor ('Wigdor'), published and republished false and defamatory statements that harmed . . . Plaintiff. . . ." *Id.* at 4.

## 2. Defendants

Folkenflik lives in New York City and is a media correspondent on NPR's Business Desk. *Id.* at 9, ¶ 4. According to the Complaint, NPR describes itself as a "mission-driven, multimedia news organization and radio program producer." *Id.* at 9, ¶ 5. NPR produces news, talk, music and entertainment programs. NPR also distributes programs produced by member stations and independent producers under the NPR brand. *Id.* Chapin is the Executive Editor of NPR News, Cook is a senior business editor on NPR's Business, and Gogoi is the Senior Business Editor for NPR's Business Desk. *Id.* at 10, ¶ 6. "NPR's reach and engagement is extensive: On air, NPR reaches 30.2 million weekly listeners through more than 1,000 public radio stations. Online, NPR.org attracts a growing audience of 36.9 million unique monthly users." *Id.* at 11, ¶ 7.

## 3. Douglas Wigdor

Non-party attorney, Douglas Wigdor, lives in New York and is a partner of Wigdor LLP. According to Plaintiff's Complaint, Wigdor LLP is "a public relations firm that masquerades as a law firm." *Id.* at 11, ¶ 8. Plaintiff further alleges as follows:

> Although Wigdor is an attorney, the clear majority of his time is spent in front of cameras or giving interviews to MSNBC, CNBC, CNN, the New York Times, Bloomberg Businessweek, and many other main stream media outlets, in which

12

Wigdor promotes himself and his causes, especially his 'crusade' against Fox. Wigdor's war against Fox is featured front and center on Wigdor's website and on his YouTube channel – 'Wigdor LLP – Employment Lawyer NYC' – where he collects and publishes sound bites and personal praise.

*Id.*

According to the Complaint, Wigdor's website represents that:

Mr. Wigdor currently represents thirteen clients who have alleged racial discrimination against Fox. Mr. Wigdor also represents Rod Wheeler, a Fox contributor in an 'explosive' lawsuit alleging defamation in connection with a story published about murdered DNC staffer Seth Rich, Scottie Nell Hughes, a former Fox contributor in a lawsuit alleging retaliation after she complained of sexual assault by Fox Business host Charles Payne, and Lydia Curanaj, a Fox5 reporter in a lawsuit alleging gender and pregnancy discrimination against Fox News. The lawsuits join a succession of sexual harassment allegations made against Fox, and have been extensively reported on by both national and international media and referred to as a 'Normandy like' legal assault.

*Id.* at 11-12, ¶ 9.

Plaintiff alleges Wigdor uses the press and social media as weapons; he "brazenly litigates his causes outside the courtroom in the 'court of public opinion' as part of a 'press strategy' to intimidate and coerce settlements;" and he "often grants in-depth access to a single reporter from a prominent news outlet, on the condition that the story be embargoed until the day a suit is filed, when it can be set off like a firecracker." *Id*. at 12, ¶ 10.

### 4.   The alleged conspiracy

According to Plaintiff, Wigdor selected Folkenflik and deliberately leaked a false narrative to Folkenflik because Wigdor knew that Folkenflik harbored bias and animus towards Fox and its Chairman, Rupert Murdoch. *Id*. at 12, ¶ 11.  Plaintiff alleges Widgor correctly surmised "Folkenflik would never question or doubt Wigdor's veracity," and "Folkenflik gladly accepted the 'scoop' from Wigdor and published fake news with reckless indifference to the consequences of his actions as a

'journalist.'" *Id.*

According to the Complaint, as of June 2017, Wigdor had filed and/or threatened to file numerous discrimination lawsuits against Fox ("Wigdor Discrimination Suits").  *Id*. at 16, ¶ 21. Prior to June 23, 2017, in anticipation of a mediation of the Wigdor Discrimination Lawsuits, Wigdor prepared a draft of a complaint (referred to in this R&R as the *Wheeler* Complaint) against Fox, Zimmerman, and Plaintiff that Wigdor intended to use "to extort a global settlement of the Wigdor Discrimination Suits from Fox at the mediation." *Id*. at 17, ¶¶ 22, 23.  Wigdor intentionally included in the draft document salacious, scandalous and impertinent allegations about the President, "fake news," and Russian collusion. *Id*. at 17, ¶ 23.

According to Plaintiff, the draft of the complaint included the false statement that Zimmerman, "with knowledge and support of Butowsky, fabricated two quotations and attributed them to Mr. Wheeler:" (1) "'My investigation up to this point shows there was some degree of email exchange between Seth Rich and Wikileaks,' said Wheeler;" and (2) "'My investigation shows someone within the DC government, Democratic National Committee or Clinton team is blocking the murder investigation from going forward,' Wheeler said. 'That is unfortunate. Seth Rich's murder is unsolved as a result of that.'" *Id*. at 17, ¶ 24.

Plaintiff contends the draft of the complaint stated the following concerning Plaintiff: (1) Butowsky said the statements were falsely attributed to Wheeler because "that is the way the President wanted the article;" (2) Zimmerman, Butowsky, and Fox had created fake news to advance President Trump's agenda; (3) Butowsky and Zimmerman were not simply Good Samaritans attempting to solve a murder. Rather, they were interested in advancing a political agenda for the Trump Administration. Specifically, it was Butowsky and Zimmerman's aim to have Wheeler

14

confirm that: (i) Seth Rich was responsible for the leak of DNC emails to WikiLeaks; and (ii) Seth Rich was murdered by a Democrat operative because he leaked the emails to WikiLeaks; (4) Butowsky and Zimmerman were not in this alone.  Rather, they colluded with Sean Spicer, Steve Bannon and Sarah Flores to shift the blame for the DNC hacks from the Russians to Seth Rich in order to undermine reports of collusion between Russia and the Trump Administration; (5) President Trump wanted Zimmerman's article published to help lift the cloud of the Russia investigation; (6) Simultaneous with baseless claims of nonpartisanship to British regulators, Fox was contriving with Butowsky and members of the Trump Administration to publish and disseminate fake news to affect politics in America; (7) Because of Fox and Butowsky's "devious scheming" British regulators have yet to provide a green light to Fox for the Sky takeover bid, and many U.K. politicians question whether Fox is capable of news dissemination in a fair and neutral manner; (8) In falsely quoting Wheeler, Butowsky and Zimmerman attempted – through the publication of fake news – to accomplish what they had set out to do from the start: "solve the problem about Russians are the ones that gave the emails" and establish that "there was no collusion like Trump with the Russians;" (9) Plaintiff planned to extort Seymour Hersh in an effort to save the May 16, 2017 Seth Rich story; and (10) Wheeler had to backtrack on his statements to Zimmerman because he never made the statements to begin with.  *Id.* at 17-19, ¶ 25.

During the last week of July 2017 – after Fox refused to accede to Wigdor's outrageous demands and the mediation failed – Wigdor secretly met with Folkenflik to discuss publication of the scandalous false narrative. *Id.* at 19, ¶ 26.  Wigdor leaked the false narrative to Folkenflik prior to the commencement of the judicial proceeding "with the intent that [the media] correspondent publish the false story as fact."  *Id.* at 19, ¶ 27.

5.      **The allegedly defamatory statements**

Plaintiff alleges Folkenflik and NPR published, between August 1, 2017 (the date the *Wheeler* Complaint was filed) and September 19, 2017, the following reports in which they made and repeated false and defamatory statements.  *Id.* at 4.

*Folkenflik Article (August 1, 2017 Report)*

At 7:23 a.m. on August 1, 2017 – before any courts were open – Folkenflik published an online article entitled "Behind Fox News' Baseless Seth Rich Story: The Untold Tale." ("August 1 Report"). Plaintiff alleges this first article included the following statements:

- Fox News' May 16, 2017 story, "*Seth Rich, slain DNC staffer, had contact with WikiLeaks, say multiple sources*," was "baseless";

- Fox and Butowsky "worked in concert under the watchful eye of the White House to concoct a story" about the death of Seth Rich;

- The Fox News story was a "fake news story";

- The Fox News story was a "deceptive story";

- Wheeler did "not make great headway" in his investigation of the murder of Seth Rich.  "The FBI informs Butowsky, Wheeler and Zimmerman that the agency is not assisting the Washington, D.C., police on the investigation – undercutting claims about an FBI report."

- On May 11, 2017, Fox News reporter, Malia Zimmerman, "sends Wheeler a draft of her story. . . . It includes no quotes from Wheeler";[7]

- "Zimmerman's online story . . . cites Wheeler, incorporating two key quotations from Wheeler that do not appear on video.  In each, the private investigator seemingly takes ownership of the accusations";

---

[7] Plaintiff alleges "Folkenflik intentionally omitted the fact that Zimmerman sent Wheeler three (3) drafts of her story on May 15, 2017 – the day before the Fox News story ran – that contained the exact same quotations that Widgor and Wheeler would claim that Fox and Butowsky had made up out of whole cloth."  Docket Entry # 1 at 20, n. 9.

- "Zimmerman issues instructions for Wheeler's appearance on Sean Hannity's show later that evening. 'Reread the story we sent you last night [that contained the invented quotes] and stick to the script,' she texts Wheeler."

- "Despite his misgivings, Wheeler plays along" with the fake news promoted by Butowsky and Zimmerman.[8]

*Id*. at 20-21.

The August 1 Report was viewed by millions of subscribers to NPR.org.  *Id.* at 22, ¶ 32.  "Folkenflik's Article, including the false narrative and preconceived defamatory statements fed to Folkenflik by Wigdor, was republished over and over, hundreds of times, with no fact-checking whatsoever, by other main stream and alternative media outlets and online newspaper publishers."  *Id.* at 22-24, ¶ 33.  Plaintiff alleges Folkenflik used Twitter to amplify the defamation.  *Id*. at 24-33.  Plaintiff alleges Wigdor republished the August 1 Report via Twitter and Facebook.  *Id*. at 33-34.

### The August 6, 2017 Mediaite Interview (Mediaite Interview)

According to Plaintiff, Folkenflik gave interviews after August 1, 2017 in which "he continued to push the false narrative created by Wigdor and Wheeler."  *Id.* at 35, ¶ 47.  Plaintiff alleges Folkenflik told *Mediaite* columnist John Ziegler that "Butowsky's narrative is 'inconsistent'" and that "collaboration" between Butowsky and the President "is still a plausible assumption with the current evidence."  *Id*.

---

[8] According to Plaintiff, prior to and through publication of Zimmerman's article on May 16, 2017, "Wheeler expressed no 'misgivings' at all and he did not 'play along' with anything.  In fact, he voluntarily offered Zimmerman quotations.  Wheeler approved the quotations in writing."  Docket Entry # 1 at 21, n. 10.  Plaintiff alleges: "As was fully disclosed in and by public record available to Folkenflik, and, upon information and belief, reviewed by Folkenflik and/or his editors and publishers, Wheeler only back-tracked on his quotations after being threatened with litigation by the Rich family.  Folkenflik intentionally misrepresented and distorted the truth in order to support the scandalous preconceived story about the President, Fox and Butowsky."  *Id.*

### *August 7, 2017 Article/Broadcast (August 7 Report)*

On August 7, 2017, Folkenflik and NPR published additional false and defamatory statements about Plaintiff in an article/broadcast entitled "Fox News' Seth Rich Story Echoes Previous Problems for Owner Rupert Murdoch" (the "August 7 Report"). *Id*. at 35, ¶ 48.  According to the Complaint, the August 7 Report contained the following false statements:

- "Revelations about Fox News' role in concocting a baseless story on the death of a young Democratic staffer has problematic echoes for the network's controlling owner, Rupert Murdoch";

- Fox was involved in a "journalistic scandal" over the Seth Rich story;

- Fox "concocted" the story "in order to help President Trump."

*Id.* at 35-36, ¶ 49.

### *August 16, 2017 Article (August 16 Report)*

On August 16, 2017, Folkenflik and NPR published a photograph of Butowsky beneath the caption "The Man Behind The Scenes In Fox News' Discredited Seth Rich Story." (the "August 16 Report"). *Id*. at 36, ¶ 50.  In addition to the statement in the caption, the August 16 Report contains the following false statement: "Butowsky displays no curiosity about the way Fox's reporting and his activities affected the very people [the Rich Family] he says he sought to help." *Id*. at 36-37, ¶ 51.

### *September 15, 2017 Article (September 15 Report)*

On September 15, 2017, Folkenflik and NPR published an article, entitled "No Apology, No Explanation: Fox News And The Seth Rich Story." (the "September 15 Report").  *Id.* at 37, ¶ 52.  Plaintiff alleges the September 15 Report made the following false statements:

- "Fox News was compelled to retract the story, which involved presidential

18

politics, international intrigue and a man's murder. When a story of this scale crumbles, most news organizations feel obligated to explain what happened and why. Not so far at Fox. . . . In the four months since its retraction, Fox News has not apologized for what it reported. Nor has it explained what went wrong";

- "**Lesson No. 1: Investigative reports should be ironclad**" – the Fox story was "groundless";

- "**Lesson No. 2: Make sure your sources are saying what you think they're saying**" – "Before the story ran, Zimmerman sent Wheeler a draft with quotes she intended to attribute to him. NPR has seen a transcript of the texts from Zimmerman calling his attention to that email. But there's zero evidence Wheeler ever said those words or gave permission for her to use them. And if Zimmerman did invent the quotes, that's a big problem – regardless of whether Wheeler gave her the green light";

- "**Lesson No. 3: Make sure each of your sources can stand on its own**" – "Butowsky fed tips to Wheeler and Zimmerman, the Fox reporter, as he sought to link the dead man to the leaked emails instead of hackers working on behalf of the Russians";

- "**And that leads us to lesson No. 4**" – Transparency and Trust - "Fox withheld Butowsky's various roles in the story from its audiences — he blurred lines between benefactor, source, player and, possibly, even reporter."

*Id*. at 37-38, ¶ 53 (emphasis in Complaint).

## V.  APPLICABLE LAW

### A.    Texas law, generally

The Court has jurisdiction under 28 U.S.C. § 1332 based on the parties' diversity of citizenship. Because this is a diversity action, the Court must decide as a threshold matter which state's substantive law applies. The parties have cited, and the Court agrees, Texas law applies.

### B.    Competing constitutional concerns

"A free press is essential to a healthy democracy." *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 431 (Tex. 2017), *reh'g denied* (Sept. 29, 2017).  "Through conscientious and

diligent reporting, the press holds public officials accountable and helps citizens stay informed on matters of public concern." *Id*. Both the U.S. Constitution and the Texas Constitution "robustly protect freedom of speech," but "these safeguards are not unlimited and do not categorically deprive individuals of legal recourse when they are injured by false and defamatory speech."[9] *Id*.; *see also Kinney v. Barnes*, 443 S.W.3d 87, 91 (Tex. 2014) (noting courts have long recognized "a cause of action for damages to a person's reputation inflicted by the publication of false and defamatory statements"). "The line between the rights of the press and the rights of defamed individuals is not easily drawn." *Rosenthal*, 529 S.W.3d at 433.

The tension between the "need for a vigorous and uninhibited press" and "the legitimate interest in redressing wrongful injury" necessarily comes into play in cases addressing First Amendment limitations on defamation liability.[10] *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974)).  According to the Supreme Court of Texas in *Rosenthal*,

> in today's world, we must be especially mindful of this longstanding yet delicate balance, as modern technology allows information to be easily and widely

---

[9] Unlike the federal Constitution, the Texas Constitution twice expressly guarantees the right to bring suit for reputational torts.  *Neely v. Wilson*, 418 S.W.3d 52, 60 (Tex. 2013) (citing TEX. CONST. art. 1, § 8 ("Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press."); § 13 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person *or reputation,* shall have remedy by due course of law." (emphasis added)).

[10] Protections for the press are especially vital because of the pivotal role it plays in the dissemination of information to the public. *Rosenthal*, 529 S.W.3d at 433 (citing *N.Y. Times Co. v. United States*, 403 U.S. 713, 717, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (Black, J., concurring) ("In the First Amendment, the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy.")).  While freedom of the press is critically important to the functioning of our democratic society, members of the press are also "responsible for the abuse of that privilege." *Rosenthal*, 529 S.W.3d at 433 (quoting TEX. CONST. art. I, § 8).

disseminated without necessarily being subjected to the sort of rigorous verification processes that conventional media sources are expected to employ. Maintaining that balance of allowing the press the freedom to perform its critical societal function while protecting the rights of individuals harmed by false or misleading reporting remains an essential task, and courts continue to struggle 'to define the proper accommodation between these competing concerns.'

*Id.*

## C.  Defamation

### 1.  Generally

"Every defamation action that the law permits necessarily inhibits free speech." *Diamond Shamrock Ref. & Mktg. Co. v. Mendez*, 844 S.W.2d 198, 210 (Tex. 1992). Thus, in Texas, "the defamation action has been narrowly tailored to limit free speech as little as possible." *Id.*

Defamation is a tort, the threshold requirement for which is the publication of a false statement of fact to a third party. *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 623–24 (Tex. 2018), *reh'g denied* (Sept. 28, 2018)*, cert. denied*, No. 18-864, 2019 WL 659885 (U.S. Feb. 19, 2019) (citing *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017)). The fact must be defamatory concerning the plaintiff, and the publisher must make the statement with the requisite degree of fault. *Id.* And in some cases, the plaintiff must also prove damages. *Id.* (citations omitted). Defamation may occur through slander or through libel. Slander is a defamatory statement expressed orally. *See Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). By contrast, libel is a defamatory statement expressed in written or other graphic form. *See* TEX. CIV. PRAC. & REM. CODE § 73.001.

### 2.  Elements

The elements that a defamation plaintiff must prove are that (a) the defendant published a false statement of fact; (b) the statement defamed the plaintiff; (c) the defendant acted with actual malice, if the plaintiff is a public figure or a public official, or negligently, if the plaintiff is a private individual; and (d) the statement proximately caused damages. *Rodriguez v. Gonzales*, No. 14-17-00667-CV, 2018 WL 6614153, at \*2 (Tex. App. Dec. 18, 2018) (citing *Anderson v. Durant*, 550 S.W.3d 605, 617–18 (Tex. 2018)) (other citations omitted).  General damages are recoverable under a defamation claim for non-economic losses, such as loss of reputation and mental anguish. *MVS Int'l Corp. v. Int'l Advert. Sols., LLC*, 545 S.W.3d 180, 201 (Tex. App. – El Paso 2017) (citing *Rosenthal*, 529 S.W.3d at 439).

Defamation claims are divided into two categories – defamation *per se* and defamation *per quod* – according to the level of proof required to make them actionable.  *KTRK v. Robison*, 409 S.W.3d 682, 689 (Tex. App. – Houston [1st Dist.] 2013, pet. denied).  Statements that are defamatory *per quod* are actionable only upon allegation and proof of damages.  *Id.*  On the other hand, if a statement is defamatory *per se*, then damages are presumed.  *MVS*, 545 S.W.3d at 201 (citations omitted); *see also Hancock v. Variyam*, 400 S.W.3d 59, 63–64 (Tex. 2013) ("Historically, defamation *per se* has involved statements that are so obviously hurtful to a plaintiff's reputation that the jury may presume general damages, including for loss of reputation and mental anguish.").  Statements that injure a person in her office, profession, or occupation are typically classified as defamatory *per se. Hancock*, 400 S.W.3d at 64.  If the court must resort to innuendo or extrinsic evidence to determine that the statement was defamatory, then it is libel *per quod* and requires proof of injury and damages. *Main v. Royall*, 348 S.W.3d 381, 390 (Tex. App. – Dallas 2011).

22

3.      **Falsity and truth**

"Both standards of fault—negligence and actual malice—inherently incorporate the notion of falsity." *Klentzman v. Brady*, 312 S.W.3d 886, 898 (Tex. App. – Houston [1st Dist.] 2009) ("*Klentzman I*") (citations omitted). Under the common law, the falsity of the defamatory statement is presumed and the defendant bears the burden of proving the statement true. *Klentzman I*, 312 S.W.3d at 898 (citing *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 776–77 (1986)). "However, when a defamation suit is brought against a *media defendant* and involves an issue of *public concern,* the constitutional requirements of the First Amendment supersede the common law presumption of falsity, and the plaintiff—whether a public plaintiff or a private individual—is required to prove the falsity of the challenged statement by a preponderance of the evidence before recovering any damages."  *Klentzman I*, 312 S.W.3d at 898 (citing *Hepps,* 475 U.S. at 775–76 (noting that public figure plaintiffs are required to show falsity and then holding in regard to private individuals that "the common law's rule on falsity—that the defendant must bear the burden of proving truth—must similarly fall here to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages.") (emphasis added in *Klentzman I*).

The Texas Supreme Court developed the "substantial truth doctrine" to determine the truth or falsity of a broadcast or publication: "if a broadcast taken as a whole is more damaging to the plaintiff's reputation than a truthful broadcast would have been, the broadcast is not substantially true and is actionable." *Neely v. Wilson*, 418 S.W.3d 52, 63 (Tex. 2013) (citations omitted).  In *Neely*, the court reaffirmed the importance of assessing a publication's gist in evaluating a

23

defamation claim. *Id*. at 63–64. The court explained that a publication "with specific statements that err in the details but that correctly convey the gist of a story is substantially true." *Id.* (citing *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000)). Conversely, even if all the publication's individual statements are literally true, the story "can convey a false or defamatory meaning by omitting or juxtaposing facts." *Neely*, 418 S.W.3d at 64 (quoting *Turner*, 38 S.W.3d at 114).

It is a well-settled legal principle that one is liable for republishing the defamatory statement of another. *See Neely*, 418 S.W.3d at 61 (Tex. 2013) (citing *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 386 (1973) (noting a "newspaper may not defend a libel suit on the ground that the falsely defamatory statements are not its own")). "The rule's broad application has thus brought about efforts to soften its impact," such as requiring a showing of fault as well as the privileges and defenses described below. *Neely*, 418 S.W.3d at 61–62; *see also Lee v. TMZ Prods. Inc.*, 710 Fed. Appx. 551, 557 (3d Cir. 2017) ("The fair-report privilege is an exception to the general principle of defamation law that those who repeat or republish defamatory statements of another may themselves be held liable for defamation.").

### 4.    Defenses

Whether or not a particular plaintiff is required to prove the falsity of the challenged statement, a defendant may assert truth as a defense to a libel action. *Klentzman I*, 312 S.W.3d at 898 (citing TEX. CIV. PRAC. & REM. CODE § 73.005 (Vernon 2005); *Randall's Food Mkts.,* 891 S.W.2d at 646). The truth of a statement is an absolute defense to a claim for defamation. *See Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d 762, 766 (Tex.1987). Texas Civil Practice and Remedies Code § 73.005(a) provides that truth is a defense to a claim for defamation. TEX. CIV. PRAC. & REM. CODE § 73.005(a). Recently added § 73.005(b), which Defendants refer to as the "third-party allegations

rule," clarifies that "[i]n an action brought against a newspaper or other periodical or broadcaster, the defense described by Subsection (a) applies to an accurate reporting of allegations made by a third party regarding a matter of public concern." *Dallas Morning News, Inc. v. Hall*, 524 S.W.3d 369, 380 (Tex. App. – Fort Worth 2017), *review granted* (Aug. 31, 2018) (quoting TEX. CIV. PRAC. & REM. CODE § 73.005(b)).

### 5.     Privileges

Privileges applicable to defamation are of two classes—absolute and conditional or qualified. *Hurlbut*, 749 S.W.2d at 768 (citing Restatement (Second) of Torts §§ 583–612 (1977)). "Both are based on public policy concerns which elevate the good to be accomplished by the free and open exchange of information over the harm which may result from a falsehood." *Hurlbut*, 749 S.W.2d at 768.  An absolute privilege is more properly thought of as an immunity because it is based on the personal position or status of the actor. *Id*. (citing W. Keeton, *Prosser & Keeton on the Law of Torts,* § 16 at 109 (5th Ed.1984)). "Such immunity, however, attaches only to a limited and select number of situations which involve the administration of the functions of the branches of government, such as statements made during legislative and judicial proceedings." *Hurlbut*, 749 S.W.2d at 768 (citing 3 J. Dooley, *Modern Tort Law,* § 36.09 (B. Lindahl Ed. 1984 and Supp. 1987)).

A conditional privilege is defeated when the privilege is abused.  *Hurlbut*, 749 S.W.2d at 768 (citation omitted). Abuse may be found when the person making the defamatory statement knows the matter to be false or does not act for the purpose of protecting the interest for which the privilege exists. *Id.* Thus, an absolute privilege confers immunity regardless of motive whereas a conditional privilege may be lost if the actions of the defendant are motivated by malice.  *Id.*

25

The common law and Texas statutes provide privileges to defamation claims.  In this case, Defendants assert statutory and common law privileges and defenses (namely, the fair report[11] and fair comment privileges and the third-party allegations rule) preclude liability.  *See* Docket Entry # 25 at 15. The fair report privilege, as it is recognized at common law, originated in *Curry v. Walter*, 126 Eng. Rep. 1046 (C.P. 1769), when an English judge observed that a newspaper should not be held liable for republishing allegedly defamatory statements made during a judicial proceeding because such a proceeding "is open to all the world." *Funk v. Scripps Media, Inc.*, No. M2017-00256-SC-R11-CV, 2019 WL 1146705, at *4 (Tenn. Mar. 13, 2019) (citing Kathryn Dix Sowle, *Defamation and the First Amendment: The Case for a Constitutional Privilege of Fair Report*, 54 N.Y.U. L. Rev. 469, 478 & n.40 (1979) (quoting *Curry*, 126 Eng. Rep. at 1046)). American courts later adopted the fair report privilege and expanded it to protect the publication of reports about a variety of official actions or proceedings.  *Funk*, 2019 WL 1146705, at *4 (citing David Elder, *Defamation: A Lawyer's Guide* § 3:1 (July 2018 update)).

American courts also identified another justification for the fair report privilege beyond the original justification—that newspapers should be allowed to report on publicly accessible information. *Id*. The second justification is that the privilege facilitates the worthwhile goal of public supervision of official actions or proceedings. *Id.*; *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492(1975) ("With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice.").

---

[11] Defendants refer to the official/judicial proceedings privilege codified at TEX. CIV. PRAC. & REM. CODE ANN. § 73.002(b)(1) as the fair report privilege.

The Texas Legislature has codified what is called the official/judicial proceedings privilege, which shields periodical publications from republication liability for fair, true, and impartial accounts of judicial, executive, legislative, and other official proceedings. *Neely*, 418 S.W.3d at 62 (citing 13 TEX. CIV. PRAC. & REM. CODE § 73.002(b)(1)). The official/judicial proceedings privilege assesses whether the reporter's account of the proceedings (not the underlying allegations made in those proceedings) was fair, true, and impartial. *Neely*, 418 S.W.3d at 68 (citing *Denton Publ'g Co. v. Boyd,* 460 S.W.2d 881, 883 (Tex.1971)) (holding that article in question would be privileged under predecessor statute to § 73.002 "as long as it purported to be, and was, only a fair, true and impartial report of what was stated at the meeting, regardless of whether the facts under discussion at such meeting were in fact true, unless the report was made with actual malice"). The Texas Legislature has also adopted the fair comment privilege, shielding periodical publications from republication liability for reasonable and fair comment on or criticism of official acts of public officials or other public concerns. *Neely*, 418 S.W.3d at 62 (citing 13 TEX. CIV. PRAC. & REM. CODE § 73.002(b)(2)).

The privileges outlined by § 73.002 are similar to the privilege recognized in the Restatement (Second) of Torts. *Klentzman v. Brady*, 456 S.W.3d 239, 252 (Tex. App. – Houston [1st Dist.] 2014), *aff'd*, 515 S.W.3d 878 (Tex. 2017) ("*Klentzman II*"). Section 611 of the Restatement (Second) of Torts provides as follows:

> The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

Restatement (Second) of Torts § 611. "[T]he privilege exists even though the publisher himself does

not believe the defamatory words he reports to be true and even when he knows them to be false."

*Freedom Commc'ns, Inc. v. Sotelo*, No. 11-05-00336-CV, 2006 WL 1644602, at *3 (Tex. App. –

Eastland June 15, 2006) (unpublished) (quoting Restatement (Second) of Torts § 611 cmt. a (1977)).

This privilege, however, is not absolute.

> Comment c provides, in relevant part, as follows:
>
> A person cannot confer this privilege upon himself by making the original defamatory publication himself and then reporting to other people what he had stated. This is true whether the original publication was privileged or not. Nor may he confer the privilege upon a third person, even a member of the communications media, by making the original statement under a collusive arrangement with that person for the purpose of conferring the privilege upon him.

Restatement (Second) of Torts § 611 cmt. c. If the publication involves some form of judicial

proceeding, there must be official action in the proceeding before one can invoke the privilege:

> A report of a judicial proceeding implies that some official action has been taken by the officer or body whose proceedings are thus reported. The publication, therefore, of the contents of preliminary pleadings such as a complaint or petition, before any judicial action has been taken is not within the rule stated in this Section. An important reason for this position has been to prevent implementation of a scheme to file a complaint for the purpose of establishing a privilege to publicize its content and then dropping the action. (See Comment c). It is not necessary, however, that a final disposition be made of the matter in question; it is enough that some judicial action has been taken so that, in the normal progress of the proceeding, a final decision will be rendered. So too, the fact that the proceedings are *ex parte* rather than *inter partes* is immaterial if the matter has come officially before the tribunal and action has been taken in reference to it.

Restatement (Second) of Torts § 611 cmt. e (emphasis in original).  And the "reporter is not

privileged under this Section to make additions of his own that would convey a defamatory

impression." Restatement (Second) of Torts § 611 cmt. f (1977).

> "The fair-reports privilege . . . contemplates a degree of arms-length objectivity on the part

of the reporter, an objectivity that goes beyond the far less demanding standards of the actual malice test. Whereas the orthodoxy is that a lack of balance in the presentation of a story is not enough, standing alone, to establish actual malice, a lack of balance *is* enough to disqualify a reporter from the benefits of the fair-reports privilege." § 6:83. Common-law defamation privileges—The "fair reports" privilege for fair and accurate reports of official proceedings, 1 Rights and Liabilities in Media Content § 6:83 (2d ed.) (emphasis in original).  Additionally, "a reporter who acts in collusion with a party to a proceeding, or who presents material under the pretense of a fair report when it is in actuality a sham effort to put forward one side's party line, is deservedly ousted from the protection of the privilege." *Id*. (citing *Butler v. Hearst-Argyle Television, Inc*., 345 Ark. 462, 49 S.W.3d 116, 29 Media L. Rep. (BNA) 2210 (2001)).

"Conditional privileges, like the fair report privilege as it is recognized at common law and in the Civil Practice and Remedies Code, 'arise out of the occasion upon which the false statement is published' and are "'based on public policy concerns which elevate the good to be accomplished by the free and open exchange of information over the harm which may result from a falsehood.'" *Klentzman II*, 456 S.W.3d at 251(quoting *Hurlbut,* 749 S.W.2d at 768; *Writt v. Shell Oil Co.,* 409 S.W.3d 59, 66 (Tex. App.–Houston [1st Dist.] 2013, pet. granted) (citing Restatement (Second) of Torts ch. 25, title B, intro. note (1977)); *see also Neely,* 418 S.W.3d at 69 (discussing "conditional judicial proceedings privilege" outlined in Civil Practice and Remedies Code § 73.002; *Langston v. Eagle Pub. Co.,* 719 S.W.2d 612, 624 (Tex.App.–Waco 1986, writ ref'd n.r.e.) (identifying Texas's statutory fair report privilege as "a qualified or conditional privilege")).  To prevail on a defamation claim when a conditional privilege applies, the plaintiff must establish that the privilege was abused, i.e., that the person making the defamatory statement knew the statement was false or

did not act for the purpose of protecting the interest for which the privilege exists. *Klentzman II*, 456 S.W.3d at 252 (citing *Hurlbut,* 749 S.W.2d at 768; *Writt,* 409 S.W.3d at 66).

## D.    Business disparagement

"Business disparagement and defamation are similar in that both involve harm from the publication of false information." *Camp v. Patterson*, No. 03-16-00733-CV, 2017 WL 3378904, at *6 (Tex. App. Aug. 3, 2017) (quoting *In re Lipsky*, 460 S.W.3d 579, 591 (Tex. 2015) (citing *Waste Mgmt. of Tex., Inc. v. Texas Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 155 (Tex. 2014))). "To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff." *Forbes Inc. v. Granada Bioscis., Inc.*, 124 S.W.3d 167, 170 (Tex. 2003) (citing *Hurlbut*, 749 S.W.2d at 766).

## E.    Civil conspiracy

To state a claim for civil conspiracy, a plaintiff must allege: (1) a combination of two or more persons; (2) to accomplish an unlawful purpose or a lawful purpose by unlawful means; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) the plaintiff suffered injury as a proximate result of the wrongful act. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 675 (Tex. 1998). "Civil conspiracy is a derivative tort; therefore, liability for a civil conspiracy depends on participation in an underlying tort." *Allstate Ins. Co. v. Receivable Fin. Co., L.L.C.*, 501 F.3d 398, 414 (5th Cir. 2007).

With these standards in mind, the Court considers Defendants' motion to dismiss Plaintiff's defamation *per se* claim.

30

## VI.  PLAINTIFF'S DEFAMATION *PER SE* CLAIM

### A.      Plaintiff's allegations

In his Complaint, Plaintiff asserts a defamation *per se* claim and specifically alleges as follows:

> Folkenflik and NPR's false statements constitute defamation *per se*. The statements accuse and impute to Butowsky the commission of crimes involving moral turpitude and for which Butowsky may be punished and imprisoned in a state or federal institution. The statements impute to Butowsky an unfitness to perform the duties of an office or employment for profit, or the want of integrity in the discharge of the duties of such office or employment. Folkenflik and NPR's statements also prejudice Butowsky in his profession or trade.

Docket Entry # 1 at 72, ¶ 164.

Plaintiff further alleges "Folkenflik and NPR's false statements caused Butowsky to suffer loss and injury to his business, insult, pain, embarrassment, humiliation, and mental suffering, harm to Butowsky's name reputation, and out-of-pocket loss." *Id.* at 72, ¶ 165. According to the Complaint, Folkenflik and NPR acted with actual malice and reckless disregard for the truth for the following reasons:

> a. Folkenflik, NPR and its editors and publishers abandoned all journalistic standards in writing, editing and publishing the Articles at issue;
>
> b. Acting in concert with Wigdor,[12] Folkenflik and NPR conceived a story line in advance of any investigation and then consciously set out to make the evidence conform to the preconceived story. Folkenflik pursued and regurgitated the

---

[12] Plaintiff alleges Wigdor leaked a false narrative to Folkenflik prior to the commencement of the judicial proceeding with the intent that Folkenflik publish the false story as fact.  Docket Entry # 1, ¶ 27. Although Plaintiff's Complaint also alleges the August 1 Report misrepresents Wigdor had already filed the lawsuit, and in truth the *Wheeler* Complaint was filed after Folkenflik and NPR had already published the August 1 Report, *id.* at ¶ 31, the Court notes this allegation is not in the proposed Amended Complaint.

preconceived narrative that he knew to be false.

c. Folkenflik and NPR relied on a primary source – Wheeler – that Folkenflik and NPR knew to be wholly debunked and unreliable. Based on information known and available to Folkenflik, Folkenflik in fact harbored serious doubt as to the veracity of Wigdor and Wheeler's statements about Butowsky. Indeed, the statements were knowingly false, with not a shred of supporting evidence, and Folkenflik knew that before he wrote the Articles published by NPR.

d. Folkenflik and NPR were in possession of Wheeler's email communications and text messages with Zimmerman and other information that demonstrated the falsity of Wigdor and Wheeler's information. Folkenflik consciously and intentionally ignored known and available contradictory evidence that demonstrated the preconceived thesis was false and deliberately failed to investigate sources of information (*e.g., Marraco, Hersh, etc.*) that contradicted the preconceived storyline.

e. Folkenflik and NPR knowingly presented half-truths wrapped in misstatements and conjecture. They repeated Wigdor and Wheeler's words knowing that the words were false or inherently improbable and at a time when there were obvious reasons to doubt the veracity and credibility of both Wigdor and Wheeler. Folkenflik and NPR repeated Wigdor and Wheeler's words at a time when they were cognizant of the sources inconsistencies and credibility problems.

f. Folkenflik and NPR knew that Wigdor and Wheeler both had a strong motive to lie about Butowsky, and a motive to fabricate the charges conspiracy, collusion, fraud and 'fake news.' Folkenflik and NPR never questioned the extreme bias of their sources. Rather, Folkenflik and NPR were guided by their own extreme bias, ill-will and desire to publish a salacious story about the President, Fox, fake news and 'collusion.' Folkenflik's book, prior articles, blogs and tweets about Fox and Rupert Murdoch further demonstrate that he and NPR was prejudiced against Fox and had an axe to grind. Butowsky was a victim of that actual malice.

g. Folkenflik and NPR chose to manufacture and publish false statements about Butowsky and use unnecessarily strong and violent language, disproportionate to the occasion, when they knew there was no evidentiary basis for the statements. Folkenflik and NPR did not act in good faith because, in the total absence of evidence, they could not have had an honest belief in the truth of their statements about Butowsky.

h. Folkenflik and NPR reiterated, repeated and continued to publish the false defamatory statements out of a desire to gain notoriety, increase revenues for NPR, hurt Butowsky and Fox and with reckless disregard for the consequences.

i. Folkenflik and NPR initiated the defamation, and went out of their way to publish extra-judicial statements about Butowsky.

*Id*. at 72-74, ¶ 166.  According to Plaintiff, "Folkenflik and NPR lacked reasonable grounds for any

belief in the truth of their statements and acted negligently in failing to determine the true facts."
*Id.* at 74, ¶ 167.

## B.  Defendants' assertions

### 1.  Generally

In their motion, Defendants argue Plaintiff's defamation *per se* claim fails for several independent reasons.  First, Defendants assert "virtually all of the statements" at issue are privileged, either as a "fair, true, and impartial account of a judicial proceeding" (TEX. CIV. PRAC. & REM. CODE § 73.002(b)(1)) or as a "fair comment or criticism on a matter of public concern" (TEX. CIV. PRAC. & REM. CODE § 73.002(b)(2)). Docket Entry # 25 at 13. Defendants further assert the statements are protected by the third-party allegations rule (TEX. CIV. PRAC. & REM. CODE § 73.005(b)).  According to Defendants, Plaintiff identifies five reports that he alleges contain defamatory statements, four of which Folkenflik authored and NPR published, and one interview, published on *Mediaite.com*, in which Folkenflik discussed his reporting on the *Wheeler* lawsuit. Defendants argue all but one of the twenty-three statements Plaintiff specifically mentioned in the Complaint "simply repeated, restated, or commented on allegations contained" in the *Wheeler* Complaint or the issues of significant public concern the *Wheeler* lawsuit implicates.  Docket Entry # 25 at 2.  Defendants assert the one statement that does not (that the *Wheeler* lawsuit had already been filed) is demonstrably true (and is not "of and concerning" Plaintiff).  *Id.* at 2, 18.

Second, Defendants assert Plaintiff has failed to establish any of the required elements of defamation.  According to Defendants, many of the statements at issue are not "of and concerning" Plaintiff; others are not capable of defamatory meaning; and many are protected expressions of

opinion. Docket Entry # 25 at 14.  In a footnote, Defendants further assert Plaintiff has failed to

adequately alleged the statements at issue are defamatory *per se*.[13]  *Id.* at 13, n. 16 (citing *Hancock*,

400 S.W.3d at 66-67 (statements regarding the truthfulness of a physician are not defamatory *per se*);

*Moore v. Walthrop*, 166 S.W.3d 380, 386 (Tex. App. – Waco 2005, no pet.) (To be defamatory *per*

*se*, the defamatory nature of the challenged statement must be apparent on its face without reference

to extrinsic facts or "innuendo."); *Robison*, 409 S.W.3d 682, 692 (Tex. App. – Houston [1st Dist.]

2013, pet. denied) (dismissing claim for defamation *per se* where complained-of statements did not

unambiguously charge plaintiff with commission of a crime or injury in her professional capacity).

---

[13] The Court finds this argument without merit. The law presumes certain categories of statements are defamatory *per se*, including statements that (1) unambiguously charge a crime, dishonesty, fraud, rascality, or general depravity, or (2) are falsehoods that injure one in his office, business, profession, or occupation. *Robison*, 409 S.W.3d at 690 (citing *Main v. Royall*, 348 S.W.3d 381, 390 (Tex. App. – Dallas 2011)).

Plaintiff alleges the statements accuse and impute to him the commission of crimes involving moral turpitude and for which Plaintiff may be punished and imprisoned in a state or federal institution. Docket Entry # 1 at 72, ¶ 164. According to the Complaint, the statements impute to Plaintiff an unfitness to perform the duties of an office or employment for profit, or the want of integrity in the discharge of the duties of such office or employment. *Id*. Plaintiff alleges he has suffered substantial damage and loss, including, but not limited to, pain and suffering, emotional distress and trauma, insult, anguish, stress and anxiety, public ridicule, humiliation, embarrassment, indignity, damage and injury to her personal and professional reputations, and loss of income, business and out-of-pocket expenses of not less than $57,000,000.00. *Id.* at 74-77, ¶¶ 168, 174, 179. Specifically, Plaintiff alleges "Folkenflik's defamation spread like wildfire throughout mass media, social media and over the Internet, causing Butowsky to be ostracized, causing enormous loss of business (including, without limitation, the termination and loss of Chapwood's Investment Manager Service Agreement with Charles Schwab), and causing Butowsky substantial personal injury, fear, and mental and physical pain and suffering. Butowsky has received death threats to his family, damage to his home in Plano, and thousands of *ad hominem* attacks." *Id.* at 8-9, ¶ 3.

Additionally, the Court notes in his proposed Amended Complaint Plaintiff asserts both defamation *per se* and defamation *per quod*. Docket Entry # 54, ¶ 176.

34

Third, Defendants contend Plaintiff has failed to plausibly allege "Defendants acted with actual malice or – in the case of [Chapin, Cook and Gogoi] – that Defendants acted at all." *Id*. Finally, Defendants argue the Defamation Mitigation Act bars Plaintiff's claims. *Id.* at 29.

## 2.     The statements at issue and Defendants' specific bases for dismissal

According to Defendants, approximately two hours after the *Wheeler* Complaint was filed, Folkenflik published the August 1 Report on NPR detailing the allegations of the *Wheeler* Complaint. Docket Entry # 25 at 8, n. 9.  In the following weeks, Folkenflik published several additional articles on NPR regarding the *Wheeler* lawsuit, and he also participated in an interview with *Mediaite.com* columnist and podcaster John Ziegler.   According to Defendants, a comparison of the *Wheeler* Complaint to the statements at issue in this case "shows the Reports, in large part recounted the allegations" in the *Wheeler* lawsuit. Defendant has provided a chart containing each statement at issue in the five separate reports, along with the bases for their motion to dismiss.

> **David Folkenflik, *Behind Fox News' Baseless Seth Rich Story: The Untold Tale*, NPR.ORG (Aug. 1, 2017 7:23 AM) (The August 1 Report)**

There are eleven specific statements from the August 1 Report referenced in Plaintiff's Complaint, ten of which Defendants argue fairly report or comment on allegations in the *Wheeler* Complaint.[14]  In their chart, Defendants compare the complained-of statements to the allegations

---

[14] According to Defendants, six of the statements are protected by the fair report and fair comment privileges as well as the third-party allegations rule.  For three of the other statements, Defendants assert the fair report privilege and third-party allegations rule but not the fair comment privilege.   For one statement, Defendants assert only the fair comment privilege. For the one statement not contained in the *Wheeler* Complaint (that the "explosive claim is part of a lawsuit filed against Fox News by Rod Wheeler"), Defendants assert the defense of truth and argue the statement is not "of and concerning Plaintiff" and is not capable of defamatory meaning.

contained in the *Wheeler* Complaint.  The Court sets forth the comparisons below.

The Title of the August 1 Report (*Behind Fox News' Baseless Set Rich Story: The Untold Tale*) indicates Fox News' May 16, 2017 story (*Seth Rich, slain DNC staffer, had contacts with WikiLeaks, says multiple sources*) was "baseless."  Defendants point to allegations in the *Wheeler* Complaint that "Zimmerman, Butowsky and Fox had created fake news to advance President Trump's agenda."  *Wheeler* Compl., ¶ 4; *see also id.*, ¶ 25 ("Fox was contriving with Butowsky and members of the Trump Administration to publish and disseminate fake news to affect politics in America."), ¶ 77 ("At no point in time did Mr. Wheeler say that his investigation revealed that Seth Rich sent any emails to WikiLeaks, nor did he say that the DNC, Democratic Party or Clintons were engaged in a cover-up.  In fact, the only purported source saying that Seth Rich sent any emails to WikiLeaks was Butowsky and Zimmerman's supposed source within the FBI.").

The August 1 Report reports on the "explosive claim," according to the lawsuit filed against Fox by Rod Wheeler, that Fox and "wealthy supporter of President Trump worked in concert under the watchful eye of the White House to concoct a story" about the death of Seth Rich.  In addition to ¶¶ 4 and 25 of the *Wheeler* Complaint ("fake news"), Defendants point to the following allegations in the *Wheeler* Complaint: (1) "As it turned out, Butowsky and Zimmerman were not simply Good Samaritans attempting to solve a murder.  Rather, they were interested in advancing a political agenda for the Trump Administration." (¶ 8); (2) "A few days later, Butowsky wrote to Zimmerman, '***I didn't tell you yet but the federal government is involved at this moment, behind the scenes and believe your story***.'" (¶¶ 14, 84) (emphasis in original); and (3) "Butowsky and Zimmerman called Mr. Wheeler to inform him that they had supposedly secured a source at the FBI

who confirmed that emails were sent between Seth Rich and WikiLeaks."  (¶¶ 17, 70).

Regarding the August 1 Report's statement that Wheeler's lawsuit alleged Fox News defamed him by manufacturing two false quotations attributed to him and ruining his reputation by blaming him as the "deceptive story fell apart," Defendants point to the following allegations in the *Wheeler* Complaint: (1) "On the morning of May 16, 2017, Zimmerman published her article on the Seth Rich murder investigation.  The article attributed two quotations to Mr. Wheeler relevant to this action." (¶ 79); (2) "First, the article falsely quoted Mr. Wheeler as stating: 'My investigation up to this point shows there was some degree of email exchange between Seth Rich and Wikileaks.'  Mr. Wheeler did not provide this quote or make this statement." (¶ 80); (3) "Second, the article falsely quoted Mr. Wheeler as stating: 'My investigation shows someone within the D.C. government, Democratic National Committee or Clinton team is blocking the murder investigation from going forward,' 'That is unfortunate. Seth Rich's murder is unsolved as a result of that.'  Again, Mr. Wheeler did not provide this quote or make this statement." (¶ 81).

Defendants rely on the same three paragraphs in the *Wheeler* Complaint in asserting the fair report privilege and third-party allegations rule in response to Folkenflik's statement in the August 1 Report that: "Zimmerman's online story cites an unnamed 'federal investigator who reviewed an FBI report' for its findings.  It also cites Wheeler, incorporating two key quotations from Wheeler that do not appear on video.  In each, the private investigator seemingly takes ownership of the accusations."

Regarding the statements in the August 1 Report that Wheeler did not "make great headway" in his investigation of the murder of Seth Rich and that the FBI informed Plaintiff, Wheeler, and

Zimmerman that the agency was not assisting the Washington D.C. police on the investigation, Defendants rely on ¶ 69 of the *Wheeler* Complaint ("Detective Della-Camera also stated that he had no knowledge of any FBI involvement with the Seth Rich murder investigation.").  Regarding the statement in the August 1 Report that Zimmerman sent Wheeler a draft of her story but it included no quotes from Wheeler, Defendants rely on ¶¶ 18 and 71 of the *Wheeler* Complaint.  Regarding the statement in the August 1 Report that Zimmerman issued instructions for Wheeler's appearance on Sean Hannity's show, Defendants rely on ¶ 87 of the *Wheeler* Complaint.  Finally, regarding the statement in the August 1 Report that Wheeler was used as a "pawn" by Plaintiff "to try and steer away the attention that was being given about the Russian hacking of the DNC emails," Defendants rely on ¶¶ 2, 4, and 8 of the *Wheeler* Complaint. Defendants rely generally on the fair comment privilege in response to the statement in the August 1 Report that despite his "misgivings," Wheeler played along.

### Ken Meyer, David Folkenflik: *'Very Hard to Rule Out' White House Involvement in Seth Rich Conspiracy*, MEDIAITE.COM (the *Mediaite* Interview)

There are two specific statements from the *Mediaite* Interview referenced in Plaintiff's Complaint: (1) Folkenflik told *Mediaite* columnist that Plaintiff's narrative was "inconsistent;" and (2) Folkenflik said "collaboration" between Plaintiff and the White House "is still a plausible assumption with the current evidence."  Defendants compare these statements (which paraphrased the Folkenflik interview) with Folkenflik's actual statements in the interview.  Defendants assert the fair comment privilege and further argue each statement is an opinion and mischaracterizes Folkenflik's statements.

**David Folkenflik, *Fox News' Seth Rich Story Echoes Previous Problems For Owner Rupert Murdoch*, NPR.ORG (Aug. 7, 2017 4:16 PM) (the August 7 Report)**

There are three specific statements from the August 7 Report referenced in Plaintiff's Complaint: (1) "Revelations about Fox News' role in concocting a baseless story on the death of a young Democratic staffer has problematic echoes for the network's controlling owner, Rupert Murdoch;" (2) Fox was involved in a "journalistic scandal" over the Seth Rich story; and (3) Fox "concocted" the story "in order to help President Trump." Docket Entry # 1, ¶ 49. Defendants compare the last statement with ¶¶ 4 and 25 of the *Wheeler* Complaint. Defendants assert the fair comment privilege in response to all three statements and further argue they are not "of and concerning" Plaintiff. Defendants further argue the first two statements are opinions and the last statement is also protected by the fair report privilege and the third-party allegations rule.

**David Folkenflik, *The Man Behind The Scenes In Fox News' Discredited Seth Rich Story*, NPR.ORG (Aug. 16, 2017 5:04 AM) (the August 16 Report)**

There are two specific statements from the August 16 Report referenced in Plaintiff's Complaint: (1) Ed Butowsky was the "Man Behind The Scenes In Fox News' Discredited Seth Rich Story;" (2) "Butowsky displays no curiosity about the way Fox's reporting and his activities affected the very people [the Rich Family] he says he sought to help." Docket Entry # 1, ¶ 51. Defendants compare the first statement to ¶¶ 70-79 of the *Wheeler* Complaint and assert the fair report and fair comment privileges as well as the third-party allegations rule. Defendants assert the fair comment privilege in response to the second statement and also argue both statements are opinions.

39

**David Folkenflik, *No Apology, No Explanation: Fox News And The Seth Rich Story*, NPR.ORG (Sept. 15, 2017 5:06 AM) (the September 15 Report)**

There are five specific statements from the September 15 Report referenced in Plaintiff's Complaint: (1) "Fox News was compelled to retract the story, which involved presidential politics, international intrigue and a man's murder. When a story of this scale crumbles, most news organizations feel obligated to explain what happened and why. Not so far at Fox. . . . In the four months since its retraction, Fox News has not apologized for what it reported. Nor has it explained what went wrong;" (2) "Lesson No. 1: Investigative reports should be ironclad" – the Fox story was "groundless;" (3) "Lesson No. 2: Make sure your sources are saying what you think they're saying" – "Before the story ran, Zimmerman sent Wheeler a draft with quotes she intended to attribute to him. NPR has seen a transcript of the texts from Zimmerman calling his attention to that email. But there's zero evidence Wheeler ever said those words or gave permission for her to use them. And if Zimmerman did invent the quotes, that's a big problem – regardless of whether Wheeler gave her the green light;" (4) Lesson No. 3: Make sure each of your sources can stand on its own" – "Butowsky fed tips to Wheeler and Zimmerman, the Fox reporter, as he sought to link the dead man to the leaked emails instead of hackers working on behalf of the Russians;" and (5) "And that leads us to lesson No. 4" – Transparency and Trust – "Fox withheld Butowsky's various roles in the story from its audiences – he blurred lines between benefactor, source, player and, possibly, even reporter." Docket Entry # 1, ¶ 53.

Defendants compare the second statement to ¶¶ 4, 25, and 77 of the *Wheeler* Complaint. In response to all five statements, Defendants assert the fair comment privilege and argue the statements are not opinions. Defendants argue the first three statements are not "of and concerning"

Plaintiff, and Defendants further argue the second, fourth, and fifth statements are not capable of defamatory meaning.

## C.      Plaintiff's response

In his response, Plaintiff focuses on the stage of the proceedings, asserting the issue before the Court is not what Wigdor alleged in the *Wheeler* Complaint but whether Plaintiff's allegations, accepted as true, state plausible claims for defamation *per se.*   According to Plaintiff, viewing the statements as a whole in the light most favorable to Plaintiff, he plausibly states a claim for defamation.   Plaintiff states his Complaint clearly and repeatedly alleges "this action is about the conspiracy between Wigdor and Folkenflik – hatched well before any lawsuit was filed on August 1, 2017 – to publish a patently false, scandalous and shocking narrative about" Plaintiff, Fox News, and the President.   Docket Entry # 32 at 17.   Plaintiff asserts Folkenflik and NPR, with reckless disregard for the truth, "embraced a preconceived narrative provided by Wigdor, totally ignored known and available contrary facts, and relied on a source – Rod Wheeler – that they knew to be wholly incredible."   *Id.* at 2.

## D.      Whether Defendants' motion to dismiss should be granted based on common law or statutory privileges or the third-party allegations rule

Defendants argue the Court should dismiss this case under Rule 12(b)(6) because (1) they accurately reported third-party allegations (from the *Wheeler* Complaint), which satisfies the test for substantial truth;[15] and (2) the publications' substantial truth establishes the reports are privileged

---

[15] According to Defendants, a libel plaintiff cannot establish falsity if a claim is based on accurate reporting of third-party allegations about a matter of public concern.   Docket Entry # 25 at 17.

under Chapter 73 (fair comment and judicial proceeding privileges) and common law (fair report privilege).  According to the Texas Supreme Court, the media have a common law privilege to report on judicial proceedings without regard for whether the information from such proceedings in actually true.  *KBMT Operating Co., LLC v. Toledo*, 492 S.W.3d 710, 714 (Tex. 2016). In 1901, the Texas Legislature codified this privilege and extended it to "a fair, true, and impartial account" of not only judicial proceedings but all official proceedings.  *Id.*  According to the court, "[w]hen the privilege applies, the gist of an allegedly defamatory broadcast must be compared to a truthful report of the official proceedings, not to the actual facts."  *Id.*

Here, Plaintiff asserts the privilege does not apply.  Specifically, Plaintiff relies on an "important exception" to the "common law 'fair report privilege,' embodied in Texas Civil Practice and Remedies Code § 73.002(b)," and contained in § 611 of the Restatement (Second) of Torts.[16]  Docket Entry # 32 at 2, n. 2. Specifically, Plaintiff argues Wigdor and Folkenflik's "collusive arrangement" falls squarely within comment c to § 611, which provides as follows:

> A person cannot confer this privilege upon himself by making the original defamatory publication himself and then reporting to other people what he had stated. This is true whether the original publication was privileged or not. Nor may he confer the privilege upon a third person, even a member of the communications media, by making the original statement under a collusive arrangement with that person for the purpose of conferring the privilege upon him.

Restatement (Second) of Torts § 611 cmt. c.

The Court's research has not located a Texas case citing comment c of § 611 of the Restatement (Second) of Torts. "That is not to say that [the Court] need ignore the Restatement."

---

[16] In their reply, Defendants assert they are asserting a statutory privilege, and thus the Restatement's recitation of the common law exception is irrelevant.  Docket Entry # 42 at 4. Defendants further assert Texas has not adopted the Restatement position.  *Id.*

*Doe v. Doe*, 941 F.2d 280, 287 (5th Cir.), *on reh'g in part*, 949 F.2d 736 (5th Cir. 1991). The Court's task is to predict how the Texas Supreme Court would decide the issue.

The Court first notes the statutory codification of libel does not affect the existence of common law, statutory law, or other defenses to libel. *Weaks v. White*, 479 S.W.3d 432, 438 (Tex. App. – Tyler 2015) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 73.006).  Although the Texas Supreme Court has not adopted this exception to the fair report privilege, the Court predicts that, given the opportunity, it would do so.  *See ZS Assocs., Inc. v. Syngy, Inc.*, 2011 WL 2038513, at *4 (E.D. Pa. 2011) (predicting the Pennsylvania Supreme Court would, given the opportunity, adopt the exception provided in comment c to § 611 "because application of the exception advances the principle underlying the fair report rule"). Although Texas courts have not addressed comment c, they have relied on other comments to § 611. *See Klentzman II*, 456 S.W.3d at 252 (comments d, f); *Goss v. Houston Cmty. Newspapers*, 252 S.W.3d 652, 655 (Tex. App. - Houston [14th Dist.] 2008, no pet.) (comments a, f, h); *Freedom Comm'ns v. Sotelo*, 2006 WL 1644602, at *3 (Tex. App. – Eastland 2006, no pet.) (comments a, f).

Courts in other states have uniformly followed comment c. *See, e.g., ZS Assocs.*, 2011 WL 2038513, at * 4 (stating the privilege was not "intended to permit a person maliciously to institute a judicial proceeding, alleging false and defamatory charges, then to circulate a press release or other communication based thereon, and, ultimately to escape liability by invoking the fair report privilege statute"); *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 732 (7th Cir. 2004); *Burrill v. Nair*, 217 Cal. App. 4th 357, 397-98, 158 Cal.Rptr.3d 332 (Cal. Ct. App. 2013); *Missner v. Clifford*, 914 N.E. 2d 540, 551 (Ill. App. 2009), *cert denied*, 560 U.S. 939 (2010); *Butler v. Hearst-*

*Argyle Television, Inc.*, 49 S.W.3d 116, 121-22 (Ark. 2001) (The fair-report privilege does not apply

where a person testifies in a proceeding solely for the purpose of obtaining the fair-report shield for

himself or in collusion with a third party); *Kurczaba v. Pollock,* 318 Ill.App.3d 686, 252 Ill.Dec. 175,

742 N.E.2d 425, 442-43 (2000) (holding the fair reporting privilege did not apply to a defendant who

sought to confer the privilege upon himself by filing a complaint and then "reporting" the complaint

to others). Consistent with comment c, many states hold the privilege cannot be self-conferred when

the defendant has an improper motive for inserting defamatory statements in the original proceeding.

*Rosenberg v. Helinski,* 616 A.2d 866, 876-77 (Md. 1992), *cert. denied,* 509 U.S. 924 (1993)

(collecting and discussing cases); *Computer Aid, Inc. v. Hewlett-Packard Co.,* 56 F. Supp. 2d 526,

534 (E.D. Pa. 1999) (whether statement was made for an improper purpose was jury question).

The Court is also concerned about whether the fair report privilege would apply because of

comment e (especially considering the allegations here also invoke comment c specifically

mentioned in comment e).[17] Although the parties do not address whether Wigdor withdrew the

---

[17] If the publication involves some form of judicial proceeding, there must be official action
in the proceeding before one can invoke the privilege:

> A report of a judicial proceeding implies that some official action has been taken by
> the officer or body whose proceedings are thus reported. The publication, therefore,
> of the contents of preliminary pleadings such as a complaint or petition, before any
> judicial action has been taken is not within the rule stated in this Section. An
> important reason for this position has been to prevent implementation of a scheme
> to file a complaint for the purpose of establishing a privilege to publicize its content
> and then dropping the action. (See Comment c). It is not necessary, however, that a
> final disposition be made of the matter in question; it is enough that some judicial
> action has been taken so that, in the normal progress of the proceeding, a final
> decision will be rendered. So too, the fact that the proceedings are *ex parte* rather
> than *inter partes* is immaterial if the matter has come officially before the tribunal
> and action has been taken in reference to it.

Restatement (Second) of Torts § 611 cmt. e.

*Wheeler* Complaint after the August 1 Report was published, Plaintiff mentions in his response the lawsuit is no longer pending.  Docket Entry # 32 at 17.  The Court notes the court in *Dallas Morning News, Inc. v. Hall* also expressed its concerns whether the statutory judicial proceedings privilege covers statements contained in pleadings.  524 S.W.3d at 380, n. 9 (noting the court had located only one nonbinding case (*Langston v. Eagle Publ'g Co.*, 719 S.W.2d 612 (Tex. App. – Waco 1986, writ ref'd n.r.e.) stating the statutory judicial proceedings privilege covers pleadings).  Even so, the court in *Hall* considered falsity and found for the appellees.  *Id*.

Putting aside the Court's above concerns as to the applicability of the common law and statutory privileges – something Defendants must demonstrate – there are other reasons for recommending Defendants' Rule 12(b)(6) motion to dismiss based on the common law and statutory privileges and the third-party allegations rule be denied.  <u>First</u>, even if the conditional privileges do apply, Plaintiff can overcome the privileges by pleading actual malice.  *See Doe*, 941 F.2d at 291 (stating Louisiana's fair reporting privilege is not absolute and further stating the fair reporting privilege, like all qualified privileges, is defeated by proof that the defendant's statements were made with "actual malice," that is, with knowledge that they were false or with reckless disregard for their truth value); *see also Klentzman II,* 456 S.W.3d at 252 ("To prevail on a defamation claim when a conditional privilege applies, the plaintiff must establish that the privilege was abused, i.e., that the person making the defamatory statement knew the statement was false or did not act for the purpose of protecting the interest for which the privilege exists.") (citing *Hurlbut,* 749 S.W.2d at 768; *Writt,* 409 S.W.3d at 66).

According to the Fifth Circuit Court of Appeals in *Doe,*

> [a]buse is a jury issue and, on the record before us, a reasonable jury could find that
> the defendants have in point of fact abused and thus forfeited their privilege of fair
> reporting. Naturally, DiLeo may well stumble in his attempt to persuade the jury that
> impermissible liberties were taken with the Report or that the defendants' writings
> defamed him. Our point is simply that DiLeo should have just such an opportunity.

*Doe*, 941 F.2d at 292.  Notably, *Doe* was decided in the context of a summary judgment motion, whereas Defendants have raised the issue in the context of a Rule 12(b)(6) motion.[18]   As will be addressed more fully below, Plaintiff alleges facts which plausibly allege actual malice (that Folkenflik knew the statements were false or did not act for the purpose of protecting the interest for which the privileges exist).

Second, regardless of whether Defendants are seeking to establish the common law or statutory privileges or both, those conditional privileges only protect publications which are fair, true and impartial accounts.  *See Goss*, 252 S.W.3d at 655 (noting the privilege protected publications "fairly and accurately report[ing] the contents of the [matter of public concern] without embellishment . . . even if the underlying facts being reported on are untrue or defamatory"); *Neely*, 418 S.W.3d at 62 (stating the statutory official/judicial proceedings privilege shields publications

---

[18] Almost every case relied upon by Defendants was decided in the context of summary judgment or early dismissal under the Texas Citizens Participation Act (TCPA), not applicable here. In one case decided at the motion to dismiss stage relied upon by Defendants, the Third Circuit Court of Appeals affirmed the district court's dismissal of the plaintiff's defamation claims against numerous media outlets as protected under the fair report privilege.  *Lee v. TMZ Prods. Inc.*, 710 Fed. Appx. 551, 559 (3d Cir. 2017). The appellate court disagreed with the plaintiff's contention that the application of the fair report privilege cannot be decided on a Rule 12(b)(6) motion, noting the issue of whether an allegedly defamatory report is full, fair, and accurate is for the court to determine as a matter of law.  *Id.* at 558 n.7 (citing *Salzano v. H. Jersey Media Grp. Inc.*, 201 N.J. 500, 993 A.2d 778, 792 (2010)). According to the Third Circuit, even if the fair report privilege did not protect the challenged articles, the plaintiff's libel and libel *per se* claims would still fail because she had not adequately alleged actual malice on the part of the media outlets and their employees.  *Id.* at 559-60.  Here, however, Plaintiff has adequately alleged actual malice.

from republication liability for fair, true, and impartial accounts of judicial and other official proceedings) (citing TEX. CIV. PRAC. & REM. CODE § 73.002 (b)(1)); *Rosenthal*, 529 S.W.3d at 441 (stating the statutory fair comment privilege is an affirmative defense to a defamation action extending to publications that are "reasonable and fair comment[s] on or criticism[s] of . . . matter[s] of public concern published for general information") (citing TEX. CIV. PRAC. & REM. CODE § 73.002(b)(2)).

In *Doe*, the Fifth Circuit considered Louisiana's fair reporting privilege and stated the privilege is defeated if the allegations are made with knowledge that the information is false, or with reckless disregard for its truth value, or if the report is less than a "fair and true" account. 941 F.2d at 289. Even though no Louisiana case had cited § 611 of the Restatement, *id.* at 287, the court considered Louisiana's own substantive law and ascertained whether it varied from the Restatement's common law compilations. *Id.* The Fifth Circuit noted Louisiana's qualified fair reporting privilege was unavailable if the defendant published less than a "fair and true" account of the official report. *Id.* at 289.

Even though the Fifth Circuit was shown no Louisiana cases interpreting this "fair and true" restriction, the court thought "it analogous to the Restatement requirement that the defendant's account be a 'fair and accurate' rendition of the original." *Id.* According to the court in *Doe*, what the rule requires is that matters of public record be reported fairly and truthfully, i.e., that the report is not "so edited and deleted as to misrepresent the proceeding and thus be misleading." *Id.* (quoting Restatement (Second) of Torts § 611 cmt. f).

Here, with regard to Texas law, the Court also considers it analogous to the Restatement requirement that the defendant's account be a fair and accurate rendition of the original. The Court

finds instructive *Express Publishing Co. v. Gonzalez*, 326 S.W.2d 544 (Tex. App. – San Antonio 1959), *writ dismissed*, (Oct. 21, 1959), a case which arose from an article appearing in a newspaper reporting on an oil land suit won by twin sisters. *Id*. at 545. The sisters alleged they had been defrauded of certain oil-rich land and originally brought suit against two defendants, Barrera and Gonzalez. *Id*. at 546. Gonzalez filed a motion for summary judgment, and the sisters voluntarily took a nonsuit against Gonzalez, which was entered by the court. *Id*. The sisters' amended petitions did not mention Gonzalez.

The suit proceeded successfully against Barrera. *Id.* The appeal was by Barrera and Gonzalez who was one of the sureties on Barrera's cost bond for the appeal. *Id*. On appeal, the judgment was affirmed as to Barrera. Costs were also assessed against Barrera, Gonzalez, and the other surety on the cost bond. *Id*. The newspaper's article, which was "undoubtedly a report concerning official proceedings," *id.*, gave the impression that both Barrera and Gonzalez were found guilty on the merits of defrauding the sisters of their land. Specifically, the article stated that "[n]inety-nine-year-old twin sisters, perhaps the oldest twins in the United States, Saturday had won their suit for 13 acres of oil-rich land in Starr County," and that the sisters "had alleged that the land was fraudulently taken from them by a nephew, Benigno Barrera and Enrique G. Gonzalez, both of Starr County." *Id.* at 545.

The article was literally "true," the court said, "in that the twin sisters had charged Gonzalez with fraud in their original petition and the Fort Worth Court of Civil Appeals had found against Gonzalez as to court costs." *Id.* at 547. However, to be privileged, the publication "must not only be literally true, but it must also be fair and impartial." *Id.* According to the court, it was unfair for the newspaper to rely on the original petition, which had been dropped, thereby leaving the

48

impression that Gonzalez had also been found guilty of fraud. *Id.* The court held the newspaper was not protected by the "fair, true, and impartial" reports privilege. *Id*.

The Court finds Plaintiff has alleged facts which plausibly allege the reports were not fair, true, and impartial accounts of the *Wheeler* Complaint.  As will be discussed in more detail below, there are differences between the reports and the *Wheeler* Complaint which "are potentially significant in the aggregate."  *See Doe*, 941 F.2d at 291; *see also Burke v. Sparta Newspapers, Inc.*, No. M2016-01065-COA-R3-CV, 2018 WL 3530839, at *6 (Tenn. Ct. App. July 23, 2018), *appeal granted* (Jan. 17, 2019) (discussing Tennessee's qualified fair report privilege and finding the article went beyond official actions and proceedings because it "also included informal remarks on the strength of the case and what 'lessons' might have been learned from the incident by the participants in the youth football program," details which fall outside the scope of the privilege).[19]

The Court disagrees with Defendants that they have established their entitlement to dismissal under § 73.002(b) (fair report and fair comment privileges) at this stage of the proceedings. *See Klentzman II*, 456 S.W.3d at 253 ("Thus, we disagree with Klentzman and The Star that they satisfied their burden of establishing their entitlement to privilege under section 73.002(b)."); *see also Levine v. CMP Publications, Inc.,* 738 F.2d 660, 668-69 (5th Cir.1984) (refusing to conclude that, as a matter of law, magazine articles published by the defendant were "fair, true and impartial" accounts of public proceedings entitled to a Texas statutory privilege and finding the inaccuracies "raised fact questions" and "presented a jury question").

According to Defendants' reply, the Court need not address the issue of actual malice to

---

[19] Similarly here, the September 15 Report also included Folkenflik's "lessons," details which may fall outside the scope of the fair report privilege.

decide the applicability of the third-party allegations rule.  Docket Entry # 42 at 6.  Defendants argue the third-party allegations rule is a defense, not a conditional privilege, and it provides that the allegedly defamatory statements at issue in this case cannot be actionable because they are accurate reports of the allegations made in the *Wheeler* Complaint regarding a matter of public concern.  *Id*. at 5.  Defendants further argue Plaintiff fails to adequately plead material falsity under the third-party allegations rule, as he is required to do to avoid dismissal.  The Court finds the *Hall* case instructive.

In *Hall*, the appellants argued the publications at issue had merely reported on third-party allegations that had not been lodged against the appellees in other lawsuits and that the appellees could not meet their burden to establish that the appellants' coverage of those third-party allegations was false and not privileged.  524 S.W.3d at 373.  The trial court denied the appellants' motion to dismiss.  On appeal, the appellants argued the publications were privileged under either the judicial proceedings privilege or the third-party allegations rule.  *Id*. at 379.

According to the appellate court, in "a case in which the burden has shifted to the plaintiff to prove falsity, as in this case, although the defendant bears the burden to prove that the privilege is applicable, the plaintiff retains the burden to prove that the gist of the publication was not substantially true—that is, that the publication was not a fair, true, and impartial account of the proceedings."  *Id*. at 380.  The court noted truth is a defense to a claim for defamation but further noted falsity was an element of the appellees' claim.  *Id.*  "Although falsity [was] an element of Appellees' claim, as opposed to truth being a defense to be proved by Appellants," the court saw "no reason why section 73.005(b) [third-party allegations rule] would not otherwise apply."  *Id.*

Therefore, according to the court in *Hall*, under either the judicial proceedings privilege or the third-party allegations rule, the appellees bore the burden to establish the statements which the

appellants published were not substantially true. *Id.* The court noted the appellants compared the complained-of statements against their respective sources and argued the challenged articles accurately reported the third-party allegations.  *Id.* at 382.  The court held the appellees brought a claim for defamation based on the publication as a whole (i.e., defamation by implication). *Id.* After comparing the gists of the articles against the proceedings from which the statements originated, the court held the appellees met their burden to establish that the gist of the publications was not substantially true.  *Id.* at 383 (noting the gist cast the appellees in a worse light than the proceedings themselves).

Here, as will be discussed in detail below, the Court finds, at this stage of the case and under the facts as alleged in the Complaint, Plaintiff has sufficiently alleged the gist of the publications was not substantially true.  The Court is not convinced the publications place Plaintiff in no worse light than the underlying allegations contained in the *Wheeler* Complaint, as urged by Defendants. Thus, the Court is not convinced the third-party allegations rule codified in Texas Civil Practices and Remedies Code § 73.005(b) applies, and as a matter of law, bars Plaintiff's claims.   The Court now considers Defendants' separate argument that Plaintiff has failed to establish the required elements of defamation.

**E.     Whether Plaintiff has failed to adequately plead the elements of defamation**

**1.      The elements**

As noted above, to state a claim for defamation a plaintiff must allege the following elements: (1) defendant published a false statement of fact (as opposed to opinion); (2) the statement defamed plaintiff; (3) defendant acted with actual malice, if plaintiff is a public figure or a public official, or negligently, if plaintiff is a private individual; and (4) plaintiff suffered damages or the

article is defamatory *per se. Rosenthal*, 529 S.W.3d at 439 (citing *In re Lipsky*, 460 S.W.3d at 593).

According to Defendants, many of the statements at issue are not "of and concerning" Plaintiff;

others are not capable of defamatory meaning; and many are protected expressions of opinion.

Docket Entry # 25 at 14.  Although not specifically raised in their motion, Defendants assert in their

reply (in their discussion of the third-party allegations rule) that Plaintiff fails to adequately plead

falsity.  Docket Entry # 42 at 5.  Defendants further assert Plaintiff fails to adequately plead that

Defendants acted with actual malice.

## 2.      Falsity and substantial truth

"At common law, truth was a defense in a suit for defamation; falsity was not an element of

the action. But as [the Texas Supreme Court] recently observed, '[t]he United States Supreme Court

and this Court long ago shifted the burden of proving the truth defense to require the plaintiff to

prove the defamatory statements were false when the statements were made by a media defendant

over a public concern.'" *Avery v. Baddour*, No. 04-16-00184-CV, 2016 WL 4208115, at *3 (Tex.

App. – San Antonio Aug. 10, 2016) (quoting *Toledo*, 492 S.W.3d at 713-14 (citation omitted)).

Stated differently, although truth is generally a defense to defamation, the burden shifts to the

plaintiff to prove falsity in cases involving matters of public concern. *Neely*, 418 S.W.3d at 56, 62.

Because NPR is undisputedly a media defendant and because the Reports communicated

matters of public concern, falsity is an essential element of Plaintiff's defamation claim. *See Hall,*

524 S.W.3d at 371 ("A private individual who sues a media defendant for defamation over

statements of public concern bears the burden to prove that the statements are false, or not

substantially true."). In approaching the question of falsity, the common law of libel "overlooks

minor inaccuracies and concentrates upon substantial truth." *Masson v. New Yorker Magazine, Inc.*,

501 U.S. 496, 516 (1991). Therefore, as long as a statement is substantially true, it is not false. *Hall*, 524 S.W.3d at 374.  Additionally, evidence that a challenged statement is not substantially true evidences falsity. *Id*. at 374, n. 3 (citations omitted).

A defendant cannot be liable for presenting a true account of events, regardless of what someone may infer from the account. *Turner.,* 38 S.W.3d at 115. "A true account is not actionable—regardless of the conclusions that people may draw—so long as it does not create a substantially false and defamatory impression by omitting material facts or suggestively juxtaposing them in a misleading way." *Klentzman I*, 312 S.W.3d at 898-99 (citing *Turner*, 38 S.W.3d at 115, 118). However, "literally or substantially true" facts which are "published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way" are actionable as defamation. *Klentzman I*, 312 S.W.3d at 899 (quoting *Turner*, 38 S.W.3d at 115).

Therefore, a defendant who "gets the details right but fails to put them in the proper context and thereby gets the story's 'gist' wrong" may be held liable for defamation. *Id.* Whether a publication is false depends on "a reasonable person's perception of the entirety of a publication and not merely on individual statements." *Id.* Conversely, liability is precluded when a defendant "correctly conveys a story's 'gist' or 'sting' although erring in the details." *Id.* This is known as the "substantial truth" doctrine. *Id.*

When the underlying facts as to the gist of the libelous charge are undisputed, the Court determines substantial truth as a matter of law. *Klentzman I*, 312 S.W.3d at 899. However, if the evidence is disputed, falsity must be determined by the finder of fact.  *Neely*, 418 S.W.3d at 64 (citing *Bentley v. Bunton*, 94 S.W.3d 561, 587 (Tex.2002)).

3.      **Whether the statements are reasonably capable of defamatory meaning**

*The parties' assertions*

According to Defendants, many of the statements at issue (four from the August 1 Report and three from the September 15 Report) are not capable of defamatory meaning.  Docket Entry # 25 at 14. As noted above, Defendants have provided a chart, attached to their motion to dismiss as Appendix A, which lists each statement challenged by Plaintiff and the bases for Defendants' motion to dismiss. In their chart, Defendants set forth each statement from the relevant report next to the allegation(s) in the *Wheeler* Complaint, where applicable. As one example of a statement Defendants challenge as not capable of defamatory meaning, Plaintiff alleges Folkenflik and NPR defamed him in the August 1 Report by stating that Zimmerman's first draft of the story did not contain the misattributed quotes. *Compare* Compl., ¶ 29 (complaining of the statement that the draft of the Zimmerman article Wheeler reviewed did not contain quotes from Wheeler), *with Wheeler* Compl., ¶¶ 18, 71 (alleging the draft did not contain any quotes from Wheeler to the effect that Seth Rich had sent any emails to WikiLeaks or that the DNC, Democratic Party or Clintons were engaged in a cover-up).

In his response, Plaintiff asserts Folkenflik and NPR did far more than simply report on a publicly-filed lawsuit.  Docket Entry # 32 at 3, n. 3.  According to Plaintiff, they were out to get Plaintiff and colluded with a third party to publish false and defamatory statements.  Although Plaintiff focuses on those individual statements in his Complaint and in his response, Plaintiff also argues the reports as a whole "smeared [Plaintiff] directly or by implication." *Id.* at 3. Thus, this case is complicated to the extent Plaintiff's claim is based on the alleged false and defamatory messages created by each publication as a whole, not just on the individual statements.

54

Before considering Defendants' arguments, the Court must first correctly characterize Plaintiff's defamation case. The Court will then determine whether the meaning Plaintiff alleges is reasonably capable of arising from the text of which the plaintiff complains. The second step is to answer whether the meaning—if it is reasonably capable of arising from the text—is reasonably capable of defaming Plaintiff.  In its discussion of the texts, the Court will consider at the same time whether Plaintiff has sufficiently alleged facts that satisfy the element of falsity (an issue briefly raised in Defendants' reply).

### *Applicable law*

In a defamation case, the threshold question is whether the words used "are reasonably capable of a defamatory meaning." *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987). In answering this question, the "inquiry is objective, not subjective." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157 (Tex. 2004). But if the court determines the language is ambiguous, the jury should determine the statement's meaning. *See Musser*, 723 S.W.2d at 655. If a statement is not verifiable as false, it is not defamatory. *Neely*, 418 S.W.3d at 62 (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21–22 (1990)). Similarly, even when a statement is verifiable as false, it does not give rise to liability if the "entire context in which it was made" discloses that it is merely an opinion masquerading as a fact. *Dallas morning News, Inc. v. Tatum*, 554 S.W.3d 614, 624 (Tex. 2018), *reh'g denied* (Sept. 28, 2018), *cert. denied*, No. 18-864, 2019 WL 659885 (U.S. Feb. 19, 2019) (citing *Bentley*, 94 S.W.3d at 581; *Isaacks*, 146 S.W.3d at 156–57).

As the Texas Supreme Court has recently explained,

'[m]eaning is the life of language.' Thus, the first question in a libel action is whether the words used are 'reasonably capable of defamatory meaning.' Meaning is a

55

question of law. In answering it, the 'inquiry is objective, not subjective.' We note that the question involves two independent steps. The first is to determine whether the meaning the plaintiff alleges is reasonably capable of arising from the text of which the plaintiff complains. The second step is to answer whether the meaning—if it is reasonably capable of arising from the text—is reasonably capable of defaming the plaintiff.

*Tatum*, 554 S.W.3d at 625 (citations omitted).

In *Tatum*, the court explained it has adopted the terms "textual defamation" to refer to "defamation that arises from the statement's text without reference to any extrinsic evidence" and "extrinsic defamation" to refer to "defamation that *does* require reference to extrinsic circumstances." *Id.* at 626 (emphasis in original). "Textual defamation" occurs when a "statement's defamatory meaning arises from the words of the statement's itself, without reference to any extrinsic evidence." *Id.* "Extrinsic defamation occurs when a statement whose textual meaning is innocent becomes defamatory when considered in light of 'other facts and circumstances sufficiently expressed before' or otherwise known to the reader." *Id.* (citing *Snider v. Leatherwood*, 49 S.W.2d 1107, 1109 (Tex. Civ. App.—Eastland 1932, writ dism'd w.o.j.)). An extrinsically defamatory statement requires extrinsic evidence to be defamatory at all. *Id.* Further, a plaintiff relying on extrinsic defamation must assert the theory in his petition to present it at trial. *Tatum*, 554 S.W.3d at 626 (citing *Billington v. Hous. Fire & Cas. Ins.*, 226 S.W.2d 494, 497 (Tex. Civ. App. – Fort Worth 1950, no writ)).

The ordinary textual defamation involves a statement that is explicitly defamatory. *Tatum*, 554 S.W.3d at 626-27. "Explicit textual-defamation cases share two common attributes." *Id*. at 627. First, none necessarily involve any extrinsic evidence, and second, "the defamatory statement's literal test and its communicative context align." *Id.* In other words, what the statement says and

56

what the statement communicates are the same; thus, the defamation is both textual and explicit. *Id.*

When a publication's text implicitly communicates a defamatory statement, the court refers to the plaintiff's theory as "defamation by implication." *Id.* Defamation by implication is not the same thing as textual defamation; it is a subset of textual defamation. *Id.* "That is, if the defamation is textual, it may be either implicit or explicit." *Id.* "The difference is important because the precepts that apply to construing explicit meanings do not necessarily apply with the same force or in the same manner when construing implicit meanings." *Id.* And, importantly, nor is implicit textual defamation the same thing as extrinsic defamation, although parties and courts have often confused the two.[20]

The court in *Tatum* discussed *Turner* (the "foundational case recognizing defamation by implication") and *Rosenthal*. *Id.* at 627-28. In *Turner*, the Texas Supreme Court held "a plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way." Id. at 627 (quoting *Turner*, 38 S.W.3d at 115). According to the *Tatum* court, *Turner* focused on the "converse of the substantial truth doctrine," which is that a defendant may be liable for a "publication that gets the details right but fails to put them in the

---

[20] The court in *Tatum* further noted defamation by implication is not the same thing as defamation by innuendo. "The dividing line is the same as that between extrinsic defamation and textual defamation generally: the first requires extrinsic evidence, but the second arises solely from a statement's text. The difference is important because plaintiffs relying on extrinsic defamation must say so in their pleadings, whereas plaintiffs relying on textual defamation need not." 554 S.W.3d at 627 (citing *Billington*, 226 S.W.2d at 497).

proper context and thereby gets the story's 'gist' wrong." *See id.* "Although *Turner* used the word

'gist,' commentators were relatively quick to point out that the decision actually addressed libel by

implication." *Tatum*, 554 S.W.3d at 627 & n.8.

The issue in *Turner* was whether a plaintiff could bring a "gist" claim based on "the entirety

of a publication and not merely on individual statements." Tatum, 554 S.W.3d at 628 (citing *Turner*,

38 S.W.3d at 115).  The Texas Supreme Court answered that question in the affirmative and has

"maintained the same approach in subsequent cases," including in *D. Magazine Partners, L.P. v.*

*Rosenthal*.  *Tatum*, 554 S.W.3d at 628 (citing *Rosenthal*, 529 S.W.3d at 434) (holding that "[i]n

making the initial determination of whether a publication is capable of a defamatory meaning, we

examine its 'gist.' That is, we construe the publication 'as a whole. . . .'").

According to the court in *Tatum*, "*Turner* and its progeny recognize that a plaintiff can rely

on an entire publication to prove that a defendant has implicitly communicated a defamatory

statement. However, . . . there is no reason that implicit meanings must arise only from an entire

publication or not at all."  554 S.W.3d at 628. The court in *Tatum* pointed out that in *Rosenthal* the

plaintiff brought a defamation claim based on an article titled "THE PARK CITIES WELFARE

QUEEN." *Id.* (quoting *Rosenthal*, 529 S.W.3d at 431).  The article was

> published under the heading 'CRIME' and [was] accompanied by Rosenthal's mug
> shot from a prior unrelated charge. The article state[d] under the aforementioned
> 'Welfare Queen' title that Rosenthal, described as a 'University Park mom,' ha[d]
> 'figured out how to get food stamps while living in the lap of luxury.' It then
> invite[d] the reader to see how Rosenthal 'pulls it off' despite the assumption that
> one living in the affluent Park Cities would 'never qualify.'

*Tatum*, 554 S.W.3d at 628 (quoting *Rosenthal*, 529 S.W.3d at  437).

As explained in *Tatum*,

the article's language would not *necessarily* have been any less defamatory if it had been appended to a larger piece discussing, for example, the biographies of various individual Park Cities homeowners. Of course, the larger context would have been relevant for construing what the article meant. But the language would not have ceased being defamatory *solely* by being published within a larger article. In recognizing defamation-by-'gist' in *Turner*, we also recognized the broader category of defamation by implication.

*Tatum*, 554 S.W.3d at 628 (emphasis in original).

Thus, a plaintiff bringing a textual-defamation claim may allege a defamatory meaning arises (1) explicitly from the statement, (2) implicitly as a result of the publication's entire gist, or (3) implicitly from a distinct portion of the publication rather than from the publication's as-a-whole gist. *Id.* The distinction between "as-a-whole" gist and "partial" implication is important. *Id.* at 628-29 (citing *Sassone v. Elder*, 626 So.2d 345, 354 (La. 1993) ("[P]laintiffs prove that the alleged implication is the *principal* inference a reasonable reader or viewer will draw. . . ."); *see also* C. Thomas Dienes & Lee Levine, *Implied Libel, Defamatory Meaning, and State of Mind: The Promise of New York Times Co. v. Sullivan*, 78 Iowa L. Rev. 237, 289 (1993) ("The distinction between inferences that may reasonably be drawn from a publication, on the one hand, and the meaning a reasonable reader would ascribe to the publication, on the other, is crucial. . . .")).

The court in *Tatum* then explained "gist" refers to a publication or broadcast's main theme, central idea, thesis, or essence.  554 S.W.3d at 629.  "Implication," on the other hand, refers to the inferential, illative, suggestive, or deductive meanings that may emerge from a publication or broadcast's discrete parts and includes necessary logical entailments as well as meanings that are merely suggested.  *Id.*  "Defamation by implication," as a subtype of textual defamation, covers both "gist" and "implication." *Id.*

According to the court in *Tatum*, the difference between gist and implication is especially

important in two contexts:

> The first relates to the substantial-truth doctrine. 'A broadcast with specific statements that err in the details but that correctly convey the gist of a story is substantially true.' *Neely*, 418 S.W.3d at 63–64. If the [defendant] demonstrates substantial truth, the doctrine 'precludes liability for a publication that correctly conveys a story's "gist" or "sting" although erring in the details. . . .' *Turner*, 38 S.W.3d at 115. We have never held, nor do we today, that a true implication—as opposed to a true gist—can save a defendant from liability for publishing an otherwise factually defamatory statement. Second, the difference between gist and implication matters when considering the requirements that the U.S. Constitution imposes on defamation law.

*Id.* According to the court, to determine whether a defamation by implication has occurred, the question is the same as it is for defamatory content generally: is the publication "reasonably capable" of communicating the defamatory statement? *Id.*

When the plaintiff claims defamation by implication, the judicial task is to determine whether the meaning the plaintiff alleges arises from an objectively reasonable reading. *Id*. at 631 (citing *Isaacks*, 146 S.W.3d at 157 (explaining that "*the* hypothetical reasonable reader" is the standard by which to judge a publication's meaning (emphasis added in *Tatum*))). "The appropriate inquiry is objective, not subjective." *Id.* In an implication case, the judicial role is not to map out every single implication that a publication is capable of supporting. *Tatum*, 554 S.W.3d at 631. "Rather, the judge's task is to determine whether the implication the plaintiff alleges is among the implications that the objectively reasonable reader would draw." *Id.*

According to the court,

> [m]aking this determination is a quintessentially judicial task. It involves 'a single objective inquiry: whether the [publication] can be reasonably understood as stating' the meaning the plaintiff proposes. . . . The objectively reasonable reader aids in the inquiry, as a 'prototype . . . who exercises care and prudence, but not omniscience, when evaluating allegedly defamatory communications.' . . . He does not place 'overwhelming emphasis on a[ny] single term.' . . . Nor does he 'focus on individual

statements' to the exclusion of the entire publication. *See id.* The objectively reasonable reader internalizes all of a publication's reasonable implications. When doing so, he considers inferential meaning carefully, but not exhaustively. He performs analysis, but not exegesis.

*Id.* (internal citations omitted).

The court in *Tatum* agreed with the following limit on the inquiry into meaning:

[I]f a communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn, the libel is not established. But if the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference, the communication will be deemed capable of bearing that meaning.

*Id.* at 635 (emphasis in original) (citing *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir.1990) (other citations omitted)). Thus, a plaintiff who seeks to recover based on a defamatory implication—whether a gist or a discrete implication—must point to "additional, affirmative evidence" within the publication itself that suggests the defendant "intends or endorses the defamatory inference." *Id.*

However, this rule may vary in application depending on the type of defamation that the plaintiff alleges. *Tatum*, 554 S.W.3d at 636. It does not apply in cases of explicit defamation because when the defendant speaks explicitly, the court indulges the presumption that the defendant intended the communicatory content that he conveyed. *Id.* In a gist case, the court must "construe the publication 'as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it.'" *Id.* (quoting *Rosenthal*, 529 S.W.3d at 434). Under the "would" standard, courts are usually able to determine a publication's gist as a matter of law. *Tatum*, 554 S.W.3d at 636. According to the court in *Tatum*, a "gist case is similar to an explicit-meaning case in that the very fact of the gist's (or meaning's) existence is presumptive evidence that the

publisher intended to convey the relevant meaning." *Id.* "Thus, it will usually be the case that if a meaning is reasonably capable of being communicated from the gist as a whole, the fact that the gist arises will be sufficient textual evidence that the publisher meant to communicate it." *Id.*

In a discrete-implication case, however, "it becomes especially relevant for the court to apply the requirement that the publication's text demonstrates the publisher's intent to convey the meaning the plaintiff alleges." *Id.* Thus, in applying the requirement, courts must bear its origin in mind: "The especially rigorous review that the requirement implements is merely a reflection of the 'underlying principle' that obligates 'judges to decide when allowing a case to go to a jury would, in the totality of the circumstances, endanger first amendment freedoms.'" *Id.* (quoting *Ollman v. Evans*, 750 F.2d 970, 1006 (D.C.C. 1984) (Bork, J., concurring)).

### *Discussion*

Throughout the briefing on their motion to dismiss Defendants consider the publications' statements individually. In their specific argument that many of the statements at issue are not capable of defamatory meaning, Defendants address four statements from the August 1 Report and three statements from the September 15 Report. *See* Docket Entry # 25 at 14. From the August 1 Report, Defendants state the following statements are not capable of defamatory meaning: (1) "Wheeler does not make great headway. The FBI informs Butowsky, Wheeler and Zimmerman that the agency is not assisting the Washington, D.C., police on the investigation — undercutting claims about an FBI report;" (2) "The next day, Zimmerman sends Wheeler a draft of her story, which is to run initially on the network's website.  It includes no quotes from Wheeler;" (3) "Zimmerman's online story cites an unnamed 'federal investigator who reviewed an FBI report' for its findings. It also cites Wheeler, incorporating two key quotations from Wheeler that do not appear on video.  In

each, the private investigator seemingly takes ownership of the accusations;" and (4) "The explosive

claim is part of a lawsuit filed against Fox News by Rod Wheeler. . . ."

From the September 15 Report, Defendants assert the following statements are not capable

of defamatory meaning: (1) "Lesson No. 1: Investigative reports should be ironclad. But those

conspiracy theories remained as groundless after the Fox story as before it;" (2) "Lesson No. 3: Make

sure each of your sources can stand on its own. Butowsky fed tips to Wheeler and Zimmerman, the

Fox reporter, as he sought to link the dead man to the leaked emails instead of hackers working on

behalf of the Russians.  It was all part of an effort, as he confided to others in conversations captured

on tape and emails, to defend President Trump, whose ties to the Russians are under federal

investigation;" and (3) "And that leads us to lesson No. 4: 'Transparency and trust are the absolute

lifeblood of any mainstream media organization,' says media lawyer Charles Glasser. Fox withheld

Butowsky's various roles in the story from its audiences — he blurred lines between benefactor,

source, player and, possibly, even reporter."

It is not clear from Plaintiff's response whether he is asserting an explicit defamation case,

a gist case, and/or a discrete-implication case.  Plaintiff's overarching allegation is that Folkenflik

and NPR acted in concert with Wigdor to conceive a story line in advance of any investigation, and

then they chose to manufacture and publish false and defamatory statements about Plaintiff even

though they knew the preconceived narrative (the *Wheeler* Complaint) was false.  Docket Entry #

1, ¶ 166(b).  Plaintiff alleges Folkenflik and NPR "initiated the defamation, and went out of their

way to publish extra-judicial statements about Butowsky." *Id*., ¶ 166(i).  Plaintiff's Complaint

focuses on twenty-three specific statements contained in the five reports. *See* Docket Entry # 32 at

3 ("The false and defamatory statements published by Folkenflik and NPR are stated *in haec verba*

in Butowsky's Complaint.").

In his response to Defendants' motion to dismiss, which ties almost every complained-of statement to the allegations in the *Wheeler* Complaint, Plaintiff argues in terms of explicit defamation and defamation by implication.[21]  Specifically, Plaintiff argues the articles as a whole "smeared [Plaintiff] directly *or by implication*." *Id.* (emphasis added).  Plaintiff further argues the "gist" of the publications is that Plaintiff, a "Dallas investment manager" and "financial talking head," concocted, spearheaded and actively participated with Fox News and the White House in a concerted scheme to promote "fake news." *Id.*

 In responding to Defendants' arguments, Plaintiff argues certain statements in terms of their implication, focusing on the overall "gist" of the publication(s).  *See, e.g.* Docket Entry # 32 at 22-26.  Therefore, in considering falsity and whether the publications are reasonably capable of communicating the defamatory statement, the Court considers Plaintiff's textual-defamation claim as arising implicitly as a result of each publication's entire gist.[22]  *Tatum*, 554 S.W.3d at 628 ("In recognizing defamation-by-'gist' in *Turner*, we also recognized the broader category of defamation by implication").

An implied defamation plaintiff must show the defamatory implication that arises from the

---

[21] In *Klentzman II*, the state appellate court noted the plaintiff alleged not only that individual statements were false and defamatory "but also the impression, or gist, created by the omission or juxtaposition of certain details was false and defamatory."  456 S.W.3d at 256.  The court noted nothing in the Texas Supreme Court's analysis in *Turner* "indicates that a plaintiff cannot recover for both the defamatory impression caused by an article as a whole and for individual false and defamatory statements." *Id.* at 255; *see also id.* at 256 ("Klentzman and The Star do not cite any authority indicating that Wade could not allege a cause of action for defamation on both of these bases.").

[22] Texas law allows "public figures—and by extension, private figures, *see Rosenthal*, 529 S.W.3d at 434—to bring cases alleging defamation by implication." *Tatum*, 554 S.W.3d at 634.

context in which the statements were made. This exercise will require an inquiry into the case-specific context of the defamatory implication as a whole, rather than a focus on individual statements. *Verity v. USA Today*, No. 45530, 2019 WL 1010446, at *9 (Idaho Mar. 4, 2019) (citing *Tatum*, 554 S.W.3d at 635). Questions that may help guide the Court's inquiry include the following, as set forth by the Texas Supreme Court in *Tatum*:

> Does the publication 'clearly disclose[] the factual bases for' the statements it impliedly asserts? *See Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 185 (4th Cir. 1998). Does the allegedly defamatory implication align or conflict with the article's explicit statements? *See, e.g.*, *Wyo. Corp. Servs. v. CNBC, LLC*, 32 F.Supp.3d 1177, 1189 (D. Wyo. 2014). Does the publication accuse the plaintiff in a defamatory manner as opposed to simply reciting that others have accused the plaintiff of the same conduct? *See, e.g.*, *McIlvain*, 794 S.W.2d at 15. Does the publication report separate 'sets of facts,' or does it 'link[ ] the key statements together'? *See, e.g.*, *Biro v. Conde Nast*, 883 F.Supp.2d 441, 467 (S.D.N.Y. 2012). And does the publication 'specifically include[ ] facts that negate the implications that [the defendant] conjures up.' *Deripaska v. Associated Press*, 282 F.Supp.3d 133, 148 (D.D.C. 2017), *appeal dismissed per stipulation*, No. 17-7164, 2017 WL 6553388 (D.C. Cir. Dec. 8, 2017).

*Id.*

Plaintiff's claim implicates five reports that he alleges contain defamatory statements, four of which Folkenflik authored and NPR published, and one interview, published on *Mediaite.com*, in which Folkenflik discussed his reporting on the *Wheeler* lawsuit. As previously noted, Plaintiff argues the "gist" of the publications is that Plaintiff, a "Dallas investment manager" and "financial talking head," concocted, spearheaded and actively participated with Fox News and the White house in a concerted scheme to promote "fake news."[23]  *Id.*

---

[23] In their reply, Defendants criticize Plaintiff for identifying several statements that were not included in the Complaint, asserting Plaintiff cannot use his response to supplement the Complaint and complain of additional allegedly defamatory statements. Docket Entry # 42 at 3-4, n. 4. The Court does not find Plaintiff has to specifically allege each statement in his Complaint. Rather, the Court considers each report as a whole to answer whether the meaning Plaintiff alleges–if it is

Some of these meanings explicitly appear in several of the reports. (August 1 Report - "The Fox News Channel and a wealthy supporter of President Trump worked in concert under the watchful eye of the White House to concoct a story" about the death of Seth Rich; August 16 Report - "A federal lawsuit now accuses Butowsky, a Fox News reports and the network of con-cocting the story about Rich's death in an effort to help the president.  Butowsky even briefed a White House official about what they had found;" September 15 Report - "A Dallas investment manager and Trump supporter named Ed Butowsky helped to orchestrate the Fox News story. . . . And Butowsky fed tips to Wheeler and Zimmerman, the Fox reporter, as he sought to link the dead man to the leaked emails instead of hackers working on behalf of the Russians.  It was all part of an effort, as he confided to others in conversations captured on tape and emails, to defend President Trump, whose ties to the Russians are under federal investigation.").  However, some of these meanings do not explicitly appear in the reports or in the statements specifically challenged by Defendants as not being capable of defamatory meaning. With the above standards in mind, the Court considers each publication as a whole below.

Evaluating the August 1 Report as a whole, the Court finds because of material additions and misleading juxtapositions, an objectively reasonable reader could conclude the report mischaracterized Plaintiff's role in the Seth Rich investigation and "thereby cast more suspicion on [Plaintiff's] actions than an accurate account would have warranted."[24]  *Turner*, 38 S.W. 3d at 119

---

reasonably capable of arising from the text– is reasonably capable of defaming Plaintiff. *See Tatum*, 554 S.W.3d at 625.

[24] Because this is either an explicit defamation or gist case, as opposed to a discrete-implication case, the Court does not need to also consider whether the publications indicate by their plain language that the publisher intended to convey the meaning asserted by Plaintiff.  However, even if the Court were to apply the requirement that the publisher's intent to convey the meaning,

("But by omitting key facts and falsely juxtaposing others, the broadcast's misleading account cast more suspicion on Turner's conduct than a substantially true account would have done. Thus, it was both false and defamatory."). The August 1 Report as a whole is reasonably capable of a defamatory meaning because it goes "beyond merely reporting materially true facts." *White*, 909 F.2d at 521.

As an initial matter, there are statements in the August 1 Report that are not contained in the *Wheeler* Complaint.  For example, Folkenflik stated Wheeler did "not make great headway" in his investigation of the murder of Seth Rich.  According to Folkenflik, "[t]he FBI informs Butowsky, Wheeler and Zimmerman that the agency is not assisting the Washington, D.C., police on the investigation – undercutting claims about an FBI report." However, this last statement is nowhere in the *Wheeler* Complaint.  The *Wheeler* Complaint actually alleged Wheeler "was able to secure an interview with Detective Della-Camera [the lead homicide detective on the Seth Rich case], with the Washington D.C. Metro Police Department."  *Wheeler* Compl., ¶ 68. According to the *Wheeler* Complaint, Detective Della-Camera stated he had no knowledge of any FBI involvement with the Seth Rich murder investigation.  *Id.*, ¶ 69.

According to Plaintiff, by misstating Wheeler did "not make great headway" in his murder investigation and by stating the FBI had, in fact, informed Plaintiff "that the agency [was] not assisting the Washington D.C. police on the investigation," Folkenflik implied Plaintiff fabricated the story about Seth Rich and WikiLeaks.  The Court agrees, especially when read in context with the rest of the statements contained in the August 1 Report.  ("The lawsuit focuses particular attention on the role of the Trump supporter, Ed Butowsky, in weaving the story;" "The first page

_____

the Court would find the publications as a whole provide "a clear signal from which a reader could conclude . . . that the defamatory meaning was intended or endorsed." *White*, 909 F.2d at 521.

of the lawsuit quotes a voicemail and text from Butowsky boasting that Trump himself had reviewed the drafts of the Fox News story just before it went to air and was published;" "The question of Rich's death took on greater urgency for Butowsky after Trump fired Director James Comey in early May;" "Wheeler alleges the story was orchestrated behind the scenes and from the outset by Butowsky, who hired him on behalf of the Rich family;" "Wheeler alleges Butowsky was using the White House references to pressure him;" "Butowsky is a silver-haired brash investor who became known for helping newly rich athletes figure out how to manage their money – and avoid getting fleeced;" "The lawsuit alleges Ed Butowsky, a wealthy Trump supporter from Texas, played a significant role in weaving a false story about Rich's death.").

Additionally, the August 1 Report stated "Butowsky presented himself as a good Samaritan who came across a sliver of information about Seth Rich's death and shared it with the Riches," when Wheeler alleged it turned out "Butowsky and Zimmerman were not simply Good Samaritans attempting to solve a murder" but rather were interested in advancing a political agenda for the Trump Administration. *Wheeler* Compl., ¶¶ 8, 52.  According to Plaintiff, by suggesting Plaintiff "presented himself as a good Samaritan" in the same statement as sharing information about Seth's death "with the Riches," Folkenflik implied not only that Plaintiff had impure motives and a self-interest in helping the Riches, but also that he actually misrepresented his intentions to the Rich family when his generosity was "clearly politically motivated."  This was not alleged in the *Wheeler* Complaint.

Finally, the August 1 Report stated the following, not contained in the *Wheeler* Complaint: "Despite his misgivings, Wheeler plays along. On Hannity's show, Wheeler says he doesn't personally know about Rich's emails or computers but says that a 'very credible' federal investigator

says 'he laid eyes on the case file.'  Wheeler offers energetic speculation though not much more . .

. . [25] According to Plaintiff, by falsely stating Wheeler had "misgivings" but "play[ed] along" with

what Folkenflik elsewhere described as a deceptive story orchestrated by Plaintiff, Folkenflik at least

implies Plaintiff engaged in dishonest, deceptive, and unethical practices.

The August 1 Report also juxtaposed facts in a possibly misleading way. For example, the

*Wheeler* Complaint alleged Plaintiff, Wheeler, and Zimmerman met for lunch on February 28, 2017.

*Wheeler* Compl., ¶ 59. According to the *Wheeler* Complaint, following the lunch, Plaintiff

introduced Wheeler to the Rich family, but before doing so, Plaintiff warned Wheeler to ""play down

Fox News, don't mention you know Malia [Zimmerman]." *Id*., ¶ 60.  The *Wheeler* Complaint

alleges Wheeler had multiple conversations with the Rich family in the following weeks, and on

March 14, 2017, Wheeler was formally retained to investigate the murder of Seth Rich.  *Id*., ¶¶ 61-

62. According to the complaint in *Wheeler*, "[a]s it turned out, Butowsky and Zimmerman (who Mr.

Wheeler later learned was working with Butowsky) were not simply Good Samaritans attempting

to solve a murder.  Rather, Butowsky and Zimmerman were interested in advancing a political

agenda." *Id*., ¶ 52.  "Indeed, before Butowsky ever contacted Mr. Wheeler, he had already had a

conversation on this topic with Seymour (Sy) Hersh," an "American investigative journalist who is

---

[25] Defendants assert the defense of truth to this statement. According to Plaintiff's Complaint, which the Court accepts as true at this stage of the proceedings, prior to and through publication of Zimmerman's article on May 16, 2017, "Wheeler expressed no 'misgivings' at all and he did not 'play along' with anything. In fact, he voluntarily offered Zimmerman quotations.  Wheeler approved the quotations in writing."  Docket Entry # 1 at 21, n. 10.  Plaintiff alleges: "As was fully disclosed in and by public record available to Folkenflik, and, upon information and belief, reviewed by Folkenflik and/or his editors and publishers, Wheeler only back-tracked on his quotations after being threatened with litigation by the Rich family.  Folkenflik intentionally misrepresented and distorted the truth in order to support the scandalous preconceived story about the President, Fox and Butowsky." *Id.*

notorious for using anonymous sources and is responsible for publishing a number of highly

controversial stories." *Id.*, ¶ 54.

> In the August 1 Report, Folkenflik states as follows:
>
> Five days later, the two men [Plaintiff and Wheeler] meet in person at a lunch in Washington.  Butowsky introduces an unexpected third guest: Malia Zimmerman, a Fox News investigative reporter based in Los Angeles known for enterprise reporting from a conservative standpoint.
>
> According to the account in the suit, Butowsky cautions Wheeler before they set out to meet the Riches: '[M]ake sure to play down Fox News.  Don't mention you know Malia.'
>
> And Butowsky lays out a different mission than aiding the Rich family.  Butowsky says he became convinced that the FBI had a report concluding that Seth Rich's laptop showed he had had contacts with WikiLeaks after speaking to the legendary Seymour Hersh, who was also investigating Rich's death. According to the transcripts in the law-suit, Butowsky says Hersh had an FBI source who confirmed the report.

August 1 Report. This implied that Plaintiff specifically laid out a politically motivated mission

different from aiding the Rich family.

> [I]f the defendant juxtaposes [a] series of facts so as to imply a defamatory connection between them, or [otherwise] creates a defamatory implication . . . he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct.

*White*, 909 F.2d at 523 (quoting Prosser, The Law of Torts § 116, 5th Ed. (Supp.1988)); *see also*

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990) (finding that nine sentences and a caption

combined to "*imply* an assertion that Milkovich perjured himself" and the implication was

sufficiently susceptible of being proved true or false to preclude First Amendment protection)

(emphasis added). The Court finds the August 1 Report, as a whole, can be reasonably understood

as stating the meaning Plaintiff proposes and is capable of defamatory meaning.

Plaintiff asserts Folkenflik made three defamatory statements during the *Mediaite* Interview. First, Folkenflik is quoted as saying: "[s]adly, the way in which this White House has operated has forced people to go out and to say things that are almost certainly knowingly untrue, and that are often proven certainly to be untrue." According to Plaintiff, Folkenflik's statement implies Plaintiff "knowingly" made untrue statements, "which in the securities industry is a crime." Docket Entry # 32 at 23. Second, Folkenflik was quoted as saying "collaboration" between Plaintiff and the White House "is still a plausible assumption with the current evidence." According to Plaintiff, "collaborate" is synonymous with "conspire" or "collude," and "that is most certainly what Folkenflik meant: that Butowsky conspired or colluded with the President in the production of fake news." *Id.* Third, Folkenflik was quoted as saying Plaintiff's "narrative" when he spoke with CNN's Chris Cuomo was "inconsistent." According to Plaintiff, this is a verifiable fact, not an opinion, and it implies Plaintiff lied to Chris Cuomo when Plaintiff appeared on CNN. *Id.* at 24. The Court finds Folkenflik's statements in the *Mediaite* Interview, as a whole, can be reasonably understood as stating the meaning Plaintiff proposes and are capable of defamatory meaning.

The August 7 Report contains three alleged defamatory statements: (1) Fox News had a "role" in "concocting a baseless story" on the death of Seth Rich; (2) Fox was involved in a "journalistic scandal" over the story; and (3) Fox "concocted" the story "in order to help President Trump." Unlike the other reports discussed above, Plaintiff is not mentioned in the August 7 Report. According to the Complaint, the August 7 Report, "[r]ead together with the [August 1 Report], the overall tenor and context of Folkenlik's messages was that Butowsky lied, was dishonest, and aided, abetted and actively participated in a fraudulent journalistic scandal." Docket Entry # 1 at 36, n. 12. In his response, Plaintiff argues these statements must be read together with the August 1 Report and

the other statements published by Folkenflik through September 19, 2017.  According to Plaintiff, the overall "gist" is that Fox News and Plaintiff worked together, each playing a "role," to "concoct" a "baseless story" that resulted in a journalistic "scandal."  Docket Entry # 32 at 24.  At this stage of the proceedings, accepting the allegations in the Complaint as true, the Court finds the August 7 Report can be reasonably understood as stating the meaning Plaintiff proposes.

The August 16 Report referenced in the Complaint contains two alleged defamatory statements.[26] First, Folkenflik published a photograph of Plaintiff beneath the following caption: "The Man Behind The Scenes In Fox News' Discredited Seth Rich Story."  Plaintiff asserts Folkenflik stated or implied that Plaintiff orchestrated a story that was proven to be disreputable or unbelievable. Plaintiff alleged the Fox News story was never discredited.  *See* Docket Entry # 1, ¶ 51, n. 13.  Second, Folkenflik states "Butowsky displays no curiosity about the way Fox's reporting and *his activities* affected the very people [the Rich Family] he says he sought to help." (emphasis added). According to Plaintiff, Folkenflik's statement, explicitly or by implication, accuses him of engaging in "activities" that caused harm to the Rich Family and that Plaintiff lacked empathy and understanding that his actions "affected" the Riches. The Court finds the August 16 Report, considered as a whole, can be reasonably understood as stating the meaning Plaintiff proposes and is capable of defamatory meaning.

---

[26] In his response, Plaintiff also references an August 16, 2017 Twitter Report wherein Folkenflik allegedly stated Plaintiff was "the financial talking head who helped to propel Fox News' discredited Seth Rich story." Docket Entry # 32 at 25. Although the August 16 Twitter Report is not in Plaintiff's Complaint, Plaintiff includes it in his proposed Amended Complaint. Docket Entry # 54 at 6. According to Plaintiff, referring to him as a "financial talking head" was a direct attack on Plaintiff as a securities professional who gives financial advice to clients.  Plaintiff further asserts this directly accuses Plaintiff of aiding and abetting the publication of the "discredited" "fake news story."

In the September 15 Report, Folkenflik published the following complained-of statements about Plaintiff.[27] First, Folkenflik stated a "Dallas investment manager and Trump supporter named Ed Butowsky helped to orchestrate the Fox News story." According to Plaintiff, this directly implicated Plaintiff in a scheme to publish the "baseless," "fake" and "deceptive" story and cast aspersions upon Plaintiff as a registered investment advisor. Second, Folkenflik stated "Butowsky fed tips to Wheeler and Zimmerman, the Fox reporter, as he sought to link the dead man [Seth Rich] to the leaked emails instead of hackers working on behalf of the Russians." According to Plaintiff, this statement reinforced the theme that Plaintiff was the mastermind of the conspiracy.

Third, Folkenflik stated Plaintiff's actions were "all part of an effort . . . to defend President Trump" and to influence and obstruct a "federal investigation" into the President's "ties to the Russians." Finally, Folkenflik stated Plaintiff "blurred lines between benefactor, source, player and, possibly, even reporter." Plaintiff asserts the word "player" carries a very heavy negative connotation and "highlights Folkenflik's malicious agenda and extreme bias." Docket Entry # 32 at 26. The Court finds the September 15 Report, as a whole, can be reasonably understood as stating the meaning Plaintiff proposes and is capable of defamatory meaning.

---

[27] In his response, Plaintiff also references a September 19, 2017 Report entitled "Fox News Fights Back on Lawsuit Filed Over Seth Rich Story," wherein Folkenflik allegedly stated Plaintiff "is a Dallas investment manager and supporter of President Trump's who worked behind the scenes to try to link Rich to the leak of the Democratic emails as a way of deflecting criticism of the president." Docket Entry # 32 at 26. Although the September 19 Report is not in Plaintiff's Complaint, Plaintiff includes it in his proposed Amended Complaint. Docket Entry # 54 at 7. According to Plaintiff, the "gist" of this statement is that Plaintiff lied to protect the President. Docket Entry # 32 at 26.

Finally, the Court notes Plaintiff also includes in his proposed Amended Complaint an allegation that on March 13-14, 2018 – over seven months after the original publications – Folkenflik and NPR republished three of the online articles to a new target audience – Folkenflik's followers on Twitter. Docket Entry # 54 at 7 & n. 1.

In sum, the Court finds Plaintiff has alleged the gist of the reports can be reasonably understood as stating the meaning Plaintiff proposes.  Because the reports are "reasonably capable" of communicating the meaning Plaintiff proposes, the next question is whether that meaning is "reasonably capable" of defaming Plaintiff. *Tatum*, 554 S.W.3d at 637. The Court concludes it is, as discussed further below on actual malice.[28]

## 4.      "Of and concerning" Plaintiff

In their motion, Defendants assert many of the statements at issue are not "of and concerning" Plaintiff, and therefore cannot serve as the basis for Plaintiff's defamation claim.  To maintain a defamation action, a plaintiff must be referenced in the complained-of statement. *Vice v. Kasprzak*, 318 S.W.3d 1, 13 (Tex. App. – Houston [1st Dist.] 2009) (citation omitted). Whether a plaintiff is referenced in a statement is a question of law. *Id.* A publication is "of and concerning the plaintiff" if persons who knew and were acquainted with him understood from viewing the publication that the defamatory matter referred to him. *Id.* It is not necessary that the plaintiff be specifically named in the communication to be defamatory, but it must be clear to those who know and are acquainted with him that the defamatory statement is directed to him. *Id.* The false statement

---

[28] At this stage of the case and under the facts as alleged in the Complaint (including that Defendants acted in concert and conspiracy with Wigdor to publish and republish false and defamatory statements), the Court also finds Plaintiff has sufficiently alleged the falsity element of his defamation claim. In addition to its allegations that Defendants and Wigdor manufactured the false and "preconceived" story, Plaintiff has also sufficiently alleged the gist of the reports was not substantially true – that is, that the reports were not fair, true, and impartial accounts of the *Wheeler* Complaint.  *Toledo*, 492 S.W.3d at 715; *see Hall*, 524 S.W.3d at 382 (stating "a plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way"); *see also Turner*, 38 S.W.3d at 115 (expressly observing claim for "defamation based on a publication as a whole," i.e., defamation by implication).

must point to the plaintiff and no one else. *Id.*

Again, Defendants focus on whether the Plaintiff is referenced in the individual statements rather than in the reports as a whole. With the exception of the August 7 Report, each report, including some of the complained-of statements, mentioned Plaintiff by name. *See Klentzman II*, 456 S.W.3d at 254 ("The Article recounted, over the space of several paragraphs, details regarding the theft of Wade's cell phone, the circumstances surrounding his MIP charge, and details regarding another interaction Wade had with a DPS trooper in his driveway. The Article mentioned Wade by name more than once, mentioned his MIP trial, and stated that an expunction order pertaining to his MIP charge had been issued. These statements point to Wade and no one else."). In fact, all of the reports except the August 7 Report prominently featured Plaintiff.

The August 7 Report does not mention Plaintiff. In the report, Folkenflik stated Fox News had a "role" in "concocting a baseless story" on the death of Seth Rich; Fox was involved in a "journalistic scandal" over the story; and Fox "concocted" the story "in order to help President Trump." In *Klentzman*, the court held the fact the article at issue also discussed the actions of other people in addition to Wade did not prohibit it from being defamatory concerning Wade. *Klentzman II*, 456 S.W.3d at 255 (citing *Sellards v. Express–News Corp.,* 702 S.W.2d 677, 680 (Tex.App.–San Antonio 1985, writ ref'd n.r.e.) (holding that allegedly defamatory article about car crash was "of and concerning" one of several passengers, even though she was not mentioned by name, and stating, "[w]hen a group is named and the plaintiff is a readily identifiable member of the group, a cause of action for defamation exists if those who know and are acquainted with the plaintiff understand the article refers to the plaintiff")). At this stage of the proceedings, accepting the allegations in

Plaintiff's Complaint as true,[29] the Court is not convinced Plaintiff fails to plausibly allege he is a "readily identifiable member" of the "journalistic scandal" and alleged "concoction" of Fox News' Seth Rich story.  The Court recommends this part of Defendants' motion be denied.

## 5. Statements of verifiable fact

The Supreme Court has held that, under the First Amendment, a statement can serve as a basis for a defamation claim only if it is a statement of fact and not of opinion.  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974).  As another basis for dismissal, Defendants argue many of the statements at issue are opinions.  Specifically, from the August 1 Report, Defendants state the following statements are opinions: (1) The title of the August 1 Report that the Fox News story was "baseless;" (2) The subheading of the August 1 Report that the Fox News story was a "fake" news story; (3) "Wheeler does not make great headway. The FBI informs Butowsky, Wheeler and Zimmerman that the agency is not assisting the Washington, D.C., police on the investigation — undercutting claims about an FBI report;" and (4) "'Rod Wheeler unfortunately was used as a pawn by Ed Butowsky, Fox News and the Trump administration to try and steer away the attention that was being given about the Russian hacking of the DNC emails,' says Douglas Wigdor, Wheeler's lawyer."

Defendants argue both statements at issue from the *Mediaite* Interview are opinions ("inconsistent" narrative and possible "collaboration" between Plaintiff and the White House).[30]

---

[29] According to the Complaint, the August 7 Report, "[r]ead together with the [August 1 Report], the overall tenor and context of Folkenlik's messages was that Butowsky lied, was dishonest, and aided, abetted and actively participated in a fraudulent journalistic scandal." Docket Entry # 1 at 36, n. 12.

[30] Defendants further assert: "mischaracterizes statement."  *See* Docket Entry # 25-1 at 8. The Court finds this basis for dismissal without merit.

Defendants assert two of the three statements in the August 7 Report are opinions (Fox News

"concocting a baseless story" and that Fox was involved in a "journalistic scandal" over the Seth

Rich story).  Defendants assert all of the complained-of statements in the August 16 Report and the

September 15 Report are opinions.

Whether a statement asserts a fact or opinion turns on whether the statement is

verifiable—i.e., whether it "is sufficiently factual to be susceptible of being proved true or false."

*Milkovich*, 497 U.S. at 21.  Opinions may be actionable as defamatory where they implicitly contain

an assertion of fact.  *Id.* at 18-19.  The Supreme Court has recognized that simply couching

statements in terms of an opinion does not dispel its implications of a false assertion of fact. *See id.*

at 19 ("It would be destructive of the law of libel if a writer could escape liability for accusations of

defamatory conduct simply by using, explicitly or implicitly, the words 'I think.'") (quoting *Cianci*

*v. New Times Publ'g Co.*, 639 F.2d 54, 64 (2d Cir. 1980) (Friendly, J.)(alterations omitted)).

The Texas Supreme Court in *Tatum* rejected the view that implications are opinions, either

necessarily or presumptively, pointing out publishers "cannot avoid liability for defamatory

statements simply by couching their implications within a subjective opinion."  554 S.W.3d at 634

(citing *Milkovich*, 497 U.S. at 19).  According to the court in *Tatum*, after the U.S. Supreme Court's

decision in *Milkovich*, "the opinion inquiry seeks to ascertain whether a statement is 'verifiable,' not

whether it manifests a personal view."  554 S.W.3d at 634 (citing *Neely*, 418 S.W.3d at 62).

According to the court,

> no court can decide whether a statement is verifiable until the court decides what the
> statement *is*—that is, until it conducts an inquiry into the publication's meaning. Of
> course, implications may frequently turn out to be non-verifiable opinions, but we
> disagree that implications are presumptively opinion simply by virtue of being
> implicit. So we see little hope that asking a court to decide from the outset whether

a statement is an opinion will limit the number of defamation-by-implication claims that reach a jury.

*Tatum*, 554 S.W.3d at 634 (emphasis in original).

A close reading of those statements by Folkenflik reveals they were not expressions of opinion. Instead, the statements were made as objective facts. Folkenflik provided purported "verifiable facts" to support the statements. Nothing about the context of the statements indicate Folkenflik was expressing an opinion. Based on these legal principles and the factual allegations pleaded, which must be assumed true at this stage, the Court holds that Plaintiff's defamation claims raise a right to relief above the speculative level and survive Rule 12(b)(6) attack. The Court recommends this part of Defendants' motion be denied.

**6.     Whether Plaintiff has plausibly alleged Defendants acted with actual malice**

*Applicable law*

The next disputed element of Plaintiff's defamation claim is whether Defendants acted with the requisite degree of fault. This issue relates to a showing of fault on the part of the media defendant, which is a constitutional prerequisite for defamation liability. *Klentzman I*, 312 S.W.3d at 897 (citing *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex.1998)). As to this requirement, the public plaintiff must prove, by clear and convincing evidence, that the media defendant published the statement with "actual malice," that is, "made with knowledge of [the statement's] falsity or with reckless disregard for the truth." *Klentzman I*, 312 S.W.3d at 897-98 (quoting *Gertz*, 418 U.S. at 342). "The private individual need prove only negligence on the part of the media defendant—that is, he must show that the defendant knew or should have known that the defamatory statement was false—in order to recover actual damages." *Klentzman I*, 312 S.W.3d at

898 (citing *McLemore,* 978 S.W.2d at 571; *Foster v. Laredo Newspapers, Inc.,* 541 S.W.2d 809, 819 (Tex.1976)). However, when the defamatory statement involves a matter of public concern, a private individual must meet the higher standard of proving actual malice in order to recover any presumed or punitive damages against a media defendant. *Klentzman I*, 312 S.W.3d at 898 (citing *Gertz,* 418 U.S. at 349) (holding, when defamatory statement involved issue of public concern, that private individual was required to prove actual malice to recover presumed or punitive damages against media defendant); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* 472 U.S. 749, 761 (1985) (clarifying that *Gertz* does not apply when statement involves no issue of public concern)).

### The parties' assertions

Defendants first argue the Court should dismiss this case under Rule 12(b)(6) because Plaintiff is a public figure or a limited purpose public figure and must plausibly allege actual malice, which he has failed to do. According to Defendants, by his own admission, Plaintiff is "internationally recognized" in the wealth management industry; he has been "prominently featured" in films and media coverage as a result of his work with professional athletes; he has appeared hundreds of times on national television; and he was also regularly heard on radio shows around the country. Docket Entry # 1, ¶¶ 1-2. Defendants argue these allegations suggest Plaintiff may be a general-purpose public figure, but he is at least a limited-purpose public figure because he has injected himself into the public controversy at issue in this lawsuit. Docket Entry # 25 at 22, n. 21.

Plaintiff asserts the fact he was a successful Dallas investment advisor, who generally appeared on television prior to the public controversy at issue, does not make him a public figure. Docket Entry # 32 at 15, n. 10. Plaintiff further contends he did not voluntarily assume a role of special prominence in this public controversy. *Id.* According to Plaintiff, he offered to help the Rich

family, and he had limited involvement in Wheeler's investigation. *Id.* However, in the event he is

considered a limited public figure, Plaintiff asserts he has alleged sufficient facts to demonstrate

Folkenflik and NPR acted with actual malice. *Id.*

Defendants further argue Plaintiff fails to allege Defendants Chapin, Cook, and Gogoi acted

at all, much less with actual malice. In his response, Plaintiff argues as follows:

> Defendants, Chapin, Cook and Gogoi are editors and publishers employed by NPR.
> Together with Folkenflik, they 'created, contributed, edited, published, instigated,
> directed and ratified the defamation at issue in this action.' [*Complaint, ¶ 6*].
> Contrary to Defendants' suggestion . . . , Butowsky has identified the conduct that
> subjects Chapin, Cook and Gogoi to liability.

Docket Entry # 32 at 26-27.

### Discussion

As an initial matter, the parties dispute whether Plaintiff is a public figure.  In the context of

defamation claims, there are two types of "public figures." *Rodriguez v. Gonzales*, 566 S.W.3d 844,

850 (Tex. App. – Houston [14th Dist.] 2018). "All-purpose" or "general purpose" public figures are

those "who have achieved such pervasive fame or notoriety that they become public figures for all

purposes and in all contexts." *Id.* (quoting *McLemore*, 978 S.W.2d at 571(citing *Gertz*, 418 U.S. at

351)). In contrast, a "limited-purpose" public figure is a public figure only "for a limited range of

issues surrounding a particular public controversy." *Id.*

To determine whether a defamation claimant is a limited-purpose public figure, Texas courts

apply the following three-part test: (1) the controversy at issue must be public both in the sense that

people are discussing it and people other than the immediate participants in the controversy are likely

to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role

in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation

in the controversy. *Rodriguez*, 566 S.W.3d at 850 (citing *Neely*, 418 S.W.3d at 70).  Limited-purpose public figures are persons who "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. . . ." *See Klentzman I*, 312 S.W.3d at 904 (citation omitted).

To determine whether an individual had more than a trivial or tangential role in the controversy, a court should consider: (1) whether the plaintiff actively sought publicity surrounding the controversy; (2) whether the plaintiff had access to the media; and (3) whether the plaintiff voluntarily engaged in activities that necessarily involved the risk of increased exposure and injury to reputation. *Id*. at 905 (citing *McLemore,* 978 S.W.2d at 572–73). A person does not become a public figure merely because he is "discussed" repeatedly by a media defendant or because his actions become a matter of controversy as a result of the media defendant's actions. *Klentzman I*, 312 S.W.3d at 905 (citation omitted). Rather, a defamation defendant must show the plaintiff "relinquished . . . his interest in the protection of his own name" by "engag[ing] the attention of the public in an attempt to influence the resolution" of "an[ ] issue of public concern." *Id.*

At this stage of the proceedings, the Court is not convinced these requirements are satisfied. According to the allegations in the Complaint, which the Court accepts as true and views in the light most favorable to Plaintiff, Plaintiff's role and involvement in the investigation of Seth Rich was limited, and he had "very little communication with Wheeler."  Docket Entry # 1, ¶¶ 57, 62.  These allegations do not support a finding that Plaintiff "thrust [himself] to the forefront" of that "particular public controvers[y] in order to influence the resolution of the issues involved . . . [i]nvit[ing] attention and comment," or "inject[ed] himself or [was] drawn into [that] particular public controversy . . .  assum[ing] special prominence in the resolution of public questions," or "thrust

himself into the vortex of [a] public issue . . . [or] engage[d] the public's attention in an attempt to influence its outcome." *Klentzman I*, 312 S.W.3d at 906–07.

Importantly, "[b]ased upon the present record, the court finds, as have other courts in similar circumstances, that whether [Plaintiff is a] limited-purpose public figure[] is more appropriate for resolution at the summary judgment stage on the basis of evidentiary facts." *Marous Bros. Const., LLC v. Alabama State Univ.*, No. 2:07CV384ID, 2008 WL 370903, at *3 (M.D. Ala. Feb. 11, 2008) (citing *Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.,* 12 F.Supp.2d 1035, 1044 n. 1 (C.D.Cal.1998) (applying California defamation law and noting that "it would be premature to determine, on a motion to dismiss, whether [plaintiff] is a public figure or whether the alleged statements were made with actual malice"); *Zerbe v. Guzman Pinal,* No. Civ. 05-DS-21-JD, 2005 WL 2671339, at *1 & n. 1 (D.Puerto Rico Oct.18, 2005) (noting that whether plaintiff was a public figure "was more appropriately addressed in the context of a motion for summary judgment," than a motion to dismiss, where the complaint did not allege that the plaintiff was a public figure and the plaintiff denied the categorization in his objection to the motion to dismiss)).

Even if the Court were to assume, for purposes of this Report and Recommendation only, that Plaintiff is a limited-purpose public figure, the Court would agree with Plaintiff that he has sufficiently alleged actual malice. *See id.* at 898 (holding that when defamatory statement involves matter of public concern, even private individual must prove malice to recover presumed or punitive damages against media defendant). "Actual malice in this context does not mean bad motive or ill will but rather knowledge of, or reckless disregard for, the falsity of a statement." *Robert B. James, DDS, Inc. v. Elkins*, 553 S.W.3d 596, 610–11 (Tex. App. 2018), *review denied*, (Mar. 1, 2019) (quoting *Greer v. Abraham*, 489 S.W.3d 440, 443 (Tex. 2016)). To establish reckless disregard, a

plaintiff must show the defendant "entertained serious doubts as to the truth of his [statement]." *Huckabee v. Time Warner Entm't Co. L.P.*, 19 S.W.3d 413, 420 (Tex. 2000) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

The Court analyzes the actual malice issue in terms of both Plaintiff's claim that each report as a whole presented a false and defamatory impression and his claim that individual statements were false and defamatory. *See Turner*, 38 S.W.3d at 120.  Plaintiff's Complaint alleges Folkenflik and NPR acted with actual malice and reckless disregard for the truth.  *Id.* at 5.  Specifically, Plaintiff alleges as follows:

> Hungry to publish a scandalous story about the President of the United States and Fox and to aid and abet Wigdor's effort to extort money from Fox, Folkenflik failed to verify the information Wigdor secretly provided before releasing it on NPR.org, to NPR's radio listeners via Morning Edition, and to millions upon millions via Twitter. In spite of serious doubts as to the veracity of his source, Folkenflik blindly accepted Wigdor's false statements without ever once questioning Wigdor's (and his client, Rod Wheeler's), motive to lie. Folkenflik disregarded known sources of information that flatly contradicted the false narrative peddled by Wigdor. In promoting Wigdor's story, Folkenflik misrepresented, distorted and oversimplified facts and issues. Folkenflik failed to gather, update and correct information throughout the life of his story, allowing the false narrative to build momentum and take on a life of its own. Folkenflik engaged in baseless stereotyping and allowed his (and Wigdor's) extreme bias to shape his reporting. Folkenflik published and republished the story in such a way and to such audiences and extremes as to maximize the insult, pain, humiliation and embarrassment to Ed Butowsky. Folkenflik pandered to lurid curiosity about the President and fake news about 'Russian collusion,' rather than tell the truth.

*Id*. at 5-6 (emphasis in original).

According to Plaintiff, Folkenflik had actual knowledge that his written and oral statements about Plaintiff were false and that Wheeler had been accurately quoted by Fox; he knew Plaintiff did not collude with the President of the United States or with Fox to publish "fake news;" he also knew Plaintiff did not support any effort by Fox (because there was none) to fabricate and falsely attribute

quotations to Wheeler.  *Id.* at 14, ¶¶ 15-16.   The Complaint alleges Folkenflik "deliberately misrepresented and concealed known facts, including the fact (a) that Fox reporter, Malia Zimmerman ('Zimmerman') had shared drafts of her article with Rod Wheeler ('Wheeler') on May 15, 2017, and (b) Wheeler had approved the exact quotations that appeared in Zimmerman's article." *Id*. at 14, ¶ 16.

The Complaint further alleges as follows. Before he published his first online article on August 1, 2017 at 7:23 a.m., Folkenflik possessed information that should have caused him to disbelieve the preconceived false narrative supplied to him by Wigdor. *Id.* at 14, ¶ 17. The truth was well-known to Folkenflik – not only from Wheeler's text messages and emails (described in detail in the Complaint) in Folkenflik's possession, but from public records (videos in which Wheeler and others, including Seymour Hersh, appeared) and from other information and recordings available to Folkenflik on the Internet.  *Id.* at 14-15, ¶ 17.

Although Wigdor told Folkenflik that Fox and Plaintiff had fabricated quotations that Fox and Plaintiff then falsely attributed to Wheeler, Folkenflik knew (a) Wheeler had made the statements publicly on camera on May 15, 2017 to Fox 5 DC correspondent, Marina Marraco, (b) Wheeler had actually confirmed the quotations three times to Zimmerman on May 15, 2017 in emails and text messages, (c) Wheeler had affirmed the substance of the quotations in interviews with Sean Hannity and Lou Dobbs on May 16, 2017, and (d) Wheeler had actually told FetchYourNews on May 22, 2017 that Zimmerman's story was "essentially correct."  *Id*. at 15, ¶ 18.

Instead of reporting the truth, Folkenflik "abandoned his ethics and went with a preconceived story–a story manufactured and supplied to him by his source–Wigdor–a source that was admittedly on a 'crusade' to get Fox." *Id*. at 15, ¶ 19. Folkenflik "abandoned all journalistic integrity;" he failed

to investigate the true facts; he relied on inherently unreliable and debunked sources, such as Wigdor's client and source, Wheeler; and he departed from journalistic standards and repeated words and phrases he knew were "false or inherently improbable–phrases such as 'Russian collusion.'" *Id.*

Plaintiff alleges Folkenflik, who hated Fox and craved the notoriety of salacious "breaking news," had a motive to publish a false narrative about Fox. *Id.* at 16, ¶ 20.  According to Plaintiff, "[i]n spite of known and obvious reasons to doubt the veracity of Wigdor and Wheeler, Folkenflik and NPR proceeded with the preconceived story without verification and without hesitation."  *Id.*

According to Defendants, the vast majority of Plaintiff's allegations make the "conclusory allegation" Folkenflik knew the allegations contained in the *Wheeler* Complaint were false because he could have accessed information online that would have cast doubt upon Wheeler's claims. Docket Entry # 25 at 24.  The Court does not find Plaintiff's allegations so limited.  Moreover, "[a]lthough the failure to investigate does not, on its own, demonstrate actual malice, a purposeful avoidance of the truth does." *Lane v. Phares*, 544 S.W.3d 881, 891 (Tex. App. – Fort Worth 2018) (quoting *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 578–79 (Tex. App.–Austin 2007, pet. denied); *see also Harte–Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692, 109 S.Ct. 2678, 2698, 105 L.Ed.2d 562 (1989) ("[F]ailure to investigate will not alone support a finding of actual malice"); *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 313 (5th Cir. 1995) ("Negligence, lack of investigation, or failure to act as a reasonably prudent person are insufficient to show actual malice.")). "An understandable misinterpretation of ambiguous facts does not show actual malice, but inherently improbable assertions and statements made on information that is obviously dubious may show actual malice." *Bentley*, 94 S.W.3d at 596.

A defendant's "[r]epitition of another's words" that the "repeater knows" are "false or

inherently improbable" is similarly non-dispositive but relevant, as is "evidence that a defendant conceived a story line in advance" and then "set out to make the evidence conform" to that story. *Gilmore v. Jones*, No. 3:18-CV-00017, 2019 WL 1418291, at \*24 (W.D. Va. Mar. 29, 2019) (quoting *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 872 (W.D. Virg. 2016) (citations omitted); *see also Harte-Hanks Commc'ns., Inc. v. Connaughton*, 491 U.S. 657, 668, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (noting that, although "courts must be careful not to place too much reliance on such factors," it "cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry")).   Actual malice may be inferred from the relation of the parties, the circumstances attending the publication, the terms of the publication itself, and from the defendant's words or acts before, at, or after the time of the communication. *Dolcefino v. Turner*, 987 S.W.2d 100, 111 (Tex. App. 1998), *aff'd sub nom. Turner v. KTRK Television, Inc.*, 38 S.W.3d 103 (Tex. 2000) (citations omitted) (further noting in footnote 13 that the Supreme Court in *Harte*–Hanks recognized that "a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence. . . .").

Plaintiff's allegations are sufficient at this stage to create a "plausible inference" that Folkenflik and NPR published the reports with actual malice.  *See Gilmore*, 2019 WL 1418291, at \*26.  "Although neither the pursuit of a preconceived narrative nor a failure to observe journalistic standards is alone ultimately enough to establish actual malice, [Plaintiff's] factual allegations, taken together, are sufficiently plausible to support an inference that [Folkenflik] published statements about him with actual malice."  *Id.* (citations omitted). Plaintiff's allegations sufficiently indicate at this stage in the litigation that Folkenflik purposefully avoided learning the truth. *See Bentley*, 94 S.W.3d at 596 ("A failure to investigate fully is not evidence of actual malice; a purposeful

avoidance of the truth is."). Plaintiff plausibly alleges when Folkenflik published the statements, he knew the statements were false, had serious doubts as to their truth, or had a high degree of awareness of their probable falsity. *See Isaacks*, 146 S.W.3d at 162.  Thus, the Court finds Plaintiff plausibly alleges Folkenflik and NPR published statements with actual malice.

Defendants further argue Plaintiff has failed to allege Chapin, Cook, or Gogoi published any statement that could give rise to a defamation claim, must less that they did so with actual malice. Under Texas law, an individual can be liable for a corporation's libelous publication in either of two ways:

> First, he can be liable because of his own actions in producing or circulating the libel, i.e., by aiding, assisting or advising in its publication or circulation. Second, even if not personally involved in producing or circulating the libel, he will be liable if his corporate duties charge him with the responsibility of publishing or circulating the newspaper.

*Langston v. Eagle Printing Co.*, 797 S.W.2d 66, 68 (Tex. App. 1990)

In *Cantrell v. Forest City Publishing Co.,* 419 U.S. 245 (1974), the Supreme Court held a newspaper publisher liable, under traditional doctrines of respondeat superior, for the defamatory reports of its employees.  *See Jauch v. Corley*, 830 F.2d 47, 51–52 (5th Cir. 1987) (noting the publisher in *Cantrell* was liable because it authorized the reports and holding under the reasoning of *Cantrell* that if the sheriff authorized the deputy sheriff's defamatory remarks, the plaintiff did not have to prove the sheriff acted with actual malice); *see also McFarlane v. Esquire Magazine*, No. CIV. 92-0711 TAF, 1994 WL 510088, at *11 (D.D.C. June 8, 1994), *aff'd*, 74 F.3d 1296 (D.C. Cir. 1996) ("Actual malice cannot be imputed from one defendant to another absent an employer-employee relationship giving rise to *respondeat superior*.").

In his Complaint, Plaintiff alleges Chapin is the Executive Editor of NPR News, Cook is a

senior business editor on NPR's Business, and Gogoi is the Senior Business Editor for NPR's Business Desk.  Docket Entry # 1, ¶ 6. The Court is not convinced, at this stage of the proceedings, Chapin, Cook, and Gogoi cannot be held personally liable for any of the reports.  Nor is the Court convinced Plaintiff cannot rely upon the theory of respondeat superior to impute evidence of actual malice from Folkenflik to the editors and publishers of NPR. *See McFarlane*, 1994 WL 510088, at *11 (finding the plaintiff could not rely on the theory of respondeat superior because the author of the article was not an employee of Esquire but was a freelance journalist hired to write the article).  The Court recommends this part of Defendants' motion be denied.

**F.     Whether the Defamation Mitigation Act bars Plaintiff's defamation claim**

**1.     The parties' assertions**

Finally, Defendants argue Plaintiff's defamation claim is barred by the Texas Defamation Mitigation Act ("DMA"), which requires defamation plaintiffs to request a correction, clarification, or retraction from the publisher of a defamatory statement within the limitations period for the defamation claim. *See* TEX. CIV. PRAC. & REM. CODE §§ 73.051, .054–.055 (added by H.B. 1759, 83d Leg., R.S., § 2). Under this provision, a defamation plaintiff may only recover exemplary damages if she serves the request for a correction, clarification, or retraction within 90 days of receiving knowledge of the publication.  *Id.* § 73.055(c).

In his response, Plaintiff states he has not yet requested retraction of the alleged defamatory reports pursuant to § 73.005(a)(1) of the DMA.  Docket Entry # 32 at 29.  According to Plaintiff, the filing of this action on June 21, 2018 "tolled the statute of limitations for commencement of an action for defamation;" thus, Plaintiff still has time to request a retraction.  *Id.* at n. 16.  Plaintiff further asserts the Complaint in this case satisfies the requirements of § 73.055(d) of the DMA.  *Id.*

88

Additionally, Plaintiff argues retraction is "a futile pipedream" because the damage is irreparable.  Docket Entry # 32 at 29.  Plaintiff states there is "no way for Folkenflick and NPR to put the poison back in the bottle because the Folkenflik/NPR Articles have been republished millions and millions of times by other main stream and alternative media outlets, online newspaper publishers, via social media and by other media correspondents throughout the World." *Id*. (citing Compl., ¶¶ 33, 39-46). Even if Plaintiff were to request a retraction, Plaintiff asserts there is no way for Folkenflik and NPR to comply with § 73.057(e) of the DMA ("If the original publication was on the Internet, a correction, clarification, or retraction is published with a prominence and in a manner and medium reasonably likely to reach substantially the same audience as the publication complained of it the publisher appends to the original publication the correction, clarification, or retraction."). Plaintiff asserts the Court should deny Defendants' request.  Alternatively, Plaintiff asserts the Court should merely preclude Plaintiff from recovering exemplary damages in connection with his defamation claim.

## 2.    Applicable law

### *The DMA*

The DMA went into effect on June 14, 2013, for the express purpose of "provid[ing] a method for a person who has been defamed by a publication or broadcast to mitigate any perceived damage or injury." TEX. CIV. PRAC. & REM. CODE § 73.052. The DMA applies to "a claim for relief, however characterized, from damages arising out of harm to personal reputation caused by the false content of a publication." *Id*. § 73.054(b). The DMA applies to "all publications, including writings, broadcasts, oral communications, electronic transmissions, or other forms of transmitting information." *Id*. § 73.054(b).

89

The DMA further provides, in pertinent part, as follows:

(a) A person may maintain an action for defamation only if:
    (1) the person has made a timely and sufficient request for a correction, clarification, or retraction from the defendant; or
    (2) the defendant has made a correction, clarification, or retraction.
(b) A request for a correction, clarification, or retraction is timely if made during the period of limitation for commencement of an action for defamation.
(c) If not later than the 90th day after receiving knowledge of the publication, the person does not request a correction, clarification, or retraction, the person may not recover exemplary damages.
(d) A request for correction, clarification, or retraction is sufficient if it:
    (1) is served on the publisher;
    (2) is made in writing, reasonably identifies the person making the request, and is signed by the individual claiming to have been defamed or by the person's authorized attorney or agent;
    (3) stated with particularity the statement alleged to be false and defamatory and, to the extent known, the time and place of publication;
    (4) alleges the defamatory meaning of the statement; and
    (5) specifies the circumstances causing a defamatory meaning of the statement if it arises from something other than the express language of the publication.
(e) A period of limitation for commencement of any action under this section is tolled during the period allowed by Sections 73.056 and 73.057.

TEX. CIV. PRAC. & REM. CODE § 73.055(a). To be timely, a request must be sent within one year after the day the cause of action accrues—generally, within a year of the statement's publication.

*Zoanni v. Hogan*, 555 S.W.3d 321, 326 (Tex. App. 2018) (citations omitted).[31]

### Case law

Recognizing there is a split of authority in the Texas intermediate appellate courts as to

---

[31] A cause of action for defamation generally accrues when a statement is published or circulated. *Zoanni*, 555 S.W.3d at 326 (citing *Velocity Databank, Inc. v. Shell Offshore, Inc.*, 456 S.W.3d 605, 609 (Tex. App.—Houston [1st Dist.] 2014, pet. denied)).  According to the court in *Zoanni*, the discovery rule applies to toll that limitations period if the defamatory statement is inherently undiscoverable or not a matter of public knowledge. *Id.*

whether failure to make a timely and sufficient retraction request pre-suit is a bar to litigation or just a preclusion of recovery of exemplary damages, Defendants instead rely on a Fifth Circuit case that has considered the issue and held a plaintiff's claim failed as a matter of law under the DMA because the plaintiff failed to request a modification or retraction. *See Tubbs v. Nicol*, 675 Fed. Appx. 437, 439 (5th Cir. 2017) (per curium) (unpublished).

In the *Tubbs* case, the plaintiff failed to adhere to the strictures of the DMA and claimed any request for retraction would be futile because the defendant stated in his deposition "that he would not take back having written his letter of complaint regarding the incident on the flight." *Tubbs v. Nicol*, No. 15-CV-00002, 2016 WL 7757386, at *3 (S.D. Tex. Apr. 19, 2016), *aff'd*, 675 Fed. Appx.437 (5th Cir. 2017). The district court held the plaintiff misconstrued the defendant's testimony. *Id*. According to the court, although the defendant testified he would not take back his 2013 statements in his complaint letter, this did not necessarily mean the defendant "would not have followed the strictures of the DMA and allowed for an opportunity for mitigation, or modified elements of his complaint letter, had Plaintiff timely presented a request for retraction." *Id*. Because the plaintiff did not provide a request for mitigation, the court held the plaintiff's claim for defamation failed as a matter of law. *Id*. (citing TEX. CIV. PRAC. & REM. CODE § 73.055(a)(1)).

The Fifth Circuit affirmed the court's decision, noting that "nothing in the language of the DMA indicates that it intends to exclude cases in which a request for correction, clarification, or retraction would be futile." *Tubbs*, 675 Fed. Appx. at 439. Even assuming that such an exclusion does exist, the Fifth Circuit held Tubbs' argument failed because the one statement relied upon by the plaintiff did not prove the defendant would never have responded affirmatively to any request to modify or retract. *Id*. "Thus, because Tubbs failed to follow the requirements of the DMA, her

defamation claim fail[ed] as a matter of law." *Id.*

As noted above, there is a split among the Texas appellate courts on this issue.  The Texas Courts of Appeals in Austin and Dallas, after construing the entire statute, have both interpreted the provisions of the DMA as meaning that the "consequence for failing to timely make a request is not dismissal, but rather preclusion of recovery of exemplary damages." *Tu Nguyen v. Duy Tu Hoang*, 318 F. Supp. 3d 983, 1018–19 (S.D. Tex. 2018), *appeal dismissed sub nom. Tu Nguyen v. Radio Free Asia*, No. 18-20529, 2018 WL 7142200 (5th Cir. Oct. 5, 2018) (citing *Warner Bros. Entm't v. Jones*, 538 S.W.3d 781, 812 (Tex. App.—Austin 2017, pet. filed); *Hardy v. Commc'n Workers of Am. Local 6216*, 536 S.W.3d 38 (Tex. App.—Dallas 2017, pet. denied) ("If a plaintiff's claim were subject to dismissal solely due to her failure to request a correction, clarification, or retraction of the statement, a defendant would have no need to ever challenge whether a request was timely.")).

The court in *Hardy* was the first Texas appellate court to consider the issue of whether a plaintiff's lawsuit is subject to dismissal through a no-evidence summary judgment because she failed to make a request that complied with § 73.055 of the DMA.  536 S.W.3d at 44-45.  The appellate court construed the statute to mean that the plaintiff's claim "is not subject to dismissal solely based on the plaintiff's failure to timely and sufficiently request a correction, clarification, or retraction."  *Id*. at 48. The *Hardy* court found the Fifth Circuit's unpublished opinion in *Tubbs* unpersuasive.  *Id.* at 44 n. 4. According to the court in *Hardy*, in affirming the grant of summary judgment, the Fifth Circuit in *Tubbs* "failed to construe the DMA in its entirety and did not address whether the abatement procedure set out in section 73.062 of the statute indicated an intent by the Legislature that a plaintiff's defamation claim was not subject to dismissal solely based on a failure to comply with section 73.055(a)."  *Id.*

Other Texas courts have since agreed with *Hardy*.[32]  *See Cummins v. Lollar*, No. 07-16-00337-CV, 2018 WL 2074636, at *8 (Tex. App. – Amarillo May 3, 2018), *reh'g denied* (May 29, 2018), *review denied* (Aug. 24, 2018), *cert. denied*, No. 18-7758, 2019 WL 1231913 (U.S. Mar. 18, 2019) ("The only consequence for failing to make a request for retraction within ninety days is preclusion of recovery of exemplary damages, not dismissal.").  In *Warner Bros. Entm't v. Jones*, 538 S.W.3d 781 (Tex. App. – Austin 2017), the appellate court agreed with *Hardy* that when the MDA is read in its entirety, and giving effect to all its provisions and considering the purpose of the statute, "the consequence for failing to timely make a request is not dismissal, but rather preclusion of recovery of exemplary damages." *Id.* at 812 (citing *Hardy*, 536 S.W.3d at 46–47 (citing Tex. Civ. Prac. & Rem. Code § 73.055(c); *Neely*, 418 S.W.3d at 63)).

According to the court in *Warner Brothers*, the DMA provisions which affect the damages recoverable by the plaintiff, along with the DMA's provision allowing a defendant to challenge the timeliness and sufficiency of a request for a correction, clarification, or retraction, indicate the Texas Legislature did not intend to deprive a plaintiff of a defamation claim based on a failure to request a correction, clarification, or retraction. 538 S.W.3d at 812-13 (citing *Hardy*, 536 S.W.3d at 46–47) (citing Tex. Civ. Prac. & Rem. Code § 73.059)). The court in *Hardy* further explained that the DMA's procedure furthers the goals of providing for early resolution of disputes and providing a

---

[32] However, at least one Texas appellate court has disagreed with *Hardy*.  *See Zoanni*, 555 S.W.3d at 328 ("The DMA is clear that one may maintain an action *only if* he sends a timely and sufficient request for correction, clarification, or retraction. Tex. Civ. Prac. & Rem. Code § 73.055. Once the deadline has passed, a plaintiff cannot maintain an action.") (emphasis in original).

way for a defamation plaintiff to mitigate damages because it allows both for a presuit request for the defendant to mitigate the harm from allegedly defamatory statements, and if no request is made, for the defendant to move for abatement of the suit until the request is made.  *Warner Brothers*, 538 S.W.3d at 813 (citing *Hardy*, 536 S.W.3d at 46–47; *see also* TEX. CIV. PRAC. & REM. CODE §§ 73.055(b) (establishing that request made during limitation period for commencement of action is timely), .062 (describing abatement procedure)).

As pointed out by the *Hardy* court, "if a defendant who did not receive a request for correction, clarification, or retraction could simply seek dismissal of the action, there would be no need for either the limitation of damages or abatement provisions in the statute, and the purpose of the statute would be frustrated." *Warner Brothers*, 538 S.W.3d at 813 (quoting *Hardy*, 536 S.W.3d at 46 (citations omitted)). In *Hardy*, because the plaintiff's claim was not subject to dismissal based on her failure to timely and sufficiently request a correction, clarification, or retraction, the court determined the defendants "were not entitled to prevail on a no-evidence motion for summary judgment on a ground that is not an essential element of [the plaintiff's] claim." *Id.* at 48.  In *Warner Brothers*, the court agreed with the court's analysis in *Hardy* and concluded the plaintiff was "not required to establish a prima facie case of demand pursuant to Section 73.055 as an essential element of his defamation claim when resisting a TCPA motion to dismiss."  538 S.W.3d at 813.

Two federal district courts have agreed with the reasoning set forth in *Hardy*.  *See Inge v. Walker*, No. 3:16-CV-0042-B, 2017 WL 4838981, at *3 (N.D. Tex. Oct. 26, 2017) ("Allowing for dismissal under the DMA would read an additional remedy into the statute."); *see also Tu Nguyen v. Duy Tu Hoang*, 318 F. Supp. 3d 983, 1019 (S.D. Tex. 2018).  In *Tu Nguyen*, the court found the Texas Legislature meant for § 73.055 to limit damages if a plaintiff fails to request a correction,

clarification, or retraction within ninety days; it does not require dismissal.  318 F. Supp. 3d at 1019.

In so finding, the court noted, as did the *Hardy* court, that the Fifth Circuit in *Tubbs* considered only

subsection (a) without consideration of the rest of the statute.  *Id.* (citing *Hardy*, 536 S.W.3d at 44

n. 4). The court in *Tu Nguyen* further noted there is no indication that the Fifth Circuit in *Tubbs* was

presented with the statutory construction arguments that were presented in the *Tu Nguyen* case,

*Hardy*, and *Warner Brothers*. 318 F. Supp. 3d at 1019, n. 14. The court denied the defendant's

request for dismissal based on the Texas DMA defenses.  *Id.* at 1019.

Similarly here, the Court is not convinced, as urged by Defendants, that Plaintiff's failure to

follow § 73.055(a)(1) requires dismissal for failure to state a claim.  *See Inge*, 2017 WL 4838981,

at *3. Rather than recommend at this time that Plaintiff be precluded from recovering exemplary

damages in connection with his defamation claim, the Court recommends this issue be considered

in the context of summary judgment.

## VII.  PLAINTIFF'S BUSINESS DISPARAGEMENT CLAIM

### A.    Applicable law

To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant

published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that

resulted in special damages to the plaintiff." *Forbes Inc. v. Granada Bioscis., Inc.*, 124 S.W.3d 167,

170 (Tex. 2003) (citing *Hurlbut*, 749 S.W.2d at 766).

### B.    Discussion

In their motion to dismiss, Defendants argue Plaintiff's business disparagement claim fails

for the same reason his defamation claim fails.  Docket Entry # 25 at 25.  For the same reasons the

Court recommends Defendants' motion to dismiss Plaintiff's defamation claim be denied, the Court

recommends Defendants' motion to dismiss Plaintiff's business disparagement claim be denied

## VIII.   PLAINTIFF'S CIVIL CONSPIRACY CLAIM

**A.     Applicable law**

"Civil conspiracy is a derivative tort; therefore, liability for a civil conspiracy depends on participation in an underlying tort." *Allstate Ins. Co. v. Receivable Fin. Co., L.L.C.*, 501 F.3d 398, 414 (5th Cir. 2007).   To state a claim for civil conspiracy, a plaintiff must allege: (1) a combination of two or more persons; (2) to accomplish an unlawful purpose or a lawful purpose by unlawful means; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) the plaintiff suffered injury as a proximate result of the wrongful act. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 675 (Tex. 1998).   A defendant's liability for conspiracy depends on "participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Cotton v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 701 (Tex. App. – Fort Worth 2006, pet. denied).

**B.     Discussion**

In their motion, Defendants points out the tort underlying the alleged civil conspiracy in this case is defamation.   They argue first the conspiracy claim must fail because the defamation claim must fail.   This argument is without merit.   Plaintiff has not failed to state a claim as to the underlying tort.

According to Defendants' reply, "Plaintiff also has failed to plausibly allege any facts that would establish a 'meeting of the minds' or any intent to accomplish an unlawful purpose.   Instead, he points to the fact that Douglas Wigdor, Rod Wheeler's attorney, was a source for some of Folkenflik's reporting."   Docket Entry # 42 at 9.   Defendants assert this allegation, without more,

does not plausibly establish that the two were acting together to further a collective tortious or criminal enterprise. *See Dowd v. Calabrese*, 589 F.Supp. 1206, 1214 (D.D.C. 1984) (to prevail on conspiracy claim there must be a joint purpose to defame, not merely separate and distinct improper purposes or a joint purpose to publish).

The Texas Supreme Court has "recognize[d] that proof of a conspiracy may be, and usually must be made by circumstantial evidence." *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex. 1968). However, "a vital fact may not be proved by unreasonable inferences" or "by piling inference upon inference." *Id.* Additionally, a "'close association with a coconspirator will not support an inference of participation' in a conspiracy." *Zervas v. Faulkner*, 861 F.2d 823, 837 (5th Cir. 1988) (applying Texas law) (quoting *United States v. Basey*, 816 F.2d 980, 1002 (5th Cir. 1987)) (determining a conclusion that there was a meeting of the minds to defraud the plaintiff "can only rest on an overly attenuated chain of inferences and ultimately on no more than speculation and conjecture"). "'Some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence.'" *Davis–Lynch, Inc. v. Moreno*, 667 F.3d 539, 553 (5th Cir. 2012) (applying Texas law) (quoting *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 (Tex. 1993)).

Here, Plaintiff has sufficiently alleged conduct on the part of Defendants sufficient to constitute civil conspiracy. The Court recommends this part of Defendants' motion to dismiss be denied.

## IX. RECOMMENDATION

Based on the foregoing analysis, it is hereby

97

**RECOMMENDED** that Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) for Failure to State a Claim (Docket Entry # 25) be **DENIED.**

Objections

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 17th day of April, 2019.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE