# EXHIBIT S

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

Svetlana Lokhova               )
                                    )
        Plaintiff,          )
                                    )
v.                            )          19-cv-632 (TSE)(JFA)
                                    )
Stefan A. Halper, *et. al.*,    )
                                    )
        Defendants.      )

## <u>MOTION FOR SANCTIONS</u>

Pursuant to the inherent authority of this Court, Defendant Stefan A. Halper hereby files this Motion for Sanctions on the basis of the points and authorities set forth in the attached memorandum.

Respectfully submitted,

By: _____/s/_____
Terrance G. Reed (VA Bar No. 46076)
Robert K. Moir (VA Bar No. 42359)
Lankford & Reed, PLLC
120 N. St. Asaph St.
Alexandria, VA  22314
(Phone): 703-299-5000
(Facsimile): 703-299-8876
tgreed@lrfirm.net
rkmoir@lrfirm.net

Robert D. Luskin (DC Bar 293621)
(*pro hac vice* application pending)
Paul Hastings LLP
875 15th ST NW
Washington, DC 20005
202 551 1966
202-551-0466
robertluskin@paulhastings.com

Counsel for Defendant
*Stefan A. Halper*

August 8, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of August, 2019, I electronically filed the foregoing

Motion using the CM/ECF system which will then send a notification of such filing (NEF) to all

interested parties.

By: _____/s/_____

Terrance G. Reed (VA Bar No. 46076)

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| Svetlana Lokhova | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 19-cv-632 (TSE)(JFA) |
| | ) | |
| Stefan A. Halper, *et. al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S MOTION FOR SANCTIONS

Defendant Stefan Halper respectfully asks this Court to impose sanctions upon Plaintiff

and her counsel for bad faith litigation conduct pursuant to this Court's inherent authority. This

Court has the inherent authority to impose sanctions for bad faith conduct as necessary "'to

impose order, respect, decorum, silence, and compliance with lawful mandates.'" *Projects

Management Co. v. DynCorp Int'l LLC*, 734 F.3d 366, 373 (4th Cir. 2013) (quoting *U.S. v.

Shaffer Equipment Co.*, 11 F.3d 450, 461-63 (4th Cir. 1993)). Courts "recognize 'the need to

preserve the integrity of the judicial process in order to retain confidence that *the process works

to uncover the truth.'" *Id*. at 376 (emphasis in the original, quoting *Silvestri v. Gen. Motors

Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)). That confidence is threatened by the bad faith

litigation misconduct of the Plaintiff and her counsel in this case.

This Court can and should impose sanctions upon Plaintiff and Plaintiff's counsel for

their bad faith litigation conduct of: (i) using this Court to make, publicize and disseminate

vulgar and degrading accusations against Defendant Halper; (ii) making meritless accusations of

defamation based solely on alleged statements that are not actually contained in the media

1

publications they cite; (iii) claiming defamation based upon obviously untimely allegedly defamatory statements.

### A. Making and Using This Court to Disseminate "Raf***er" Allegations.

In the first numbered paragraph of the Complaint, Plaintiff alleges that Defendant Halper is a "Ratf***er." Plaintiff immediately promoted the broad dissemination of this vulgar and degrading accusation by linking the Complaint on his Court's website to her promotional (Go Fund Me) website seeking contributions ostensibly to pay for the prosecution of her claims against Defendant. *See* https://www.gofundme.com/f/supportsvetlanalokhova. Specifically, Plaintiff's Go Fund Me website urges visitors to see the Complaint on this Court's website:

"See the details of my complaint here:

https://www.courtlistener.com/recap/gov.uscourts.vaed.442627/gov.uscourts.vaed.4426 27.1.0_5.pdf.

The use of the word "Ratf***er" in a complaint, not merely as an expletive, but to describe the Defendant, is as purposeful a misuse of this Court's process as imaginable, and cannot be explained, excused, or overlooked. There is no way that the decision to plead this invective was accidental or the result of a misunderstanding. It was intended to degrade Defendant Halper and to aggrandize Plaintiff and her counsel, for their mutual profit.

The use of this vile accusation serves no legal purpose—it is unnecessary to explain or to satisfy the elements of Plaintiff's legal claims. The only apparent purpose of this vulgar accusation is to convert this lawsuit (and this Court) into a source of publicity and notoriety for Plaintiff and her counsel. Plaintiff and her counsel are using this Court's docket to host this outrageous invective for their own profit and fame beyond this Courthouse. That is not the purpose of this Court, or of its mission to dispense justice herein.

The particular mechanism chosen to accomplish this improper object—the embedding of the "Ratf***er" accusation in a filed complaint, which Plaintiff then linked to her internet Go Fund Me  website to market this accusation to a global audience—is a transparent effort to shield the broadcasting of this outrageous charge from liability through the privilege applied to federal pleadings filed in good faith. *See Spencer v. American Int'l Grp., Inc.*, 2009 WL 47111, *5 (E.D. Va. Jan. 6, 2009) (citing *Donohoe Constr. Co. v. Mount Vernon Assocs.*, 235 Va. 531, 537 (1988)). This is not good faith litigation conduct. This ploy reflects the perspective of a lawyer versus that of a layperson.

The Court has the inherent authority to sanction Plaintiff and her counsel for the use of this vulgar and degrading profanity.  *See, e.g., Carrol v. Jacques Admiralty Law Firm, PC*, 110 F.3d 290 (5th Cir. 1997) (sanctioning attorney for abusive, profane, and vile language at deposition).  More important, this Court must have the authority to prevent litigants from conscripting this Court, and its necessary docketing practices, into a protected hosting platform for the broad dissemination of such gratuitous vile accusations over the internet for their gain.

This Court's docket is not a political blog lacking the basic restraints of decency.  This Court has an institutional need to deter such bad faith conduct from Plaintiff, her counsel, and any other litigant who would similarly misuse this Court.

This is especially necessary in this case because the filed legal claims are themselves transparently defective, thereby revealing that the *raison d'etre* of the suit is the propagation of Plaintiff's invective for the ulterior purpose of promoting her critique of an FBI investigation.

## B.  Plaintiff's Bad Faith Misrepresentation of the Allege Defamation.

The core defamation claimed in the Complaint is that: "Halper misrepresented that Plaintiff was a 'Russian spy' and a traitor to her country and that Plaintiff had an affair with General Flynn on the orders of Russian intelligence." Complaint, ¶ 3.  The bulk of the Complaint is devoted to claims that Mr. Halper was a source used by the media to republish these two allegedly defamatory statements (Russian spy, Flynn affair).  *Id.*, ¶¶ 105, 115, 121, 150, 157. The problem with this representation is that none of the cited media articles contain either statement—none of the eight cited media articles contain a representation that Plaintiff is a Russian spy or had an affair with General Flynn.

The articles themselves demonstrate that they contain no spy or affair allegations.  And Plaintiff could not have misread them.  In April 2019, Plaintiff demanded by tweet that the New York Times set the record straight, to which it responded:

> But, for the NYT there was no record to set straight.  We never named you in any story, nor did we claim that you were a Russian spy.

Exhibit 1, p. 5.

Thus, Plaintiff was told the obvious before filing this suit—the New York Times coverage of her never claimed she was a Russian spy.  Despite this, Plaintiff then filed this lawsuit claiming that the New York Times did so with Halper as its source. Complaint, ¶ 150.

Furthermore, the Complaint contains not a single fact to support either the allegation that Mr. Halper was a media source or that he was a source for the two defamatory statements (Russian spy, General Flynn affair).  Indeed, the Complaint chronicles and quotes the extensive and continuing dialogue between Plaintiff and the relevant journalists surrounding each article, and in those exchanges as reported in the Complaint, neither side attributes therein any such statement to Mr. Halper. Complaint, ¶¶ 101-103, 106, 113, 128-33, 158, 160.

4

**C.  Plaintiff's Bad Faith Assertion of Untimely Defamation Claims**.

The Complaint's repeated assertions of defamation claims that are clearly barred under the applicable one-year statute of limitations constitutes sufficient grounds for the imposition of sanctions.  *Brubaker v. City of Richmond*, 943 F.2d 1363, 1384 (4th Cir. 1991).  Plaintiff had her United Kingdom defamation claim dismissed as untimely in 2016 under the one-year limitations statute applicable in the United Kingdom where Plaintiff lives.  Exhibit 2.  Hence, Plaintiff could not have labored under any misunderstanding in this case as to need for timely bringing defamation claims.

All but one of the articles cited in the Complaint was published more than a year before the commencement of this defamation suit, rendering them untimely under Va. Code § 8.01-27.1 ("Every action for injury resulting from libel, slander, insulting words or defamation shall be brought within one year after the cause of action accrues.").  None of the articles claim Defendant Halper as their source.

More important, the only arguably timely article--the Washington Post article of June 5, 2018—affirmatively denies that Mr. Halper made any comment to the Post.   In short, Plaintiff has no good faith basis to allege that Mr. Halper was a source of any of the articles.  Despite this, the Complaint repeatedly alleges that Defendant Halper was a source for these articles.  Complaint, ¶¶ 97, 115, 121, 150, 157.

Equally obvious, if the actual published articles constitute an untimely basis for a defamation claim because they were published more than a year prior to suit,[1] any prior alleged

---

[1] Defamation actions accrue on the date of publication.  *Mercer v. Fairfax County Child Protective Services*, 2015 WL 5037636, *6 (E.D. Va. 2015) (citing *Hatfill v. N.Y. Times Co.,* 416 F.3d 320, 334 (4th Cir. 2005)), *aff'd on other grounds*, 673 Fed. Appx. 358 (4th Cir. 2017).

statement of Mr. Halper as their "source" would likewise constitute an untimely basis for a defamation claim. *See Spencer*, 2009 WL 47111, *5 (statements made prior to untimely publication are themselves untimely).

Even as to the only arguably timely article—the Washington Post article of June 5, 2018—the Complaint admits that the only "falsehoods" contained therein are about Mr. Halper's attendance at a 2014 Cambridge dinner, and whether Halper and another attendee were "disconcerted" about Flynn's attention to Plaintiff at that dinner. Complaint, ¶ 162.  The only statement about Plaintiff was her own statement to the Post denying that anything inappropriate occurred at the dinner. *Id.*, ¶ 161 (quoting Post article).  Such allegations are not remotely defamatory *per se*, and are nonactionable.  Nor could they cause any reputational harm to Plaintiff, even in a faculty lounge. The thinness of this gruel is apparent.

Bringing obviously untimely and insufficient defamation claims, particularly to launch an internet financing and marketing campaign, constitutes bad faith litigation.

### D.  This Court Should Award Appropriate Sanctions.

Defendant Halper respectfully asks this Court to consider imposition of the following escalating sanctions: (i)  the reasonable attorney fees incurred in responding to the Complaint: (ii) an order suspending Plaintiff's counsel from practice before this Court (the United States District Court for the Eastern District of Virginia) for a period of at least 90 days; and (iii) dismissal of this case.

An award of the attorney fees caused by a litigant's bad faith conduct is a permissible sanction under this Court's inherent authority.  *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178 (2017).  The misconduct at issue is the filing of a meritless and profane Complaint, which has caused the attorney fees necessary to seek its dismissal.  If this Court determines that

this sanction is justified, Halper defense counsel will submit a fee application to the Court for purposes of determining an appropriate fee sanction.

Suspension of Plaintiff's counsel from practice before this Court is justified because the bad faith misconduct affects not only Defendant Halper and his reputation, but also harms this Court. This harm is not limited to the resources needed to respond to an untimely and meritless Complaint. It includes the misuse of this Court's docketing system as clickbait to propagate vulgar and degrading accusations around the internet, for the profit of Plaintiff and her counsel. This Court, like all federal courts, is not equipped to address such bad faith practices at the time of the filing of a complaint; rather, it traditionally awaits the outcome of service of process and the ensuring responsive process. The Court, therefore, must rely upon the professionalism of the lawyers licensed to appear before it to avoid drive-by slander at the outset of a case. Such reliance is misplaced here.

Revoking filing privileges before this Court is an authorized sanction for bad faith litigation conduct. *See, e.g., Allen v. Fitzgerald for Region Four*, 590 B.R. 352, (W.D. Va. 2018) (filing privileges suspended for 6 months). In *Allen*, Chief Judge Urbanski upheld a privilege revocation sanction imposed by the bankruptcy court under its inherent authority, and noted that such a sanction does not constitute an injunction, and does not affect litigation privileges in other courts. *Id.* at 356-59.

Finally, this Court should consider the ultimate sanction of dismissal. Whether to impose this sanction is guided by the so-called *Shaefer Equipment* factors:

'(1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5)

7

the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest.'

*Projects Management*, 734 F.3d at 373-74 (*Shaeffer Equipment*, 11 F.3d at 462-63).

Here, degree of culpability is overwhelming and is shared by Plaintiff and her counsel: both are familiar with the applicable limitations period; both are familiar with the non-defamatory nature of the publications at issue; both understand the bombastic nature of the invective with which they began their suit. Plaintiff is not blameless in this matter.

The prejudice to the judicial process and the administration of justice goes well beyond the needless diversion of judicial resources to address a meritless complaint. The Court is being conscripted to host and involuntarily propagate vile accusations over the internet to promote the extra-judicial objectives of both Plaintiff and her counsel. Mr. Halper is a victim of not just meritless charges but also of an outrageous accusation now posted over the internet that, as a result, cannot be effectively recalled by this Court. This Court regularly sees meritless claims, but few that transparently trade upon a lack of merit to create an opportunity to promote ulterior extra-judicial objectives. While other sanctions are available, as previously discussed, they are insufficient to deter similar conduct in the future because they cannot restore the *status quo ante*. The public interest is served by this Court rejecting this gambit through the emphatic sanction of dismissal.

## Conclusion

For the foregoing reasons, this Court should invoke its inherent authority to impose the sanctions of a fee-reimbursement, revocation of court privileges for 90 days, and dismissal.

Respectfully submitted,

By: _____/s/_____
Terrance G. Reed (VA Bar No. 46076)
Robert K. Moir (VA Bar No. 42359)
Lankford & Reed, PLLC
120 N. St. Asaph St.
Alexandria, VA 22314
(Phone): 703-299-5000
(Facsimile): 703-299-8876
tgreed@lrfirm.net
rkmoir@lrfirm.net

Robert D. Luskin (DC Bar 293621)
(*pro hac vice* application pending)
Paul Hastings LLP
875 15th ST NW
Washington, DC 20005
(Phone): 202-551-1966
(Facsimile): 202-551-0466
robertluskin@paulhastings.com

*Counsel for Defendant*
*Stefan A. Halper*

August 8, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of August, 2019, I electronically filed the foregoing

Motion using the CM/ECF system which will then send a notification of such filing (NEF) to all

interested parties.

By: _____/s/_____

Terrance G. Reed (VA Bar No. 46076)

**EXHIBIT 1**



**Svetlana Lokhova**
@RealSLokhova

New York Times had evidence to suggest that Confidential Informant to the FBI at the heart of Crossfire Hurricane Halper was faking intelligence. Yet they did not reflect it in their reporting. Further, they did not report it to Mueller despite NYT close links with Mueller team.



Matthew Rosenberg ● @AllMattNYT · 4h ⌄
Svetlana, you have my deepest sympathies for what you've been put through. But, for the NYT, there was no record to set straight. We never named you in any story, nor did we claim that you were a Russian spy.

♡ 5        ⟲        ♡        ✉

Svetlana Lokhova @RealSLokhova · 29m ⌄
Matt, NYT logo is 'Truth is Worth It'. You suppressed the evidence that FBI confidential informant Halper was faking intelligence. That's a huge story. Halper was inventing evidence of Russian intelligence contacts with the Trump campaign.

♡ 1        ⟲ 1        ♡ 4        �.�header.

**Svetlana Lokhova**          ⌄
@RealSLokhova

Replying to @RealSLokhova @AllMattNYT and 2 others

NYT times had this BBC piece for 10 months. And you published a long piece about Halper, neglecting to say that you have evidence that his intelligence is false



ir with Mr. Flynn's visi

ce to be accused of spying for Russia?     general's apparent clc

314   4:40 PM - Apr 4, 2019

347 people are talking about this

⨍ 16.4K Share    🦅 715 Tweet    ✉ Email

# EXHIBIT 2



Neutral Citation Number: [2016] EWHC 225 (QB)

Case No: HQ12D04720

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 12/02/2016

Before :

**MR JUSTICE DINGEMANS**

- - - - - - - - - - - - - - - - - - - -

**Between :**

| | |
|---|---|
| **Svetlana Lokhova** | **Claimant** |
| - and - | |
| **Piotr Tymula** | **Defendant** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**David Sherborne and Julian Santos** (instructed by **Taylor Wessing**) for the **Claimant**
**Justin Rushbrooke QC and Gervase De Wilde** (instructed by **Carter-Ruck**) for the
**Defendant**

Hearing dates: 25, 26 and 27 January 2016
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

THE HONOURABLE MR JUSTICE DINGEMANS

**Mr Justice Dingemans:**

### Introduction

1.  This is the hearing of a number of applications which relate to a libel claim brought by Svetlana Lokhova ("Ms Lokhova") against Piotr Tymula ("Mr Tymula"). One issue is whether I should disapply the limitation period which applies because the libel claim is in respect of two emails sent by Mr Tymula concerning Ms Lokhova dated 21st and 22nd September 2011 and the action was commenced on 9th November 2012. This is an action to which the provisions of the Defamation Act 2013 do not apply.

2.  At the time when the emails were sent, Ms Lokhova and Mr Tymula were work colleagues at Troika Dialog (UK) Limited ("the bank"). The bank subsequently became part of the Sberbank Group and became Sberbank CIB (UK) Limited ("Sberbank").

3.  Ms Lokhova, who left her employment with the bank, brought proceedings in the Employment Tribunal against the bank, David Longmuir ("Mr Longmuir") and Paolo Zaniboni ("Mr Zaniboni") who were her line managers, and a number of other Respondents for sex discrimination, harassment, victimisation and unlawful dismissal. The hearings took place over 22 days and Ms Lokhova was successful in her claim and was awarded compensation in the sum of £1,762,129.50. Although there were many allegations made by Ms Lokhova the claim mainly succeeded in respect of a campaign against Ms Lokhova by Mr Longmuir which included very derogatory emails sent by him about Ms Lokhova, the Bank's defensive response to Ms Lokhova's proper complaints which caused her detriment, and the influence that those matters had on Ms Lokhova's decision to resign. As both parties have referred to press coverage of this hearing in their submissions (as appears below) I should make it clear that this libel claim is not in respect of the very derogatory emails sent by Mr Longmuir.

### The applications and procedural issues

4.  The applications are: (1) on behalf of Mr Tymula to strike out the Particulars of Claim on the basis that the causes of action are statute barred, and on behalf of Ms Lokhova to disapply the limitation period. There are issues about when Ms Lokhova became aware of the email dated 22nd September 2011, and when a stay of proceedings, agreed by the parties, expired; (2) on behalf of Mr Tymula to strike out the Particulars of Claim on the basis that the action is a *Jameel* abuse of process. This is on the basis that there was a minimal publication and that there is no real and substantial tort; (3) on behalf of Mr Tymula to strike out the claim or, depending on whether Mr Tymula was granted permission to issue such an application on 14th December 2015, for reverse summary judgment, because it is contended that the emails were published on an occasion of qualified privilege and Ms Lokhova has not identified any arguable case of malice.

5.  The applications have been particularly hard fought. There has been a conspicuous lack of co-operation by the parties with each other in the preparation of these applications for hearing, an example of which was that the parties did not agree the order of applications in the bundles or the order in which the applications were to be

    addressed at the hearing (in the event I heard Mr Rushbrooke QC first because his application had been first in time). The effect of this lack of co-operation has been to increase the costs of these applications.

6.    The applications were first listed before Nicola Davies J. on 26th November 2015, but were adjourned in circumstances where the Claimant had waited until 20th November 2015 to make an application to disapply the limitation period. The applications were ordered to be listed for 2 days on 14th and 15th December 2015. Directions for the service of evidence were given providing for service of the Claimant's evidence by 4.30 pm on 1st December 2015 and for service of the Defendant's evidence by 4.30 pm on 8th December 2015. The deadline for service of the Claimant's evidence was extended until 1159 hours on 2nd December 2015. As it was the Claimant's evidence was not served until after the close of business on 2nd December 2015 and some evidence was served in the early hours on 3rd December 2015, meaning that the evidence was not able to be considered by the Defendant until 3rd December 2015. The Defendant served evidence on 9th December 2015. In that round of evidence the Defendant served expert evidence on Russian law about which no notice had been given. The Claimant then served further evidence on the morning of the hearing on 14th December 2015, contending that the Defendant had gone further than expected with its evidence and complaining about the service of the Russian law evidence.

7.    The hearing came before me on 14th December 2015 and it was apparent that the applications could not then be fairly determined. This was because both sides were contending that the late service of evidence had been caused by the other side, because both sides wanted to be able to consider the evidence served and adduce further evidence, and because neither side had attempted to co-operate and identify what the essential issues for determination were to be. There was a dispute between Mr Sherborne for the Claimant and Mr Rushbrooke QC for the Defendant about whether the hearing before Nicola Davies J. had been a directions hearing or an adjournment.

8.    At the hearing on 14th December 2015 it had become apparent that there was a factual dispute about whether Ms Lokhova, and her partner David North ("Mr North"), had received and seen the email dated 22nd September 2011 in March 2012 (as alleged by the Defendant) or in October 2012. The Defendant relied on the evidence of James Davies ("Mr Davies"), a solicitor at Salans who were acting on behalf of the bank, and who gave evidence to the effect that the document was in bundles supplied by his firm on behalf of the bank responding to Ms Lokhova's Data Subject Action Request ("DSAR") in March 2012. As this issue of fact related to the application to disapply the limitation period, and it would be difficult to determine it fairly without cross examination, there was a discussion on 14th December 2015 about whether there should be cross examination on the witness statements.

9.    In the event I made an order pursuant to CPR 32.7(1) granting permission to the Defendant to cross examine Ms Lokhova and Mr North for 20 minutes each, and granting permission to the Claimant to cross examine Mr Davies for 20 minutes. The reason for the limit of time was because cross examination was restricted to the issue of receipt of the email dated 22nd September 2011.

10. For the reasons given in a ruling I adjourned the hearing on 14th December 2015 and reserved costs, expressing the provisional view that both parties were to blame for the need for an adjournment.

11. When the matter came back before me on 25th January 2016 there were further procedural issues raised by the parties. These were: (1) whether the Defendant was granted permission to bring an application for reverse summary judgment, as opposed only to an application for a strike out, in respect of the claim for qualified privilege at the hearing on 14th December 2015; (2) whether the Defendant should have permission to rely on the witness statement of Mr Davies who did not attend for cross examination on a witness statement in circumstances where he had moved from London; (3) whether the Defendant should have permission to rely on a new witness statement from Alex Trotter ("Mr Trotter") an associate who was working for Salans at the material time.

**Mr Tymula can apply for reverse summary judgment**

12. I am satisfied that the Defendant was granted permission to make an application for reverse summary judgment at the hearing on 14th December 2015 and I therefore approve the Defendant's form of the competing drafts of my order dated 14th December 2015 for that reason. I make this finding because at the hearing on 14th December 2015 there was a discussion about whether it would make things clearer if the Defendant issued an application dealing directly with the issue of qualified privilege in circumstances where the Defendant was contending that the limitation period should not be disapplied and the claim struck out as an abuse of process partly by reference to what was said to be the strength of the Defendant's case on qualified privilege, and where some of the submissions had suggested that the Claimant's case on malice was not arguable. In the discussions relating to that issue it is right to say that Mr Rushbrooke QC did use the words, which I repeated, of "*strike out*". However it was plain from the context that this was to ensure that the submissions on qualified privilege could be properly made, and that "*strike out*" was being used loosely to describe a summary dismissal of the claim after consideration of the evidence which had been served, or more accurately an application for reverse summary judgment pursuant to CPR Part 24. This was made clear when towards the end of the hearing I asked Mr Rushbrooke whether he was seeking reverse summary judgment and he replied "*yes*" (transcript 14th December 2015, page 61, lines 24-25).

13. I am also satisfied that there was no further evidence that the Claimant wished to serve in relation to the issue of reverse summary judgment, because the issue had been identified and the Claimant was given permission to rely on further evidence in the order dated 14th December 2015. At the hearing before me Mr Sherborne did not identify any further relevant evidence which was to be adduced for the purposes of the reverse summary judgment issue although he made submissions, which I will address when dealing with qualified privilege, to the effect that the matter should go to trial because further evidence might be obtained.

**No permission to rely on the evidence of Mr Davies**

14. At the hearing Mr Davies did not attend for cross examination. It appeared that Carter-Ruck, solicitors for Mr Tymula, had been told on 24th December 2015 that Mr Davies was moving out of London and that he would not be able to attend Court. On

19th January 2015 Mr Davies informed the bank that he was leaving London for Bath and would then be travelling in the west of the country. Carter-Ruck did not inform Taylor Wessing, solicitors for Ms Lokhova, about this until they sent a letter dated 21st January 2016 stating that Mr Davies was moving out of London and would not be available to travel to London. The letter then went on to attempt to blame Taylor Wessing for this because the previous hearing had been adjourned. This was unsustainable. No order for cross examination had been made for the previous hearing and there was no information showing that Mr Davies would have been available if such an order had been made during the hearing.

15. Mr Rushbrooke accepted that CPR Part 32.7(2) was engaged. This provides that where a Court has given permission for cross-examination (as was this case) "*but the person in question does not attend as required by the order, his evidence may not be used unless the court gives permission*". Mr Rushbrooke asked for permission to rely on Mr Davies' evidence, and Mr Sherborne resisted the application. A written application was made supported by a witness statement from Claire Woolf of Carter-Ruck setting out information about when Carter-Ruck had been informed of Mr Davies' absence. I refused permission to rely on Mr Davies' evidence because there was no good explanation for Mr Davies' absence such as a reason why he could not travel to London. I understand that the issue of fact to which his evidence went may not have been important for him, but there was a clear dispute of fact, and Mr Davies' evidence was being relied on to show that the account given by both Ms Lokhova and Mr North was wrong. This meant that his evidence merited careful consideration and cross-examination had been ordered. I also took account of the fact that the application to rely on Mr Davies' evidence was only made in the course of the hearing before me. Further although I could understand why Carter-Ruck had not alerted Taylor Wessing to the potential problems with Mr Davies over the Christmas holiday, there was no good reason for delaying providing information to Taylor Wessing until just before the hearing.

**No permission to rely on the statement of Mr Trotter**

16. Mr Rushbrooke also sought permission to rely on the evidence of Mr Trotter who had been an associate at Salans at the relevant time. A witness statement was produced from Mr Trotter setting out his dealings with the files. When Mr Trotter reviewed his witness statement he noted an inaccuracy, and very properly supplied further information. This related to the number of sets of files which had been made, which prompted further investigations by the Defendant during the hearing.

17. I refused the application to adduce Mr Trotter's witness statement. This is because there was a serious failure to comply with the rules and directions which had been given for the service of evidence. The evidence was not even complete when the application was being made, because it was intended to search for the second set of files to examine them during the hearing. There was no good reason for the failures that was given to me. Mr Trotter's evidence had been available at all times but had not been obtained. This was against a background of a procedural history where there had been failings (on both sides) to comply with orders, and where directions had been given as to service of the evidence designed to ensure that the hearing would be effective. In my judgment it would have been inconsistent with the overriding objective to allow such late evidence in circumstances where it could all have been obtained before, and where the evidence was still being clarified when the application

was being made, compare *Denton v TH White* [2014] EWCA Civ 906; [2014] 1 WLR 3926 at paragraph 32.

**Other matters**

18.   I should record that Mr Rushbrooke did tell me, in the course of his submissions in reply, what inquiries had shown in relation to the second set of bundles referred to by Mr Trotter. I did not take any account of this information. It was not evidence, and it related to information provided by a witness whose evidence was not before the Court because of serious procedural failings.

19.   I should also record that Mr Sherborne made suggestions that Mr Tymula's costs were being paid by the bank. I did not take any account of this information. It was not evidence.

20.   I should mention one further procedural matter. This was the length of the Skeleton Arguments. As a result of a late change in arrangement for the hearing (for which the parties had no responsibility) I was given the papers in the morning of 25th January 2016 for the two day hearing listed to start at 2 pm and to conclude by 1 pm on 27th January (when it did conclude). There were 6 volumes of evidence (2 volumes related to the action brought by Ms Lokhova against Mr Longmuir) and 1 volume of authorities. The Skeleton Arguments were much too long to be of any immediate assistance. Parts of the Skeleton Arguments were devoted to speculation about the other side's motives for taking a particular step (see for example paragraph 103 of the Claimant's Skeleton Argument and paragraph 75 of the Defendant's Skeleton Argument). Such speculation is very unlikely to be of assistance or persuasive.

21.   It is important to note that the Queen's Bench Guide, with which parties are expected to comply (see paragraph 1.13), provides at paragraph 7.10.13 at sub-paragraph 4, that a Skeleton Argument should *"be as brief as the issues allow and not normally be longer than 20 pages of double-spaced A 4 paper"*. Both Skeleton Arguments substantially exceeded this upper limit (being 35 pages) and the Claimant's Skeleton Argument was in narrower type than permitted. There have been a number of authorities reminding parties of the need to keep Skeleton Arguments short and concise. In *Standard Bank plc v Via Mat International Ltd* [2013] EWCA Civ 490; [2013] 2 All ER (Comm) 1222, Moore-Bick LJ said *"It is important that both practitioners and their clients understand that skeleton arguments are not intended to serve as vehicles for extended advocacy and that in general a short, concise skeleton is both more helpful to the court and more likely to be persuasive than a longer document which seeks to develop every point which the advocate would wish to make in oral argument."*

22.   The evidence before me consisted of: witness statements dated 22nd October 2015 and 9th December 2015 from Nigel Tait ("Mr Tait"), a solicitor and partner in the firm of Carter-Ruck; witness statements dated 23rd November 2015 and 2nd December 2015 from Niri Shanmuganathan ("Mr Shanmuganathan"), a solicitor and board director in Taylor Wessing; witness statements dated 23rd November 2015, 2nd December 2015, 14th December 2015 and 23rd December 2015 from Ms Lokhova, and I heard cross examination of Ms Lokhova; a witness statement from Mr North dated 2nd December 2015 and I heard cross examination of Mr North; witness statements dated 9th

December 2015 and 8th January 2016 from Mr Tymula; and a witness statement dated 8th January 2016 from Olga Klimova ("Ms Klimova").

23.    During the course of the hearing I was handed extracts from press coverage of the hearing before me, and Mr Shanmuganathan undertook, through Mr Sherborne, to make a witness statement exhibiting the extracts. By the time the judgment was circulated in draft to the parties I had not yet been provided with that witness statement, but a witness statement dated 10th February 2016 has now been produced. Mr Sherborne relied on the extracts to show that Ms Lokhova needed vindication of her reputation. Mr Rushbrooke relied on the extracts to show that the emails referred to by the press in the extracts were the ones sent by Mr Longmuir, and not the ones sent by Mr Tymula. I did not derive any assistance from this evidence. This is because it showed only what might be expected from reports of the hearing before me, which reports picked up references to emails which had featured in the Employment Tribunal proceedings.

24.    After the hearing the Defendant put in submissions to deal with the way in which Mr Sherborne had characterised a statement made by Mr Tymula in the email dated 22nd September 2011 about refusing to be back up for Ms Lokhova as a lie, when it was said to be consistent with Ms Lokhova's own evidence to the Employment Tribunal. The Claimant responded by putting in submissions to the effect that this showed that the case was not simple, and making points to the effect that Mr Tymula had not acted as if he had regulatory concerns in relation to clients. Both sides sought to adduce further evidence in the form of contemporaneous emails.

25.    I have summarised material evidence in this judgment from the witness statements. However I am not in a position to make findings of fact (apart from the issue of fact in relation to date on which Ms Lokhova first received and saw a copy of the email dated 22nd September 2011) and it is not my function to do so at an interim hearing which must not become a mini-trial. I am able to form an assessment, based on the materials before me and a reasonable assessment of what further material might become available, whether there is an arguable case on malice fit to be determined at trial and of the strength or weakness of a case to the extent that it is relevant to the limitation and abuse of process argument, but I am neither able nor entitled to go further than that, notwithstanding the invitations from counsel to do so.

**The emails dated 21st and 22nd September 2011**

26.    Ms Lokhova was originally employed by the bank in Fixed Income, and had received internal reports from the bank noting her success, but it was apparent that some persons perceived Ms Lokhova as difficult to manage. Ms Lokhova left the bank to work for a competitor but was headhunted back by the bank to join equity sales, an area of work in which it was said that Ms Lokhova had no relevant experience, although Ms Lokhova referred in her statement to having sold equities when at Morgan Stanley. Ms Lokhova rejoined the bank on 21st June 2011 and it is apparent from emails that Ms Lokhova's appointment was perceived by those in equity sales to involve office politics as Ms Lokhova had strong support from certain persons in the Moscow office. The emails showed that the appointment was not popular because it was perceived that Ms Lokhova would need to be given existing clients of the equity sales team and because of her reputation (whether deserved or not) as being difficult to manage. It was also apparent that there were those in the bank who perceived that

Ms Lokhova, who was noted for her drive and ambition, would help equity sales to do better, at a time when it was considered to be underperforming.

27.   Ms Lokhova's direct line manager was Mr Longmuir who was head of UK Sales and Mr Zaniboni who was Chief Executive Officer of the bank and head of research.

28.   The email dated 21st September 2011 was sent to Mark Van Loon ("Mr Van Loon") who was based in the bank's Moscow office. In the email Mr Tymula said "*I really hope that a pro like her will do right things ... I am really puzzled abt how we could possibly hire her ... I think that the risk for the company is huge and I want to distance myself from her as much as possible (in case there is some serious breach with accounts tht could result in my licence being revoked, etc ..)*". It is common ground that the reference to "a pro" was a reference to Ms Klimova, the Global head of equity sales, and that the reference to the person hired was a reference to Ms Lokhova.

29.   The publication of the email was to Mr Van Loon in Russia. There was an issue raised about whether the email was actionable under the laws of the Russian Federation, but that is not an issue before me at this hearing.

30.   The email dated 22nd September 2011 was sent to two senior colleagues of Mr Tymula and Ms Lokhova in the London office, being Mr Longmuir and Mr Zaniboni, and it was blind copied to Mr Van Loon. In the email Mr Tymula said "*One thing – I have always been very clear and open about the fact that SL poses a serious threat to Troika client franchise and individuals that work with her (that's why I refused to be a backup on EMSO when it was taken away from me). I will need your help/advise how to make sure she does NOT join any of the GLG meetings*". It is common ground that the reference to SL was a reference to Ms Lokhova.

31.   In the Particulars of Claim it was pleaded that the natural and ordinary meaning of the emails was that Ms Lokhova's "*conduct posed a serious threat to her colleagues' careers, as well as her employer's business and client base, by exposing them to a real risk of having their licences revoked (or other official sanction) on account of her regulatory breaches; and that the Claimant was thus completely unsuitable and unfit to do the work for which she was recruited.*" I have approached these applications on the basis that this is the meaning of the emails.

**Relevant events**

32.   A summary of events appears in the judgment of the Employment Tribunal on liability which it is not necessary to repeat. Mr Tymula became a senior equity sales person on 1st March 2012. Ms Lokhova resigned from her position on 18th April 2012 and claimed constructive dismissal, sex discrimination, harassment and victimisation against the bank in Employment Tribunal proceedings.

33.   Ms Lokhova also made a DSAR to the bank. On 9th March 2012 the bank provided documents to Russell Jones & Walker, solicitors then acting for Ms Lokhova. There is a dispute about whether the documents contained the email dated 22nd September 2011 from Mr Tymula to Mr Longmuir, Mr Zaniboni and Mr Van Loon.

34.    On 16th March 2012 Russell Jones & Walker wrote a letter of claim to Mr Longmuir. This referred to a number of damaging emails and recorded Bloomberg messaging discussions which were highlighted, which were said to be a sample and that Ms Lokhova reserved the right to expand. No complaint was made about an email sent by Mr Longmuir dated 12th May 2011 to Mr Van Loon in which Mr Longmuir had referred to Ms Lokhova in a very derogatory manner.

35.    On 26th March 2012 Russell Jones & Walker wrote to Salans complaining about the inadequacies in the DSAR disclosure. A further DSAR was made.

36.    On 14th May 2012 the complaint was served in the Employment Tribunal proceedings.

37.    On 26th October 2012 Salans sent 2 files containing further disclosure pursuant to the DSAR. This was copied to Ms Lokhova by courier. The files contained the emails dated 21st and 22nd September 2011. Ms Lokhova instructed her solicitors about the contents, and the claim form for libel was issued on 9th November 2012.

38.    On 16th November 2012 Taylor Wessing sent a letter of claim to Mr Tymula. Carter-Ruck responded by letter dated 3rd December 2012 to the claim against Mr Tymula stating that the claim was statute barred and that an application to disapply the limitation period would need to be made. Carter-Ruck contended that Ms Lokhova had had a copy of the email dated 22nd September 2011, since 15th March 2012 (although it is now contended that the date should be 9th March 2012). The claim was resisted on a number of grounds including qualified privilege. It was recorded that Mr Tymula *"reserves the right to advance a substantive defence of justification"*, which remains the current position.

39.    It was in this letter that the issue of a stay was first raised on behalf of Mr Tymula. It was said in the letter dated 3rd December 2012 that *"our client would apply for any libel proceedings to be stayed pending the outcome of the employment proceedings, as it would plainly be an inappropriate use of the Court's resources and cause unnecessary expenditure of our client's costs and time for libel proceedings to be allowed to proceed in parallel ...".*

40.    Taylor Wessing responded to the issue of a stay by letter dated 21st December 2012 saying that it would be agreed, but on the basis that no point on delay in pursuing the claim for the period of the stay would be taken. This condition was agreed by Carter-Ruck by letter dated 9th January 2013.

41.    The Employment Tribunal proceedings commenced on 27th February 2013.

42.    The Particulars of Claim in this action were served on 8th March 2013. The claim for damages included aggravated damages on the basis that the right to plead justification had been reserved, but it was not pleaded in aggravation of damages that the publication was actuated by malice or was part of a campaign. These matters should have been pleaded as a matter relevant to damages if they were to be relied on, see CPR PD 53 paragraph 2.10. There is now a draft Amended Particulars of Claim in which matters of aggravation, and Mr Tymula's alleged involvement in a campaign against Ms Lokhova, are pleaded.

43.    The libel proceedings were stayed by a consent order dated 15th March 2013, which
       was before the defence was due for service. The terms of the stay have proved
       controversial between the parties. The stay provided that: *"These proceedings be
       stayed until four weeks after disposal (whether by hand-down of judgment or
       settlement) of Employment Tribunal proceedings between the Claimant and Troika
       Dialog (UK) Limited and others (Case no.2201940/2012)."*

44.    The Claimant contends that the stay covered proceedings up to and including the
       determination of any proposed appeal. The Defendant contended that the stay
       concluded 4 weeks after the judgment on remedies.

45.    In a judgment dated 31st October 2013 the Employment Tribunal determined that Ms
       Lokhova had been the subject of sex discrimination, harassment and victimisation and
       had been unfairly dismissed by constructive dismissal on 18th April 2012.

46.    After the delivery of the judgment on liability Carter-Ruck, in a letter dated 10th
       December 2013, noted that the judgment on remedies was outstanding and referred to
       some of the issues that would be addressed in that judgment, including Ms Lokhova's
       involvement with a scheme known as DECS. Carter-Ruck stated that as the remedy
       hearing had not taken place the proceedings had not been disposed of. Taylor
       Wessing, in their letter dated 20th December 2013, wrote referring to the consent order
       saying *"we confirm that we agree that the stay will not therefore end until disposal of
       the remedy hearing or earlier settlement of those proceedings"*.

47.    There was a hearing on remedies and by a judgment handed down on 5th March 2015
       (see paragraph 14.13.2 of the first witness statement of Mr Tait and paragraph 20 of
       the second witness statement of Mr Shanmuganathan) Ms Lokhova was awarded
       compensation. Compensation was awarded on the basis that Ms Lokhova would
       never work in the financial services industry again. 4 weeks after hand down of
       judgment on 5th March 2015 was Friday 3rd April 2015.

48.    On 16th April 2015 the bank lodged a notice of appeal. On 12th June 2015 the
       Employment Appeal Tribunal issued directions, and the Judge recorded that he was
       doubtful that there were any reasonable prospects of success for the appeal.

49.    The bank did not pursue the appeal and approached the Claimant in September 2015
       about withdrawing the appeal.

50.    On 30th September 2015 Taylor Wessing wrote to Carter-Ruck stating that the stay
       was about to expire because the appeal was going to be withdrawn and recording that
       *"our client considers that your client has been part of a concerted and deliberate
       campaign over several years, together with other employees of the bank, to destroy
       her reputation and to ruin any chance of her obtaining future employment in the
       banking sector or in any other related field"*. Reliance was placed on evidence given
       in the Employment Tribunal proceedings to the effect that Mr Longmuir would have
       conversations with the equity sales team including Mr Tymula and that Mr Longmuir
       would make very derogatory comments about Ms Lokhova.

51.    On 20th October 2015 the bank and Ms Lokhova wrote to the Employment Appeal
       Tribunal withdrawing the appeal, which agreement was confirmed in an order dated
       22nd November 2015

52.     On 22nd October 2015 an application was made on behalf of Mr Tymula to strike out the proceedings.  On 20th November 2015 an application was made on behalf of Ms Lokhova to disapply the limitation period.

53.     An application was also made in the Longmuir action to disapply the limitation period.  Ms Lokhova made a witness statement in those proceedings claiming that the first time that she was aware of an email from Mr Longmuir dated 12th May 2011 was following the October DSAR disclosure.

54.     An application to amend the Particulars of Claim was made on behalf of Ms Lokhova to rely on a wider campaign by Mr Longmuir and Mr Tymula against Ms Lokhova. Ms Lokhova says that she became aware of the campaign against her from the Employment Tribunal proceedings.

**The email dated 22nd September 2011 was in the March 2012 DSAR disclosure but it was not noted by Ms Lokhova until October 2012**

55.     It is common ground that Ms Lokhova received the emails dated 21st and 22nd September 2011 when she received the response to the DSAR on 26th October 2012. The Defendant also contends, but the Claimant disputes, that Ms Lokhova received the email dated 22nd September 2011 on 9th March 2012.

56.     The letter dated 9th March 2012 was sent to Ms Lokhova's solicitors Russell Jones & Walker by Salans.  The covering letter referred to the searches being carried out and the fact that "*we now enclose seven lever-arch files*".  The letter referred to the computers which were searched which included those of Mr Longmuir and Mr Zaniboni, and that the terms searched included "*SL*".  This suggested that the email dated 22nd September 2011 should have been picked up because of the reference to "*SL*" in the email dated 22nd September 2011.

57.     The witness evidence shows that Mr North and Ms Lokhova went to pick up the files on the same day that they had been received from Russell Jones & Walker.  Ms Lokhova said that the emails had not been sorted into order, and there was duplication, see paragraph 19 of Ms Lokhova's second witness statement.  Having started to read the documents Ms Lokhova was so upset by the way that she had been referred to in one of the first documents that she read that she took no further part and relied on Mr North and Colin Chapman to deal with the material.  Mr North and Mr Chapman then put the documents, contained in the 7 lever arch files, into an intelligible form for Russell Jones & Walker.

58.     Ms Lokhova said that when she had received the October DSAR disclosure they went through "*every page of every file again to see if there was a duplicate or a new disclosure.  It was during this part of the exercise that we found the two emails complained of in this claim in the new disclosure*", paragraph 21 of the second witness statement.

59.     Ms Lokhova's recollection was challenged.  Ms Lokhova, in her evidence, was taken to her witness statement dated 23rd November 2015 in the Longmuir proceedings where she had said at paragraph 31 that in the October DSAR disclosure the bank "*included a copy of an email from Mr Longmuir to Mr Van Loon dated 12 May 2011 (amongst hundreds of other documents).  This was the first time that I was aware of*

*the email"*.  The email included a description of Ms Lokhova which was very derogatory (and it was common ground at the Employment Tribunal was untrue). This witness statement was verified by a statement of truth.

60.   However it is apparent that this email had been disclosed before October 2012.  This is because in the Complaint in the Employment Tribunal which was dated 14th May 2012, at paragraph 55 Mr Longmuir's email dated 12 May 2011 is set out.  Ms Lokhova was unable to explain how this error had occurred, but it is obvious that Ms Lokhova's witness statement about when the email dated 12th May 2011 had been disclosed was wrong.  Ms Lokhova maintained that she had an absolutely clear recollection of the spreadsheet showing the discovery of this email in October.  Ms Lokhova did not have the March disclosure any more because Ms Lokhova thought that the files had been part used in compiling the Employment Tribunal files.  Ms Lokhova emphasised that she was very ill at the time.

61.   Mr North confirmed in his evidence that he did the bulk of the donkey work in reviewing the disclosure.  This was because Ms Lokhova had been so upset by what she read that she was unable to read anything more.  He had highlighted all the damaging materials and he confirmed that he had not seen the emails dated 21st and 22nd September 2011, and he had not highlighted it in the materials sent to solicitors. Mr North labelled the *"important material in the files with yellow 'post-it' notes.  I remember that the seven files were chaotic"*.  Mr North thought that the bank had deliberately made the task difficult.  Mr North confirmed that he made notes of the most damaging material in the files from Ms Lokhova's perspective, and that most of the material related to Mr Longmuir.  Mr North confirmed that he had not seen the first or second emails, because if he had seen them he would have filed them as important since they were obviously damaging to her.

62.   Mr North related the circumstances following the delivery of material pursuant to the second DSAR.  He said *"over the course of the following week Colin Chapman and I cross-referenced the material to identify what was new and what had already been disclosed to Svetlana.  We carefully tabulated each important document and recorded when it had been sent to us.  We recorded all this information contemporaneously, including receiving the two emails complained of ...".*  Mr North exhibited a screenshot of his document, which shows in boxes: the date of the email; the time of the email; the recipient of the email; the material text of the email; and where the material came from.  This showed for the relevant emails dated 21st and 22nd September 2011 "Oct DSAR".

63.   Mr North said that he was certain that he had not seen the documents in March.  Mr North recorded that Ms Lokhova was particularly upset about finding the emails from Mr Tymula because she had, among other matters, introduced Mr Tymula to clients including GLG.  I should record that the evidence shows that GLG were an existing client of Mr Tymula, but that Ms Lokhova had had dealings with GLG when at Fixed Income.  Mr North said that it was when she read these emails that it became clear to Ms Lokhova that Mr Tymula *"was a major participant in the campaign"*.  It might be noted that Ms Lokhova's conclusion to this effect predates the Employment Tribunal proceedings and the service of the Particulars of Claim in this action.

64.   Mr North confirmed that he had helped Ms Lokhova sort out the emails for the claim against Mr Longmuir as well as the bank.  He said he was not sure what had happened

to the files delivered in March 2012, they could have gone to the solicitors and irrelevant material might not have been retained.

65. So far as the Defendant's evidence was concerned, the effect of refusing permission to rely on Mr Davies' and Mr Trotter's evidence meant that I was left with the witness statement from Mr Tait who said he had been supplied with what he was told were copies of the bundles supplied to Ms Lokhova, that those bundles were provided to him by Dentons, successors to Salans (paragraph 14 of his second witness statement), and that the email dated 22nd September 2011 was in the bundles.

66. I am satisfied that the email dated 22nd September 2011 was in the March disclosure provided to Ms Lokhova. I make this finding because the email was located in the bundles which had been retrieved from Dentons, the successor firm to Salans, and provided to Carter-Ruck. The email would have been picked up by the search terms used for the electronic search of the emails. Although I accept that there were errors about the descriptions of the files, and errors made about when the files were delivered, the fact that the bundles contained the email dated 22nd September 2011 has been a consistent statement. I do not place much reliance on Ms Lokhova's evidence that the email was not in the March disclosure because it is apparent from her own evidence that having (understandably) become upset about reading some of the things that had been written about her, she took no further part in looking for the emails and could not therefore give direct evidence of what had been found and where.

67. This meant that Ms Lokhova was dependent on the work done by Mr North and Mr Chapman on her behalf. It is apparent that there were a very considerable number of emails and the format was such that it would be very easy to miss a document or the significance of a document when reading the bundles. It must have been Mr North and Mr Chapman who carried out the same process in relation to Mr Longmuir's emails in the March disclosure, because Ms Lokhova was too upset to read the files. It is apparent that Mr North and Mr Chapman made reports which were inaccurate to Ms Lokhova about when other documents were found, so that Ms Lokhova made an inaccurate and wrong statement to the effect that the email from Mr Longmuir to Mr Van Loon dated 12th May 2011 was not in the March 2012 DSAR disclosure, when it must have been because the solicitors had identified it for the purposes of the Employment Tribunal complaint in May 2012. This means that although they might have compared the earlier disclosure with the later disclosure, the email dated 21st September 2011 was missed. It is easy to understand how a document could be missed in circumstances when the files were being collected from the solicitors, examined by a number of different persons, and returned for the solicitors to take advantage of the work done by Mr North and Mr Chapman, and where it is not clear what documents were returned back to Mr North and Mr Chapman for the purposes of their March and October comparisons.

68. However I am also satisfied that the email dated 22nd September 2011 was not brought to the attention of Ms Lokhova until October 2012 and did not become known to her until this date. I make this finding because Ms Lokhova had stopped reading the March disclosure after becoming upset, and because the first time that the email was specifically noted was by Mr North on his schedule in October.

**The stay expired on 3rd April 2015**

69. It was contended on behalf of Mr Tymula that the stay expired 4 weeks after the judgment on remedies dated 5th March 2015, namely 3rd April 2015. It was contended on behalf of Ms Lokhova that the stay did not expire until an appeal lodged by the bank against the remedies judgment was withdrawn.

70. The terms of the stay were "… *until four weeks after disposal (whether by hand-down of judgment or settlement) of Employment Tribunal proceedings …"*. This means that the critical issue is when "*disposal … of Employment Tribunal proceedings*" occurred. The stay embodied an agreement made by experienced solicitors and is to be interpreted having regard to well-known principles. A reasonable person having all the relevant background knowledge reasonably available to the parties would know that in many Employment Tribunal proceedings there are separate hearings and judgments for liability and remedies, and that formal orders are often drawn up long after the hand down of judgments. The reasonable person would also know that rights of appeal are limited, although this does not prevent unsuccessful litigants seeking to challenge the result by formulating a challenge to a finding of fact as raising points of law. The reasonable person would also know that appeals are brought by separate proceedings in the Employment Appeal Tribunal.

71. In these circumstances I consider that "*disposal … of Employment Tribunal proceedings*" meant (in the absence of a settlement) the handing down of a judgment which dealt with issues of remedies in the Employment Tribunal. This is because hand down of judgment could not be a reference to an earlier judgment on liability, because the proceedings would still be active. It is also because hand down of judgment on remedies was a disposal of the Employment Tribunal proceedings, and that Employment Appeal Tribunal proceedings were different proceedings.

72. However even if I was wrong on that construction in my judgment the parties varied their agreement on the stay to make the position clear when after the delivery of the judgment on liability, and in response to Carter-Ruck's letter dated 10th December 2013, Taylor Wessing, in their letter dated 20th December 2013, wrote referring to the consent order saying "*we confirm that we agree that the stay will not therefore end until disposal of the remedy hearing or earlier settlement of those proceedings*". This made it clear that it was the judgment on the remedy hearing which was critical to the ending of the stay.

73. 4 weeks after hand down of judgment on 5th March 2015 was Friday 3rd April 2015 and in my judgment this was the period at which the stay ended. I note that it was not until 16th April 2015 the bank lodged a notice of appeal. A problem with the Claimant's interpretation of the stay is that the stay would have ended on 3rd April 2015, before being resuscitated by the notice of appeal, which seems to me to be a construction which would not accord with the reasonable expectation of the parties.

**Relevant statutes and principles of law**

**Limitation**

74. Section 4A and 32A of the Limitation Act 1980 are relevant. They provide:

**4A. Time limit for actions for defamation or malicious falsehood.**
The time limit under section 2 of this Act shall not apply to an action for—

(a) libel or slander, or
(b) slander of title, slander of goods or other malicious falsehood.
but no such action shall be brought after the expiration of one year from the date on which the cause of action accrued.

**32A.— Discretionary exclusion of time limit for actions for defamation or malicious falsehood.**

(1) If it appears to the court that it would be equitable to allow an action to proceed having regard to the degree to which—
(a) the operation of section 4A of this Act prejudices the plaintiff or any person whom he represents, and
(b) any decision of the court under this subsection would prejudice the defendant or any person whom he represents,
the court may direct that that section shall not apply to the action or shall not apply to any specified cause of action to which the action relates.
(2) In acting under this section the court shall have regard to all the circumstances of the case and in particular to—
(a) the length of, and the reasons for, the delay on the part of the plaintiff;
(b) where the reason or one of the reasons for the delay was that all or any of the facts relevant to the cause of action did not become known to the plaintiff until after the end of the period mentioned in section 4A—
(i) the date on which any such facts did become known to him, and
(ii) the extent to which he acted promptly and reasonably once he knew whether or not the facts in question might be capable of giving rise to an action; and
(c) the extent to which, having regard to the delay, relevant evidence is likely—
(i) to be unavailable, or
(ii) to be less cogent than if the action had been brought within the period mentioned in section 4A.
(3) In the case of an action for slander of title, slander of goods or other malicious falsehood brought by a personal representative—
(a) the references in subsection (2) above to the plaintiff shall be construed as including the deceased person to whom the cause of action accrued and any previous personal representative of that person; and
(b) nothing in section 28(3) of this Act shall be construed as affecting the court's discretion under this section.
(4) In this section *"the court"* means the court in which the action has been brought.

75. The limitation period in libel actions was reduced from 6 years to 3 years in 1984, and from 3 years to 1 year in 1996. The reduction was based on the general recognition that claims to protect a reputation ought to be pursued with vigour. *"Time is always of the essence"* in defamation claims, see paragraph 1.4 of the Pre-Action Protocol for Defamation.

76. The provisions of section 32A of the Limitation Act 1980 were considered in *Steedman v BBC* [2001] EWCA Civ 1534; [2002] EMLR 17. In that case the Court of Appeal established that: the discretion in section 32A was largely unfettered, see paragraph 15; a direction under the section was always highly prejudicial to the defendant, see paragraph 18; and the expiry of the limitation period was always in some degree prejudicial to the claimant, even if the claimant had a cast iron case against his legal representatives, see paragraph 27. The extent of the prejudice would depend on the strength or otherwise of the claim or defence, see paragraph 29. It was for claimants to make the case for the disapplication of the limitation period, see paragraph 32.

77. In *Bewry v Reed Elsevier* [2014] EWCA Civ 1411; [2015] 1 WLR 2565 the Court of Appeal again underlined the need for swift remedial action in libel cases. As Brooke

LJ noted in *Steedman v BBC* at paragraph 41 it would be quite wrong to read "*wholly exceptional*" into the words of section 32A when they are not there, however the very strong policy considerations relating to libel cases mean that "*the disapplication of the limitation period in libel actions is often described as exceptional*", see Sharp LJ in *Bewry v Reed Elsevier* at paragraph 5.

78.     In *Bewry v Reed Elsevier* it was also noted that "*unexplained or inadequately explained delay deprives the Court of the material it needs to determine the reasons for the delay and to arrive at a conclusion that is fair to both sides in the litigation*", see paragraph 8.

79.     In *Steedman v BBC* there was reference to paragraph VIII.5 of the Neill Committee which referred to a situation where the subject of the libel is being investigated by some other means and there was a wish to await the outcome, see paragraphs 20 and 44. The fact that a claim is weak will reduce the prejudice to a Claimant, see paragraph 29(2) of *Steedman v BBC*.

*Jameel* **abuse**

80.     It is established that in order to deal with cases justly, proportionately and to maintain a proper balance between the Convention right to freedom of expression and the protection of other rights, the Court is required to stop as an abuse of process defamation proceedings which serve no legitimate purpose, see *Jameel v Dow Jones* [2005] EWCA Civ 75; [2005] QB 946 at paragraph 55. The test proposed in that case and accepted by the Court was whether "*a real and substantial tort*" had been committed in the jurisdiction, see paragraph 50 of *Jameel*.

81.     The test has been expressed in a number of different ways, namely whether "*the game is worth the candle*", see paragraph 69 of *Jameel*, or whether there is any prospect of a trial yielding "*any tangible or legitimate advantage such as to outweigh the disadvantages for the parties in terms of expense, and the wider public in terms of court resources*", see *Schellenberg v BBC* [2000] EMLR 296.

82.     Vindication is an important point of defamation proceedings, and vindication, and consequential injunctions, may eliminate or reduce the risk of republication, see *McLaughlin v London Borough of Lambeth* [2010] EWHC 2726 (QB); [2011] EMLR 8 at paragraph 112. This is particularly so if the Defendant is continuing to publish the allegations in this jurisdiction, see *Jameel* at paragraph 74 and *Mengi v Hermitage* [2012] EHWC 3445 (QB) at paragraph 52. If a Defendant is not intending to justify the allegations this may be relevant, but it is all a question of fact, see *McLaughlin* at paragraphs 67 and 111.

83.     It needs to be remembered that dismissing an action for an abuse of process is a draconian power vested in the Court which should only be exercised in an exceptional case, see *Haji-Ioannou v Dixon and others* [2009] EWHC 178 (QB) at paragraph 30. Applications of this type are not a "*numbers game*" so far as evidence about publication is concerned, anymore than decisions about serious harm are a numbers game.

84.     The fact that costs are likely to be high does not mean that an action should be struck out as an abuse, *Haji-Ioannou* at paragraph 43. This is particularly so given the

increased power available to Courts to control the expenditure of disproportionate costs.

85.   Applications to dismiss proceedings as an abuse of process help to ensure that actions which do not serve any legitimate purpose are not pursued and that a proper balance between competing rights is maintained, see *Karpov v Browder and others* [2013] EWHC 3071 (QB); [2014] EMLR 8.

**Reverse summary judgment and qualified privilege**

86.   CPR Part 24 is designed to deal with cases which are not fit for trial, it is not a trial or a fact finding exercise, see *Three Rivers DC v Bank of England* (No.3) [2001] UKHL 16; [2003] 2 AC 1.   A summary judgment application must not become an impermissible mini-trial.

87.   Where the maker and recipient are acting in a matter in which they have a common interest, such as the allocation of work, it will be an occasion of qualified privilege, see generally Gatley on Libel and Slander, Twelfth Edition, at 14.9.  Proof of express malice will defeat a claim for qualified privilege.  Proof of some dominant improper purpose or proof of an absence of honest belief in the statement is evidence of express malice, see Gatley at 17.3.  Mere proof that a statement is untrue is not evidence of malice, and honesty is presumed and must be disproved, see Gatley at 17.16.  An unreasonable belief may be an honest belief.

**Decision on qualified privilege and malice, *Jameel* abuse, and limitation**

88.   I will deal with the application for reverse summary judgment in respect of qualified privilege and malice first because much of the evidence related to this issue and it was said to be relevant to all of the applications.  In my judgment the publication of the emails dated 21st and 22nd September 2011 which were to work colleagues were publications to persons who had a common interest in the subject matter of the publication and were on an occasion of qualified privilege.  Although Mr Sherborne did not formally concede the point he was unable to point to any factor which suggested that these emails were not published on an occasion of qualified privilege.

89.   However Mr Sherborne submitted that the evidence was capable of showing malice and that Mr Tymula was acting for an improper purpose, namely to harm Ms Lokhova so that she would not remain part of the equity sales team and reduce his share of the profits at a time when he had taken on a substantial mortgage.  Mr Sherborne submitted that Mr Tymula did not have an honest belief in what he said, and was part of a campaign targeting Ms Lokhova to ensure her removal from the team.

90.   Mr Tymula said in his witness statement that the statements that he made reflected his beliefs because he was concerned that Ms Lokhova's background was in Fixed Income, that she had no experience of equity, and that he was worried about Ms Lokhova's capabilities and the risks that this might pose from a regulatory perspective.  He noted the differences between Fixed Income and Equities, the need for complete knowledge about the market, and the need to share information in circumstances where he said that Ms Lokhova was not a team player.  He said he was not motivated by money to make the complaints, because if he had not believed what he said he would have been back up on Ms Lokhova's accounts, which would have

given him 5-10 per cent of commission. He said it was a professional risk he wished to avoid and it was not personal, vicious or malicious.

91.   I should record that Mr Tymula did refer to an incident in paragraph 25 of his witness statement where there had been a concern about a breach of client confidence on the part of Ms Lokhova, although it transpired that the information disclosed at the relevant meeting had come from the public domain. The incident had occurred in the month after Mr Tymula had sent the emails. Mr Sherborne therefore said it could have had nothing to do with Mr Tymula's belief at the time he sent his email, and that the witness statement should have made this clear. I accept that the wording in the witness statement should have been clearer about when the incident occurred, but I had not read paragraph 25 as being other than an illustration of the sort of problems that could occur as a lack of experience. I should record that in any event it did not seem to me to be a particularly compelling example for Mr Tymula in circumstances where those in Fixed Income would also have had to respect client confidences, and it was common ground that Ms Lokhova had experience in Fixed Income.

92.   I have taken account of all the contemporaneous documents and the Claimant's *"Chronology of D's behaviour showing motive/malice"*, and in my judgment Ms Lokhova's case on malice is arguable. This is because Ms Lokhova might, with further disclosure and evidence, be able to show that Mr Tymula, being concerned about his profit share, made statements about Ms Lokhova which he knew to be untrue. I am however also satisfied that Ms Lokhova's case on malice can be fairly characterised as weak. This is because many of the matters on which Mr Sherborne relied to attack Mr Tymula and show that he might have been lying did not support the submissions made. I can illustrate this point by reference to what has been said about the fact that Mr Tymula blind copied Mr Van Loon to the email dated 22nd September 2011 in the draft amended Particulars of Claim, which Mr Sherborne invited me to consider when considering the nature of the case which Ms Lokhova was intending to make. In the draft Amended Particulars of Claim at paragraph 7C7(a) it was pleaded that *"despite her numerous requests for full disclosure from the bank there has been a deliberate and manifest failure to provide the Claimant with the documents to which she was entitled ... the Claimant will refer to the failure to search or disclose to her (a) the blind copied recipients of emails, such as the 22 September 2012 email which was sent by this email to at least Mark Van Loon ... something which the Defendant has deliberately sought to conceal"*. There are two problems with this paragraph of the draft pleading. First it conflates alleged failings on the part of the bank in giving disclosure with failings on the part of Mr Tymula. It is now common ground that Mr Tymula was not responsible for the disclosure made by the bank, and the pleading should have made this clear. The second problem is that it makes an allegation of deliberate concealment, which is tantamount to an allegation of dishonesty, in circumstances where the evidence shows that Ms Lokhova's solicitors were provided with the email which was blind copied to Mr Van Loon, as appears from the fact that Mr Van Loon's reply to the email was also provided. In these circumstances it would have been a particularly incompetent attempt at deliberate concealment to provide the very email which proved that Mr Van Loon had been provided with the email. All Mr Sherborne could say in response was that the email might have been forwarded and not blind copied. This is not a beginning of a response to the fact that Mr Van Loon's reply was available shows that there was no deliberate concealment.

93.   However, out of fairness to Ms Lokhova's team, I should record that submissions were made on behalf of Mr Tymula to the effect that Ms Lokhova knew that the email had been copied to Mr Van Loon from the start because the email was disclosed from Mr Van Loon's email account pursuant to the DSAR, and that Ms Lokhova should never have sanctioned such an attack to be made on Mr Tymula. The submissions have not assisted me. The email was copied to Mr Van Loon but Ms Lokhova is unlikely to have recollected the detail of the email itself, particularly in circumstances where she had been upset by comments that were made in the emails and had relied on others to do part of the work for her. The submissions on both sides sometimes generated more heat than light.

94.   A further illustration of the weakness of Ms Lokhova's case is that submissions were made on behalf of Ms Lokhova about Mr Tymula's motives which were internally inconsistent. In the email dated 22nd September 2011 Mr Tymula said that he had always been "*very clear and open about the fact that SL poses a serious threat to Troika clients*". The fact that Mr Tymula had been "*clear and open*" was said to be evidence of a campaign against Ms Lokhova, and the point was made in Ms Lokhova's first witness statement, and in Mr Shanmuganathan's second witness statement at paragraph 29. However in submissions before me, and revisited in the further submissions after the conclusion of the case, it was said to be a lie on the part of Mr Tymula, because he had in fact never been clear and open that Ms Lokhova had been a threat, and he was making up his concern to damage Ms Lokhova. I pointed out to Mr Sherborne that both propositions could not be right, and it is fair to say that Ms Lokhova's submission on this concluded on the basis that this statement was a lie by Mr Tymula. In my judgment there is material on which Mr Tymula can be properly questioned about this, but the changing nature of Ms Lokhova's case suggests that Ms Lokhova's case on malice is weak.

95.   This brings me to the issue, on which much reliance has been placed, about whether Mr Tymula was part of a campaign against Ms Lokhova which is said to be relevant to the issue of malice, and the circumstances of the case as a whole. Ms Lokhova referred to a "*sustained campaign which was carried out by Mr Tymula and Mr Longmuir, to destroy my reputation not just to other employees within the Bank but also externally to clients, the market place in which I worked and beyond*". Ms Lokhova was concerned about the damage that had been caused as a result of "*... these statements being disseminated to clients, competitors and the market generally by Mr Tymula ...*" (paragraph 10 of Ms Lokhova's first witness statement). Ms Lokhova shared her firm belief that "*... the publications which have been disclosed by the Bank are just the tip of the iceberg*" (paragraph 19 of Ms Lokhova's first witness statement). The phrase "*tip of the iceberg*" was repeated in submissions on a number of occasions.

96.   In support of her case that there was a campaign Ms Lokhova referred in her second witness statement, at paragraph 9, to the fact "*that the Employment Tribunal had specifically named Mr Tymula as having been one of the key individuals who had participated in the campaign to undermine me*". It was common ground that a finding of the Employment Tribunal did not bind me, and was, strictly analysed, opinion evidence on the material before the Employment Tribunal but it was suggested that such a finding was likely to be indicative of the existence of evidence supporting the case on malice. However Mr Tymula disputed this reference to the Employment

Tribunal judgment in his witness evidence, saying that he had not been a witness in the Employment Tribunal proceedings, and that the only reference to him in the Employment Tribunal judgment on liability was, in relation to an allegation called R, where the Employment Tribunal stated: "*this allegation is restricted to an allegation that little was done to discipline Mr Longmuir (and possibly others, such as Mr Van Loon and Mr Tymula) after the DSAR request answers came in on 10 March 2012*".

97.    Mr Sherborne was unable to point to any other reference to Mr Tymula in the Employment Tribunal judgments which would justify Ms Lokhova's statement. In my judgment the passing reference to Mr Tymula in relation to what was allegation R cannot justify a statement by Ms Lokhova that Mr Tymula had been named as one of the key individuals who had participated in the campaign to undermine Ms Lokhova.

98.    It is fair to note that there was some evidence given in the Employment Tribunal proceedings which suggested that there had been discussions about Ms Lokhova by members of the equity sales team and Mr Sherborne was entitled to say that he might get Bloomberg messages on disclosure (although disclosure had been given by the bank in the Employment Tribunal proceedings and pursuant to the DSAR's which included Bloomberg material and which did not include anything from Mr Tymula) and he might be able to get material from recordings of telephone calls from the trading desk. I should record that any such application for disclosure, which would involve an application against the bank which is not a party to this claim, would be close to being an impermissible fishing expedition. This is because so far as recordings are concerned it would be attempting to find information from listening to hours of recordings. In any event the exercise would be very costly.

99.    Ms Lokhova said that Mr Tymula had acted "*... knowing that my superiors would have to take that seriously, escalate it within the Bank and take action*" in paragraph 9 of her third witness statement, but there was no documentary evidence that any action had been taken as a result of Mr Tymula's email apart from a suggestion that Mr Tymula speak to the client direct. Ms Lokhova relied on the fact that she had been excluded from the meeting with GLG meeting and did not meet another client of Mr Longmuir. However there was no suggestion that those meetings did not take place because Ms Lokhova was considered to be a regulatory risk, and Ms Lokhova said that she had been careful not to tread on anyone's toes in relating to existing clients in paragraph 300 of her Employment Tribunal statement.

100.   It might be noted that in her fifth witness statement Ms Lokhova went further and started putting figures on the value of the clients she was prevented from meeting, being $2,144,000 for one client and $8,244,000 for another client. When I asked Mr Sherborne why these losses had not been pleaded, either in the original Particulars of Claim which was drafted after Ms Lokhova had had access to the relevant documents through the DSAR disclosure or in the Amended Particulars of Claim, Mr Sherborne suggested that the losses could not be related to the emails. This did not appear to be consistent with the thrust of Ms Lokhova's statement.

101.   Therefore in my judgment the evidence in support of a campaign by Mr Tymula against Ms Lokhova is weak. There is Ms Lokhova's firm belief that Mr Tymula was part of a campaign, there is evidence that there were discussions between Mr Tymula and members of the equity sales team about Ms Lokhova, but there is no documentary

evidence to suggest such a campaign on the part of Mr Tymula. There is only the possibility that further documents or telephone calls might evidence such a campaign.

102. In all these circumstances I refuse the application for reverse summary judgment. However I will consider whether my finding that this is a weak case on malice has any effect on the other applications.

*Jameel* abuse

103. Mr Rushbrooke submitted that there was no real and substantial tort in this case. He relied on the fact that the Employment Tribunal gave a judgment on remedies which awarded substantial compensation to Ms Lokhova on the basis that she will not be able to work, because of health issues, in financial services again. The award in Ms Lokhova's favour in the Employment Tribunal was for separate acts of sex discrimination, harassment, victimisation and unfair dismissal. However there are differences between the Employment Tribunal proceedings and the libel proceedings and Mr Tymula was not a party to the Employment Tribunal proceedings.

104. Ms Lokhova said, in paragraph 7 of her first witness statement, that the libel proceedings would allow Ms Lokhova to obtain vindication for the "*sustained campaign which was carried out by Mr Tymula and Mr Longmuir to destroy my reputation not just to other employees within the Bank but also externally to clients, the market place in which I worked and beyond*". However I have already noted above the very limited evidence about Mr Tymula's involvement in any campaign, and the absence of evidence about reports about Ms Lokhova by Mr Tymula to clients.

105. It might also be recorded that the publication of the emails dated 21st and 22nd September 2011 was very limited, being to Mr Van Loon (for both emails) and Mr Longmuir and Mr Zaniboni. The Defendant has relied on the fact that the recipients of the emails, namely Mr Van Loon, Mr Longmuir and Mr Zaniboni all had a very poor opinion of Ms Lokhova, as set out in the "*Defendant's Note on the publishees of the two emails*", which was responded to by the "*Claimant's Note on the publishees of the two emails in response to D's document provided on 25 January 2016*". It should be noted that the low opinion of Ms Lokhova held by Mr Van Loon, Mr Longmuir and Mr Zaniboni did not apparently relate to regulatory risk.

106. Mr Rushbrooke also relied on the fact that Ms Lokhova did not have any regard for the views of Mr Longmuir or Mr Zaniboni, and I was taken to a number of references showing this. The evidence shows that Ms Lokhova did (successfully) complain about Mr Longmuir and Mr Zaniboni and did not appear to have any regard for their views. However this does not mean that the statements could not amount to a real and substantial tort.

107. Ms Lokhova said that she needs to bring the proceedings to obtain a final injunction. Mr Sherborne placed reliance on the fact that there might be a final injunction even where a party has been said that there will be no further publication, see the judgment at first instance and the judgment of the Court of Appeal in *Weller v Associated Newspapers* [2015] EWCA Civ 1176; [2016] EMLR 7. However this is a case where there is very little evidence to suggest that Mr Tymula will republish these allegations. He has not repeated them since 2011. The fact that he reserves the right to plead

justification, and says that his comment was based on a factual matrix showing that Ms Lokhova was inexperienced in equity sales, does not make the grant of an injunction at present a realistic prospect.

108.   It might be noted that if the issue is whether there was a sufficient evidence base for Mr Tymula to form an honest, but mistaken belief, that Ms Tymula was a regulatory risk, there would be little prospect of the proceedings achieving anything legitimate to justify the irrecoverable costs on both sides of the action (let alone the recoverable costs). However there remains the possibility that justification might be in issue and Mr Tymula has made it plain that he reserves the right to plead justification. This means that the proceedings might serve a purpose.

109.   In all these circumstances in my judgment these proceedings for libel are capable of amounting to a real and substantial tort. The fact that Ms Lokhova's case on malice is weak does not mean that the action amounts to a *Jameel* abuse of process. I therefore refuse the application to dismiss the claim as a *Jameel* abuse of process.

**Limitation period**

110.   There was a dispute, in the solicitors' correspondence, about when Ms Lokhova should have made her application to disapply the limitation period. It was contended on behalf of Ms Lokhova that until the point had been put in issue by service of a defence, there was no need to make an application to disapply the limitation period. It is common ground that the Limitation Act bars the remedy and not the cause of action, meaning that it is a point that needs to be relied on by a defendant. I also agree that the service of a defence in libel actions is too often delayed, sometimes for tactical reasons. This may be because the defendant wishes to preserve the possibility of pleading justification, without at this stage running the risk of aggravating damages (although there is authority to suggest that the proper defence of an action is not to be taken into account in aggravation of damages in libel proceedings). However in this case once it had been made plain before service of the Particulars of Claim that the issue of limitation was being taken, the onus was on Ms Lokhova to make a prompt application to disapply the limitation period. However because Mr Tymula made a prompt application to strike out the claim nothing has turned on this point.

111.   I have to consider whether it is equitable to allow the action to proceed having regard to the balance of prejudice. I need to take account of all of the circumstances of the case. This includes the fact that Ms Lokhova's claim in relation to malice is weak, and that there are likely to be very considerable costs involved in the proposed disclosure exercise relating to Bloomberg and taped trading calls.

112.   I am also directed to take account of the length of and reasons for delay, the date on which any facts became known to Ms Lokhova, and the extent to which she acted promptly and reasonably once she knew whether or not the facts in question might be capable of giving rise to an action.

113.   I should record that it is an important factor in Ms Lokhova's favour that she only became aware of the existence of the emails from the DSAR disclosure provided by the bank. Although the email dated 22nd September 2011 was provided to her in the March disclosure it was provided with numerous other documents and Ms Lokhova had become so upset by reading the contents of the emails that she relied on others to

continue the task.  The email dated 22nd September 2011 was not flagged up until receipt of the October DSAR disclosure, when it was provided with the email dated 21st September 2011 and in the words of section 32A of the Limitation Act the emails *"did not become known"* to Ms Lokhova until October 2012.  Proceedings were then issued in November 2012.

114.   The suggestion made on behalf of Mr Tymula for a stay, agreed by Ms Lokhova, was a reasonable and sensible course adopted by the parties, and mirrored the type of circumstances that would justify delay contemplated by the Neill Committee in paragraph VIII.5 of the report.  It was also expressly agreed by the parties that the delay as a result of the stay would not count for the purposes of the limitation issue and I therefore discount that period of delay.

115.   It also seems to me that the parties were acting reasonably in raising and agreeing the matter in correspondence and it seems to me to be right not to take account of that period before the stay came into force.  However while there were very sensible reasons for the stay it meant that there became an increased importance to get on with the action once the stay expired.

116.   For the reasons already given above in my judgment the stay expired on e The 3rd April 2015, which was 4 weeks after hand-down of the judgment on remedies.  Ms Lokhova did not take any steps to progress the libel action at that stage.  Given that the bank did not file a notice of appeal until 16th April 2015 a mistaken understanding about the effect of the agreement of the stay could not have explained the lack of action between 3rd April and 16th April 2015.  Nothing was done to progress the libel action until Taylor Wessing wrote their letter dated 30th September 2015 suggesting that the appeal had acted as a further stay of proceedings, and that the stay operated until 4 weeks after the appeal was withdrawn.  Mr Tait made it clear in his first witness statement that the question whether Ms Lokhova claimed that there had been a misunderstanding about the scope of the stay was in issue (see paragraph 14.14 *"if indeed she does claim"*).  This is important because if Ms Lokhova wished to rely on a misunderstanding to explain this period of delay she had an obligation to provide that evidence, see *Bewry v Reed Elsevier*.  There is no evidence to show that the failure to progress the action after 3rd April and before 30th September 2015 was because of a misunderstanding about the effect of the stay.  In these circumstances there is an important period of delay after 3rd April at a time when there was a need to get on with an action.

117.   I have to have regard to the extent to which relevant evidence is likely to be unavailable or less cogent when considering the application to disapply the limitation period.  In this respect I should note that the action which was stayed was an action involving 2 emails with a small publication.  Ms Lokhova has made clear that she intends to pursue an action alleging Mr Tymula was part of a campaign against her and that these emails were the tip of the iceberg.  The evidence relating to the alleged campaign is inevitably going to have been somewhat adversely affected by delay given that there is no evidence yet proving a campaign by Mr Tymula, but it is difficult to make any assessment of this and I do not place weight on it.  However I do not accept Mr Sherborne's submissions that Mr Tymula's involvement in the campaign was discovered in the Employment Tribunal proceedings.  This is because the evidence in the Employment Tribunal proceedings does not show that Mr Tymula was involved in a campaign, it only suggests a possibility.  Further the submission

takes no account of Mr North's evidence that it became clear to Ms Lokhova that Mr Tymula was a major participant in the campaign having seen the October DSAR.

118.    As to the balance of the prejudice to Ms Lokhova from not disapplying the limitation period and the prejudice to Mr Tymula in disapplying the limitation period, in my judgment Mr Tymula will suffer substantially more prejudice than Ms Lokhova. He will be engaged in expensive and time consuming litigation which is bound to involve, at the least, contested applications for amendments and disclosure in which he will face a very serious allegation of a campaign which is made on the basis of some comments from the Employment Tribunal proceedings which, of themselves, do not yet support the allegations. This new proposed case is of a different magnitude from the claim arising out of the 2 emails sent on 21st and 22nd September 2011. On the other hand Ms Lokhova will lose her right to bring a libel action which has a weak prospect of success.

119.    Attempting to balance all of these factors, and taking into account all the circumstances of the case, in my judgment it is not equitable to allow the action to proceed. This is because although the parties acted reasonably and promptly until 3rd April 2015, the need to get on with the libel action, as with all libel actions, was very much engaged after 3rd April 2015. Instead Ms Lokhova did nothing for a further unexplained period of delay in a case which was weak, and is now seeking to pursue a much wider case involving allegations of a campaign. I do not direct section 4A of the Limitation Act shall not apply to this case.

**Conclusion**

120.    For the detailed reasons given above I dismiss the applications for reverse summary judgment and to strike out the action as a *Jameel* abuse of process. I do not direct that section 4A shall not apply to this case. I will therefore strike out the action because it is statute barred.