# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| ED BUTOWSKY, | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | Civil Action No.  4:18CV442 |
| | § | Judge Mazzant/Magistrate Judge Craven |
| DAVID FOLKENFLIK, ET AL., | § | |
| Defendants. | § | |

### REPORT AND RECOMMENDATION
### OF THE UNITED STATES MAGISTRATE JUDGE
### ON DEFENDANTS' RULE 11 MOTION FOR SANCTIONS
### AND ORDER ON PLAINTIFF'S MOTION FOR LEAVE TO FILE

The above-referenced cause of action was referred to the undersigned United States

Magistrate Judge for pretrial purposes in accordance with 28 U.S.C. § 636.  The following pending

motions are before the Court:

**Defendants' Motion for Sanctions Pursuant to Rule 11 for Violations Committed by Plaintiff and His Counsel (Docket Entry # 96); and**

**Plaintiff's Motion for Leave to File Third Amended Complaint (Docket Entry # 98).**

The Court, having carefully considered the relevant briefing and hearing arguments of counsel

August 18, 2020, recommends Defendants' Rule 11 motion for sanctions be **DENIED**.

Plaintiff's motion for leave to file Third Amended Complaint is **GRANTED.**

## I. FACTUAL BACKGROUND

This is an action for defamation, business disparagement, and civil conspiracy filed by

Plaintiff Edward Butowsky ("Plaintiff" or "Butowsky"), a Dallas investment advisor, against

National Public Radio, Inc. ("NPR"), its senior media correspondent, David Folkenflik

("Folkenflik"), and certain former and current executive editors at NPR (Edith Chapin, Leslie Cook, and Pallavi Gogoi, jointly and severally) (collectively, "Defendants" or "NPR"). According to Plaintiff, Defendants published false and defamatory statements about Plaintiff online and via Twitter between August 2017 and March 2018 – statements Plaintiff alleges injured his business and reputation. Docket Entry # 72, ¶ 5. As a general matter, Defendants contend Plaintiff filed suit against them for accurately reporting on a publicly filed lawsuit on a matter of public concern. Specifically, Defendants assert Plaintiff filed suit following NPR's reporting on a 2017 lawsuit filed by Fox News contributor Rod Wheeler against Fox News.[1] *See* Complaint, *Wheeler v. Twenty-First Century Fox, Inc., et al.*, Case No. 1:17-cv-05807 (S.D.N.Y. Aug. 1, 2017). Docket Entry # 65 at p. 2, n. 3.

The 98-page Second Amended Complaint ("SAC") alleges as follows. In early 2017, Plaintiff contacted the family of Seth Rich to help the family investigate their son's unsolved murder.[2] Docket Entry # 72, ¶ 70. Plaintiff offered to pay for a private investigator. *Id.* On February 23, 2017, Plaintiff contacted Rod Wheeler via text message to see if Wheeler would be interested in investigating the murder. *Id.*, ¶ 71. Plaintiff did not know Wheeler, but he had seen him on television and Wheeler appeared to be a competent investigator. *Id.*

Plaintiff alleges the family of Seth Rich entered into a contract with Wheeler to investigate

---

[1] According to Plaintiff, this action is not a critique of NPR's reporting of the Wheeler lawsuit. Docket Entry # 32 at p. 3, n. 3; *see also* Docket Entry # 41 at p. 5. Plaintiff asserts this case is about collusion: that Folkenflik knew Plaintiff, a "Dallas investment manager," was part of Wigdor's "press strategy" and he willingly assumed the role of "firecracker" in the scheme to extort money from Fox News. Docket Entry # 41 at p. 5. Plaintiff asserts he suffered "permanent harm to his name, reputation and business as a registered investment advisor because of a false and vile narrative published with actual malice by David Folkenflik and Douglas Wigdor, acting in concert." *Id.* at p. 1.

[2] Seth Rich was a Democratic National Committee ("DNC") staffer who was murdered on July 10, 2016. Docket Entry # 72, ¶ 5.

the murder of Seth Rich.  *Id.*, ¶ 72. Plaintiff was not a party to the contract between Wheeler and the Rich family; he has never seen the contract; and his role and involvement in the investigation of Seth's murder were limited.[3]  *Id.*, ¶¶ 73-75. According to Plaintiff, Wheeler investigated the matter and came up with the theory that Seth's murder was not the result of a botched robbery.  *Id.* at p. 20, n. 7.

On March 31, 2017, Wheeler appeared on Fox 5 DC and claimed he had been investigating Seth's murder over the "past three weeks."  *Id.*, ¶¶ 79-81. According to the SAC, after Wheeler appeared on Fox 5 DC, he updated Malia Zimmerman, an "award-winning investigative reporter" employed by FoxNews.com, concerning his investigation.  *Id.*, ¶¶ 83-85. In one of his texts to Zimmerman, Wheeler stated, "I'm ready to say that Seth's [sic] Death was not a botched robbery and there appears to be a coverup within the D.C. Govt related to his death."  *Id.*, ¶ 86.   Zimmerman expressed interest in doing a story on the murder investigation, if Wheeler was "up to it."  *Id.*, ¶ 87.

As part of the murder investigation, Wheeler was also in direct contact with the "lead detective," Joseph Dellacamera, and information Wheeler obtained from Detective Dellacamera supported Wheeler's belief and his public statements to Zimmerman and others that Seth had been in contact with WikiLeaks and had sent emails to WikiLeaks.  *Id.*, ¶¶ 95-96.   On May 15, 2017, Wheeler told Fox 5 DC reporter, Marina Marraco, on camera that he had sources at the FBI who said there was information that could link Seth to WikiLeaks. ("Absolutely, yeah, and that's confirmed.").

---

[3] Plaintiff alleges Wheeler publicly confirmed Butowsky's limited involvement in the investigation. Docket Entry # 72, ¶ 5. According to the SAC, on May 16, 2017, Wheeler represented to Sean Hannity that "I was hired by the family, Joel and Mary Rich. They signed the contract. Now, the financial benefit, if there were any financial benefit and by the way there wasn't much, that was actually paid for by **a third party [Butowsky] that I have had very little communication with at all, Sean**." *Id.* (citing https://www.youtube.com/watch?v=CuRJDKEVxHY (emphasis added in SAC)).

*Id.*, ¶¶ 99-103.

On May 15, 2017, Wheeler was in contact with Zimmerman multiple times about an article Zimmerman was writing.  *Id.*, ¶ 106. Zimmerman provided Wheeler several "drafts" containing quotes attributed to Wheeler. *Id.*, ¶¶ 108-129. At no point in time did Wheeler ever deny making the statements quoted by Zimmerman; instead he offered further quotations.  *Id.*

On May 16, 2017, in the early morning, Fox published Zimmerman's story entitled, "*Seth Rich, slain DNC staffer, had contact with WikiLeaks, say multiple sources*."  *Id.*, ¶ 143.  The article included statements Wheeler had made and approved.  *Id.*  On May 16, 2017, after publication of Zimmerman's article, Wheeler appeared on Fox News and was interviewed by Sean Hannity, where Wheeler again confirmed Seth had communicated with WikiLeaks.  *Id.*, ¶¶ 145-148.  On May 16, 2017, Wheeler appeared on Fox Business with Lou Dobbs to discuss the Seth Rich murder investigation.  *Id.*, ¶ 151.

On May 16 or May 17, 2017, one or more members of the Rich family, or a spokesman for the Rich family, threatened to sue Wheeler for violating the terms of his contract with the Rich family by speaking with Marraco, Zimmerman, Hannity, and Dobbs.  *Id.*, ¶ 153.  According to Plaintiff, the threats from the Rich family provided Wheeler with a motive to lie, backtrack, and distance himself from the quotes and statements he had made to Marraco, Zimmerman, Hannity, and Dobbs.  *Id.*, ¶ 156.  Wheeler then "flip-flopped on virtually all the essential facts."  *Id.*, ¶ 161.

> On May 23, 2017, Fox retracted Zimmerman's article with the following explanation:
> On May 16, a story was posted on the Fox News website on the investigation into the
> 2016 murder of DNC Staffer Seth Rich.  The article was not initially subjected to the
> high degree of editorial scrutiny we require for all our reporting.  Upon appropriate
> review, the article was found not to meet those standards and has since been
> removed.

4

We will continue to investigate this story and will provide updates as warranted.

*Id.*, ¶ 170.

Between August 2017 and March 2018, Folkenflik and NPR published and republished the following online articles: (1) *Behind Fox News' Baseless Seth Rich Story: The Untold Tale*, NPR.ORG (Aug. 1, 2017); (2) *Fox News' Seth Rich Story Echoes Previous Problems For Owner Rupert Murdoch*, NPR.ORG (Aug. 7, 2017); (3) *The Man Behind The Scenes In Fox News' Discredited Seth Rich Story*, NPR.ORG (Aug. 16, 2017); (4) *No Apology, No Explanation: Fox News And The Seth Rich Story*, NPR.ORG (Sept. 15, 2017); and (5) *Fox News Fights Back On Lawsuit Filed Over Seth Rich Story*, NPR.ORG (Sept. 19, 2017).   Among other things, Plaintiff alleges Folkenflik and NPR relied on a primary source – Wheeler – that Folkenflik and NPR knew to be wholly debunked and unreliable. Docket Entry # 72, ¶ 181. According to Plaintiff, based on information known and available to Folkenflik, Folkenflik "harbored serious doubt as to the veracity of Wheeler's statements about Butowsky. Indeed, the statements were knowingly false, with not a shred of supporting evidence, and Folkenflik knew that before he wrote the Articles published by NPR."  *Id.*

According to the SAC, in the articles Folkenflik misrepresented Plaintiff's involvement in the murder investigation; misrepresented Wheeler's contracts with Zimmerman; knew the President was not involved in any way; knew Wheeler had interviewed Detective Dellacamera; disregarded Wheeler's public statements to Marraco; knew Fox had accurately quoted Wheeler; disregarded Seymour Hersh's July 11, 2017 recorded statement; knew about Wheeler's appearances on Hannity and Dobbs when Wheeler again confirmed Seth Rich had communicated with WikiLeaks; knew about Wheeler's motive to lie (the Rich family's threats to sue Wheeler for violating the terms of his

contract by speaking with Marraco, Zimmerman, Hannity and Dobbs); and knew about Wheeler's statement to FetchYourNews.  *Id.*, ¶¶ 68-172. Plaintiff further alleges Folkenflik knew, before he wrote his first article, that Plaintiff's role and involvement in the investigation of Seth Rich's murder was limited.[4] *Id.*, ¶ 68.

Relevant to the Rule 11 motion for sanctions, the SAC alleges Plaintiff was not trying to solve the murder of Seth Rich. *Id.* at p. 20, n. 7. According to Plaintiff, the Rich family engaged Wheeler – not Butowsky or Fox – to help solve the murder, and Wheeler was the one who investigated the matter and came up with the theory that Seth Rich's murder was not the result of a botched robbery.  *Id*. Plaintiff alleges "Folkenflik misrepresented Butowsky's role to make it appear that Butowsky – the wealthy Dallas investment advisor – orchestrated a deception on the American people, including his own advisory clients." *Id.*, ¶ 69. Plaintiff alleges he was not a party to the contract between Wheeler and the Rich family, and he has never seen the contract. *Id*., ¶ 73. According to Plaintiff, although Folkenflik made it appear Plaintiff orchestrated and directed Wheeler's murder investigation, "in truth Butowsky did not participate in Wheeler's investigation and had very little communication with Wheeler. Folkenflik knew that Butowsky's involvement was limited." *Id.*, ¶ 74.

Plaintiff seeks money damages in a sum not less than $60,000,000.00 for alleged loss and injury to his business, insult, pain and mental suffering, humiliation, embarrassment, and injury to his reputation sustained as a result of  Defendants' publication of allegedly false and defamatory

---

[4] According to Plaintiff, "Folkenflik misrepresented Butowsky's actual involvement in Wheeler's investigation. Folkenflik made it appear as [i]f Butowsky was at the center of the investigation, directing Wheeler, feeding him 'tips', and telling him what to do. Folkenflik falsely portrayed Butowsky as a puppet master 'behind the scenes', feeding 'tips' to Wheeler and telling Fox what to do. Far from the truth."  Docket Entry # 72, ¶ 76.

statements. *Id.*, ¶ 196.  In footnote 4 of the SAC, Plaintiff alleges the loss and damage caused by Folkeflik's defamation is evidenced by an email from one of Plaintiff's clients, Sally Davis, wherein she indicated on August 3, 2017 that she had asked Schwab to remove Chapwood Investments as her advisor on her Schwab account. *Id.* at p. 11, n. 4.

## II. PROCEDURAL BACKGROUND

On October 16, 2018, Defendants filed their Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) for Failure to State a Claim. Docket Entry # 25. Defendants argued Plaintiff's original complaint failed to state a plausible claim for relief for two primary reasons. First, Defendants claimed that both Texas law and the First Amendment to the United States Constitution protect Defendants' reporting on judicial proceedings and about matters of public concern. Second, Defendants argued many of the statements are not "of and concerning" Plaintiff, are not defamatory or capable of a defamatory meaning, or are protected expressions of opinion and should be dismissed for these reasons as well.

The undersigned heard oral argument on Defendants' motion to dismiss on February 7, 2019. Docket Entry # 49. Following the hearing but before entry of the undersigned's Report and Recommendation, Plaintiff filed on March 5, 2019 an opposed motion for leave to file an amended complaint. Docket Entry # 53.

On April 17, 2019, the undersigned entered a 98-page Report and Recommendation ("R&R") regarding proposed findings of fact and recommendations that Defendants' motion to dismiss be denied.[5] Docket Entry # 58. The undersigned first found Defendants did not establish the common

---

[5] The analysis in the R&R used only the operative pleading, Plaintiff's original complaint, but the R&R did note in various footnotes differences between the original complaint and the proposed amended complaint. The R&R specifically stated as follows: "Prior to the filing of Plaintiff's motion for leave to amend, there had been extensive

law and statutory privileges barred Plaintiff's claims. *Id*. at 49. Additionally, the undersigned found Plaintiff sufficiently alleged the publications at issue were not substantially true, and the third-party allegation rule did not bar Plaintiff's claims as a matter of law at this stage of the proceeding. *Id.* at 51. The undersigned next concluded Plaintiff adequately pleaded facts sufficient to allege a defamation claim. Specifically, she found, at this stage of the proceedings, accepting the allegations in Plaintiff's complaint as true, Plaintiff plausibly alleged the statements at issue were "of and concerning" Plaintiff. The undersigned also found the statements at issue were not expressions of opinion and were capable of a defamatory meaning. *Id.* at 74, 78. She then considered whether the Defamation Mitigation Act ("DMA") barred Plaintiff's defamation claim. She concluded Plaintiff's failure to follow the DMA did not require dismissal of the action, and the issue of recovery of exemplary damages was more appropriate for consideration in the context of summary judgment. *Id.* at 95. Lastly, the undersigned found Plaintiff pleaded facts sufficient to state a claim for civil conspiracy. *Id.* at 97.

On August 7, 2019, District Judge Mazzant entered an Order Adopting the Report and Recommendation, finding Defendants' objections without merit as to the ultimate findings of the undersigned and adopting the R&R as the findings and conclusions of the Court.  Docket Entry # 65. In the Order Adopting, Judge Mazzant granted Plaintiff's motion for leave to file his amended complaint. *Id*. at p. 37.

In the Court's August 21, 2019 Amended Scheduling Order, the Court stated as follows:

---

briefing on Defendants' motion to dismiss Plaintiff's original complaint, and the Magistrate Judge had heard oral argument on the fully ripe motion to dismiss. Considering this, and further considering the proposed amended complaint would not alter the analysis in a meaningful way, the Magistrate Judge advised the parties during a telephone conference that she would consider the motion to dismiss the original complaint before ruling on Plaintiff's motion for leave to amend." Docket Entry # 58 at p. 2, n. 1.

"Plaintiff may amend his Complaint one further time as a matter of right, provided he does so on or before September 30, 2019. Defendants' deadline to respond to Plaintiff's current Amended Complaint (Dkt. # 53) is extended until October 30, 2019, with the further provision that if Plaintiff amends his Complaint again prior to that date, the current Amended Complaint will be superseded by the newly Amended Complaint, and Defendants shall respond only to the newly Amended Complaint." Docket Entry # 70 at p. 3. Thereafter, on September 30, 2019, Plaintiff filed his current Second Amended Complaint. Docket Entry # 72.

Pursuant to the Second Amended Scheduling Order, which the Court issued on February 11, 2020, the deadline to file amended pleadings remained September 30, 2019. Docket Entry # 92. On June 3, 2020, the Court entered a Third Amended Scheduling Order, granting in part (as modified) and denying in part the parties' Third Joint Motion to Modify Scheduling Order. Docket Entry # 144. Although the Court found good cause to extend the October 30, 2020 discovery deadline to January15, 2021 and the December 15, 2020 dispositive motions deadline to January 22, 2021, the Court did not find good cause at that time to extend those deadlines as far out as requested by the parties. Nor did the Court find good cause to continue the April 1, 2021 pretrial conference to November 11, 2021. Again, the deadline to file amended pleadings remained September 30, 2019.

### III. PARTIES' MOTIONS

#### A.    Defendants' Motion for Sanctions Pursuant to Rule 11

On February 18, 2020, Defendants filed their Motion for Sanctions Pursuant to Rule 11 for Violations Committed by Plaintiff and His Counsel ("Rule 11 motion for sanctions"). Docket Entry # 96. In their Rule 11 motion for sanctions, Defendants seek sanctions against both Plaintiff and his counsel for knowingly pleading false factual allegations in the original complaint (which the Court

relied on in denying Defendants' motion to dismiss) and then repeating those false allegations in the current SAC. Specifically, Defendants assert Plaintiff pleaded the following three "key allegations in his Original Complaint, and they continue to appear in his SAC:"

> (1) Plaintiff was not involved in Wheeler's investigation and had little communication with Wheeler;

> (2) Plaintiff had never seen, and was not a party to, Wheeler's contract with the Rich family; and

> (3) Chapwood Capital Investment Management, LLC ("Chapwood"), Plaintiff's business, lost Sally Davis as a customer because of the alleged defamation.

*Id.* at pp. 1-2.

According to Defendants, discovery recently obtained from third parties proves all three of these allegations to be false. *Id.* at p. 2. Relying on over 600 pages of evidence attached as exhibits to the Rule 11 motion for sanctions, Defendants assert the evidence demonstrates each of these disputed allegations is false. Defendants assert these misrepresentations are factual matters within Plaintiff's personal knowledge, and his repeated inclusion of them in his pleadings is not innocent error. *Id.* at p. 2. Defendants further assert Plaintiff's counsel had a duty to investigate the factual allegations before pleading them, and they either failed to investigate or knew the allegations to be false. *Id*. (further stating both lawyers have "checkered disciplinary histories"). According to Defendants, the Court relied upon Plaintiff's misrepresentations about his involvement with Wheeler's investigation in denying Defendants' motion to dismiss.[6] *Id.*

---

[6] *See* Docket Entry # 96 at p. 2, n. 1 (*comparing* R&R at pp. 7, 81 ("Plaintiff's role and involvement in the [murder] investigation of Seth Rich was limited, and he had 'very little communication with Wheeler.'"); Order Adopting at p. 35 ("Plaintiff's involvement in the Seth Rich investigation and Plaintiff's communications with Wheeler were both limited."); R&R at pp. 2, 34 n. 13 (relying on Plaintiff's damages allegations to find Plaintiff stated a claim for business disparagement and defamation *per quod*, which both require pleading special damages; Order at p. 2 (same), *with* Defendants' Ex. A (regarding Plaintiff's involvement in Wheeler's investigation and the creation of the retracted

In his response, Plaintiff asserts Defendants' "motion relies on disputed facts that would not even be grounds for summary judgment, yet the Defendants want the Court to resolve those disputed facts in her clients' favor and then sanction the Plaintiff and his attorneys for not accepting their interpretation of the facts." Docket Entry # 110 at p. 1. Plaintiff states he offered to amend his pleadings in order to address some of Defendants' purported concerns, but "Defendants opposed any such amendment despite the clear language of the 'safe harbor provision' in Rule 11, i.e., a motion for sanctions should not be filed 'if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service… .'" *Id.* at p. 2 (quoting FED. R. CIV. P. 11(c)(2)). Plaintiff attached email correspondence to his response, stating Defendants agreed to give Plaintiff more time to respond to their draft motion. *Id.* at p. 8 (citing February 14, 2020 email exchange between Ty Clevenger and Laura Prather (Exhibit 8)).

Substantively, Plaintiff's counsel first explains how none of the three disputed allegations are false. Even if they were false, Plaintiff then asserts none of the allegations would have changed the Court's ruling on Defendants' motion to dismiss, because none of those allegations are central to Plaintiff's claims. *Id.* at p. 5.

**B.    Plaintiff's Motion for Leave to File Third Amended Complaint**

On the same day Defendants filed their Rule 11 motion for sanctions, Plaintiff filed a Motion for Leave to File Third Amended Complaint. Docket Entry # 98. In accordance with Local Rule CV-7(k), Plaintiff's Third Amended Complaint was filed immediately after the motion for leave. Docket Entry # 99. In his motion for leave, Plaintiff states Plaintiff and his counsel "expressly and

---

Zimmerman story); Ex. B (affidavit from Sally Davis that she never left Chapwood)).

emphatically deny the allegations and accusations" in Defendants' Rule 11 motion for sanctions. Docket Entry # 98 at p. 3. "However, in light of certain evidence that has been produced in discovery and as part of a good faith effort to resolve the Motion [for Sanctions] and avoid controversy, Plaintiff agreed to make certain clarifications and corrections to the three allegations identified in the Motion pursuant to Rule 11(c)(2)." *Id.* Specifically, Plaintiff agrees to amend the following paragraphs of SAC:

Footnote 4:

"The loss and damage caused to Butowsky's reputation by Folkenflik's defamation is evidenced by the following email received from one of Butowsky's high net worth clients:

On 8/3/17, 5:29 PM, "Sally Davis" <sallyhi-d@comcast.net> wrote:

Hello Ed and Kim,

I'm really sad to write this email.

I have to let you know I asked Schwab to remove Chapwood Investments as the advisor on my Schwab Account. I will follow up with a phone call tomorrow, August 4.

I made this decision after reading news articles about Ed's involvement with a false news story. For me, this is not a question of politics. It's a question of ethics.

I very much appreciate all your help and guidance through the past twenty-five years or so. I'm heartbroken to end our relationship.

Fortunately, Chapwood was able to persuade the client to stay on as a customer with a different financial advisor. Nonetheless, Chapwood lost millions of dollars in investments from this customer and Plaintiff lost income as a direct result. Further, Plaintiff's reputation as a registered investment advisor has been destroyed. He is unable to develop new business. He has lost the ability to get referrals from Major League Baseball, NBA, etc. He can't even tell people his last name without hesitating, since he knows they will Google him and see all the fake stories."

12

Paragraph 73:

"73. Butowsky was not a party to the contract between Wheeler and the Rich family. He was not involved in any discussions between Wheeler and the Riches over the terms of a contract. He only agreed to pay for Wheeler's services. Butowsky first saw the contract between Wheeler and the Riches in May 2017 months after it was signed."

Paragraph 74:

"74. Although Folkenflik made it appear that Butowsky orchestrated and directed Wheeler's murder investigation, in truth Butowsky did not personally participate and was not directly involved in Wheeler's investigation. He left the investigating to Wheeler. Butowsky and Wheeler occasionally communicated about Wheeler's investigation. Wheeler regularly updated Butowsky on his findings. Folkenflik knew that Butowsky's involvement was limited."

Paragraph 76:

"76. Folkenflik misrepresented Butowsky's actual involvement in Wheeler's investigation. Folkenflik made it appear as if Butowsky was at the center of the investigation, directing Wheeler, telling him what to do (and telling Fox what to report). In reality, Butowsky did not direct either Wheeler's investigation or the Fox News reporting. Butowsky shared some tips that he received and asked for updates, but he never interviewed witnesses, prepared a single draft of any report or story, etc. Butowsky was not the puppet master that Folkenflik accused him of being."

Plaintiff also proposes adding the following language to paragraph 112:

"In September 2019, after this lawsuit was filed, the FBI released emails showing internal discussions about the Seth Rich murder. The emails were redacted on the basis of 'investigative technique', suggesting the FBI had, in fact, conducted an investigation related to the murder of Seth Rich. This flatly contradicts the FBI's representations to various Courts – including this one – that it never conducted any investigation into the murder. The emails appear to have been distributed among high-level officials in the FBI. They support Wheeler's allegations of a high-level cover-up."

Docket Entry # 98 at pp. 3-4.

Plaintiff asserts discovery is ongoing, and depositions have not yet been scheduled. *Id.* at p.

5. According to Plaintiff, allowing him to file a Third Amended Complaint will not interfere with

any established deadlines or otherwise affect the administration of this action. Rather, the amendments will allow Plaintiff to clarify and correct certain allegations, so as to comply with Rule 11(c)(2). *Id.*

In their response in opposition to Plaintiff's motion for leave to amend, Defendants assert, as an initial matter, that Plaintiff "wholly fails to establish the requisite 'good cause' under Rule 16 to amend the Court's recently issued Second Amended Scheduling Order [now Third Amended Scheduling Order], which provides that the deadline for parties to file amended pleadings *expired on September 30, 2019*." Docket Entry # 105 at p. 1 (emphasis in original). According to Defendants, only after Plaintiff has shown good cause for failure to timely file his proposed amendment may his motion be evaluated under Rule 15(a). *Id.* (citing *S&W Enters. v. Southtrust Bank of Ala.*, 315 F.3d 533, 536 (5th Cir. 2003)). In the event the Court reaches the Rule 15(a) issues, Defendants argue the Court should deny Plaintiff's motion "because his proffered amendments are untimely, made in bad faith, and inadequate to address the continuing and serious misrepresentations in his Second Amended Complaint." *Id.*  Further asserting the proffered amendments would cause undue prejudice to Defendants, Defendants argue as follows:

> The substance and timing of Plaintiff's motion to amend his pleadings a third time demonstrate why his Motion should be denied: Butowsky's proposed amendment is merely a 'too little, too late' gesture in a failed attempt to avoid Rule 11 sanctions. Plaintiff brings his Motion only after Defendants filed their Motion for Sanctions Pursuant to Rule 11 for Violations Committed by Plaintiff and his Counsel (the 'Rule 11 Motion'), exposing materially false and misleading statements in Butowsky's pleadings. The evidence shows that when he filed his lawsuit almost two years ago, *Plaintiff knew that all of the misleading statements identified by the Rule 11 Motion were false.* Moreover, those statements should have been the subject of reasonable inquiry by Plaintiff's counsel in evaluating Plaintiff's claims *before* signing the original complaint, filing Plaintiff's lawsuit, and signing subsequent amended complaints.

14

> In three pleadings over the course of nearly two years, Plaintiff has repeatedly failed to correct knowingly false statements to the Court. Since bringing his action in June 2018, Plaintiff has twice amended his complaint to supplement his allegations. Yet, despite knowing that key allegations were false and misleading, Plaintiff took no steps to correct them – inadequate as those steps would be to cure the Rule 11 violations – until Defendants had already filed their Rule 11 Motion. Some of Plaintiff's false statements go to the very heart of his claims, and the Court relied on them in ruling on Defendants' Motion to Dismiss. Plaintiff's delay and half-hearted amendments have increased litigation expenses needlessly and drawn on judicial resources irresponsibly. As shown below, Plaintiff's Motion should be denied and the conduct sanctioned.

*Id*. at pp. 1-2 (emphasis in original).

In his reply, Plaintiff incorporates by reference his response in opposition to Defendants' Rule 11 motion for sanctions, pointing out in both that Defendants claim the SAC contains mistakes that are sanctionable, but when Plaintiff attempts to address those purported concerns via amendment as permitted by Rule 11(c)(2), "they fight his attempts to do so." Docket Entry # 114 at p. 1. Plaintiff asserts the "good cause" for seeking to amend his complaint outside the scheduling order is obvious, noting Defendants acknowledge Plaintiff sought leave in order to address the issues raised in their Rule 11 motion for sanctions. *Id.* at p. 3. Plaintiff's counsel states he did not learn about Defendants' purported concerns until January 2020, and Defendants, by objecting to his proposed amendment, "only seek to deny the Plaintiff the benefit of the 'safe harbor' provision by blocking his good-faith efforts to address their purported concerns." *Id.*

As noted in the opposition to Defendants' Rule 11 motion for sanctions, Plaintiff states in his reply that the Court could strike ¶¶ 68, 73, 74, 75, and Footnote 4 of the SAC, and "it would not undercut any of the Plaintiff's claims against the Defendants."[7] *Id*. at p. 4. According to Plaintiff,

---

[7] According to Defendants, footnote 4 of the SAC is the only allegation of special damages, and without it, Plaintiff has not pled a defamation *per quod* or business disparagement claim. Defendants argue that unless Plaintiff's proposal to strike the footnote also includes dismissal of those claims, this proposed amendment must be denied as futile.

"[i]n retrospect, perhaps the Plaintiff should have proposed that instead of attempting to amend his complaint. Regardless, and contrary to the dishonest and belligerent rantings of the Defendants, the proposed Third Amended Complaint addresses all of the issues raised in the motion for sanctions, therefore the amendments would not be futile." *Id.*

In their surreply, Defendants assert the issue is not when Plaintiff learned of Defendants' concerns, "but rather whether he knew, and his counsel properly investigated, the underlying facts before Plaintiff filed the original pleading." Docket Entry # 118 at p. 1. Defendants contend Plaintiff's conduct is not in good faith. *Id.* According to Defendants, he twice previously amended his complaint, continuing to make allegations that he knew to be untrue when he filed his lawsuit, as revealed by documents recently obtained from the *Aaron Rich* case. *Id.* Defendants assert Plaintiff's proposed "fixes" continue to misrepresent essential facts, arguing "Plaintiff tries to create an artificial distinction between Wheeler's investigation and the retracted Fox News article." *Id.* at pp. 1-2. Defendants state both were an integral part of Plaintiff's "larger goal to prove (and publicize) that Seth Rich hacked the DNC emails."[8] *Id.* at p. 2.

## C.    Defendants' Notice of Supplemental Evidence

On June 12, 2020, Defendants filed a Notice of Supplemental Evidence in Support of Motion for Sanctions, submitting "additional evidence regarding Butowsky's knowingly false statements that

---

[8] Specifically regarding Plaintiff's allegation that "has never seen the contract" with the Rich family, Defendants assert Plaintiff's proposed amendment cannot cure this Rule 11 violation. According to Defendants, documents from Plaintiff's own files show: (1) he *hired* Wheeler *before* introducing Wheeler to the Riches; (2) he sent the original contract to Joel Rich; (3) he discussed Joel Rich's desire to control all comments to the media, a key contract provision, with Joel Rich prior to execution of the contract; (4) he *paid* Wheeler before the Rich family signed a contract; and (5) he promised the Rich family results from the Wheeler investigation. *See* Declaration of Laura Lee Prather in support of Defendants' Sur-reply to Plaintiff's Motion for Leave to File Third Amended Complaint ("Prather Decl."), attached Exs. A-5-10. Given these facts, Defendants assert Plaintiff's proposed amendment "merely adds a different lie in an attempt to minimize his involvement." Docket Entry # 118 at p. 3.

this Court should consider when evaluating the pending Motion for Sanctions." Docket Entry # 155 at p. 1. The Notice of Supplemental Authority addressed Plaintiff's discovery responses, namely his denial in response to Defendants' Requests for Admissions that he had any involvement with the websites debunkingrodwheelersclaims.com and debunkingrodwheelersclaims.net (collectively, the "Debunking Websites") and his failure to provide, in response to one interrogatory, a list of the websites he owns, manages, or controls. *Id.* According to Defendants, third-party discovery shows the Debunking Websites were created at Plaintiff's direction. *Id.* Defendants assert Plaintiff, as with his prior misrepresentations, has "woven these lies into the Complaint inviting the Court to rely upon them in denying Defendants' Motion to Dismiss." *Id.*

On June 19, 2020, Defendants filed a separate Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 37 which related to Plaintiff's involvement in the Debunking Websites. Docket Entry # 161. In this second motion, Defendants sought to recover their costs, including attorneys' fees, "associated with uncovering Butowsky's lies regarding his involvement in the Debunking Websites." *Id.* at p. 4.

In his response to Defendants' Notice of Supplemental Evidence, Plaintiff asserts an improper response to a request for admission or an interrogatory is not a basis for Rule 11 sanctions. Docket Entry # 167 at p. 1. The Court agrees.[9] Plaintiff noted he would address Defendants' latest

---

[9] It follows from the text of Rule 11 that it applies only where a person files a paper. *Tejero v. Portfolio Recovery Assocs., L.L.C.*, 955 F.3d 453, 458 (5th Cir. 2020) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) (Rule 11 "deter[s] baseless *filings* in district court" (emphasis added in *Tejero*)); also citing *In re Case*, 937 F.2d 1014, 1022 (5th Cir. 1991) (Rule 11 "ties sanctions to an attorney's signature on a particular pleading or document which is filed with the court")). Rule 11 does not extend to "abusive tactics in litigation in respects other than the signing of papers." *Id.* (quoting *Thomas v. Capital Sec. Servs., Inc*., 836 F.2d 866, 875 (5th Cir. 1988) (en banc); also citing *Chambers v. NASCO, Inc*., 501 U.S. 32, 41, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). What is more, Rule 11 explicitly notes that it does not apply to any discovery matters under Rule 26 through Rule 37. *Estate of McNamara v. Navar*, No. 2:19-CV-109, 2020 WL 1934175, at *3 (N.D. Ind. Apr. 22, 2020), *reconsideration denied*, No. 2:19-CV-109, 2020 WL 2214569 (N.D. Ind. May 7, 2020).

accusations in his response to Defendants' Rule 37 motion. *Id.* at p. 4. Plaintiff did just that in his response to Defendants' Rule 37 motion. Docket Entry # 185.

**D.     August 18, 2020 hearing and August 25, 2020 Order on Rule 37 Sanctions Issues**

On August 18, 2020, the undersigned heard oral argument on the above motions as well as Defendants' Rule 37 motion for sanctions. On August 25, 2020, the undersigned entered a sealed Order on Rule 37 Sanctions Issues (Docket Entry # 194), granting, as modified, Defendants' Rule 37 motion for sanctions and Defendants' Application for Attorney's Fees (Docket Entry # 164).[10] Specifically, the undersigned ordered Plaintiff to pay Defendants, on or before October 24, 2020, the following: (1) reasonable fees and expenses in the amount of $10,000.00 associated with proving Plaintiff's involvement in the Debunking Websites; and (2) Defendants' attorneys' fees incurred in the making of Defendants' motion to compel in the amount of $55,608.70. *Id.* at p. 42.

Considering the issues raised in Defendants' Notice of Supplemental Evidence relate to Plaintiff discovery responses and were not raised in the original Rule 11 motion for sanctions,[11] and

---

[10] On June 5, 2020, the undersigned entered an order granting in part Defendants' Motion to Compel Discovery Pursuant to FED. R. CIV. P. 37 (Docket Entry # 85), deferring any ruling on the request for expenses pursuant to Federal Rule of Civil Procedure 37(a)(5)(a). Docket Entry # 147. On June 24, 2020, Defendants filed their Application for Attorney's Fees, seeking $69,493.50 as the reasonable attorneys' fees Defendants incurred in making their "omnibus Motion to Compel along with the hundreds of pages of supporting evidence and supporting briefing." Docket Entry # 164 at p. 1.

[11] According to Plaintiff, although Defendants complied with Rule 11's safe harbor provision when filing their original motion, they failed to comply when submitting their supplemental evidence. Docket Entry # 125 at pp. 2-3 (quoting *Martin v. Allied Interstate, L.L.C.*, 192 F. Supp. 3d 1296, 1309 (S.D. Fla. 2016) (citing FED. R. CIV. P. 11(c)(2) ("A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets.")). The court in *Martin* denied the motions to supplement for failing to comply with the procedural requirements of Rule 11. *Martin*, 192 F. Supp. 3d at 1309 (citing *Mirabilis Ventures, Inc.*, 2010 WL 5582878, at *12 (denying motion to supplement that failed to comply with safe harbor requirements); also citing *Zhu v. Fed. Housing Fin. Bd.*, No. 04–2539, 2007 WL 675646, at *4 (D. Kan. Mar. 1, 2007)) ("Because defendant did not file its renewed motion for sanctions as a separate motion and has provided no evidence that it complied with the Rule 11 safe harbor provision, the Court overrules defendant's motion for sanctions.")).

further considering those issues were properly raised and addressed by the Court in relation to Defendants' Rule 37 motion for sanctions, the Court will not consider Defendants' Notice of Supplemental Evidence regarding Plaintiff's deficient discovery responses in its consideration of Defendants' Rule 11 motion for sanctions.

## IV.  RULE 11 MOTION FOR SANCTIONS

**A.     Parties' assertions**

**1.     Defendants' assertions and evidence**

Defendants assert both the original complaint (relied upon by the Court in denying Defendants' motion to dismiss) and the SAC (currently, the live pleading) contain at least three deliberate, material misrepresentations.  First, Plaintiff alleges that his involvement in Wheeler's murder investigation was limited. Second, and relatedly, Plaintiff alleges that he had never seen Wheeler's contract with the Rich family. Third, Plaintiff alleges his company lost clients and tens of millions of dollars in damages due to Defendants' alleged defamation and disparagement, and cites as proof a single email from Sally Davis.

In support of their motion for sanctions, Defendants rely on their Appendix to Defendants' Rule 11 motion for sanctions, the Declaration of Wesley D. Lewis in Support of Defendants' Motion for Sanctions Pursuant to Rule 11 for Violations Committed by Plaintiff and his Counsel ("Lewis Decl."), and the exhibits attached thereto. Specifically regarding the first two alleged misrepresentations, Defendants rely on  Exhibit A (containing over 250 pages of accompanying exhibits (A-1 through A-22)) and the Appendix, which provides the following summary regarding those exhibits:

19

**Plaintiff found Wheeler and connected him with the Rich family.**

- 2/23/17 – Plaintiff's initial outreach to Wheeler in which he mentions they have many mutual friends "including Adam Housley and many others from Fox News." He also states: "Behind the scenes I do a lot of work (unpaid) helping to uncover certain stories, my biggest work was revealing most of what we know today about Benghazi." He continues, "Of all the people you have met in your line of work you have put me right next to those you view as the most confidential. I am extremely discreet." Exhibit A-1 at 20, (WHEELER-00000891).

**Before introducing Wheeler to the Rich family, Plaintiff connected Wheeler to Zimmerman and told him to "downplay Fox [News]" and not mention he knows Zimmerman to the Rich family. Exhibit A-1 at 30 (WHEELER-00000901).**

- 2/28/17-3/3/17 – Wheeler, Plaintiff, and Zimmerman meet in person and exchange communications about the Rich murder and effort to get Wheeler hired by Rich family. (Wheeler begins contacting people he knows in the DC police department *before* being retained by the Rich family.) Exhibit A-1 at 24-30 (WHEELER-00000895-901).

- 3/3/17 – 10:02 a.m. – Plaintiff asks Wheeler to send him something for Mr. Rich to sign. He also tells Wheeler: "Expect a direct call from Joel Rich. Please call me prior to give you a few data points. ***Make sure to downplay Fox News, don't mention you know Malia.***" Exhibit A-1 at 29-30 (WHEELER-00000900-01).

**Plaintiff paid Wheeler _before_ the Rich family engaged Wheeler. When the Riches had not signed the Wheeler contract after a week, Plaintiff became anxious and threatened to send Joel Rich an "uncomfortable message" to "kickstart" him.**

- 3/3/17 – 8:10 a.m. – Plaintiff asks Wheeler to send him wiring instructions for his account (*before the Rich family has retained him*). Exhibit A-1 at 29 (WHEELER-00000900).

- 3/4/17 – Wheeler texts Plaintiff updates about his discussions with the Rich family. Plaintiff responds: "My mother would be proud of us. Money will be in your account on Monday." Exhibit A-1 at 29-30 (WHEELER-00000901-02).

- 3/6/17 – Plaintiff wire transfers money to Wheeler and comments: "…let's agree to determine and characterize our financial engagement…" Exhibit A-1 at 32 (WHEELER-00000903).

- <u>3/13/17 email</u> – Wheeler says: "Just an update: I talked with Aaron Rich last evening. He told me that I should have the signed agreement no later than today, Monday. I suspect however that there will be a lot of "legal mumbo-jumbo" contained in the agreement, as he said that Molly (wife and attorney of Aaron) was drafting a different agreement, other than the one I initially sent to them. We will see." Exhibit A-7 (WHEELER-00000066).

- Plaintiff responds that he was asked by Joel Rich to jump on a call with him and Aaron that night and asks Wheeler to let him know when he gets the agreement. Exhibit A-8 (WHEELER-0000092).

- <u>3/14/17 – 7:27 a.m.</u> – Plaintiff sends text to Wheeler: "If you don't get the agreement back this morning I'm going to leave Joel a nice but somewhat uncomfortable message. Basically, saying that since we haven't received back the agreement it appears you don't have an interest. I think that will kickstart him I also believe you'll be something that agreement that is going to really piss us off. But I guess we'll see if *we* get it and when *we* get it, but *we need to move on quickly*." Exhibit A-1 at 34 (WHEELER-00000905).

**Plaintiff and Zimmerman were interested in Wheeler being able to access additional information because of him "working on the Rich family's behalf."**

- <u>3/7/17</u> – emails between Wheeler, Zimmerman, Plaintiff discussing Wheeler getting the family to grant permissions for access to certain information, *i.e.* EMS and medical records, cell phone records. Wheeler indicates he will report back to both after talking with Joel Rich. Exhibit A-5 (WHEELER-00000042).

- <u>3/8/17</u> – Zimmerman suggests using Wheeler's representation of the Rich family to gain access to information she and Plaintiff have been trying to get from Sy Hersh: "Not sure if you and Ed [Butowsky] think it is a good idea for you to call Sy Hersh to ask about getting ahold of his FBI contact. He might tell you if you are working for the family. Just a thought." Exhibit A-6 (WHEELER-00000054).

**Once the contract was signed, Plaintiff, Wheeler and Zimmerman worked together; Plaintiff referred to it as "our investigation," discussed what "we" need to do to get the story over the "goal line," and took actions to direct the investigation and the narrative.**

- <u>3/16/17</u> emails – discussing information Plaintiff is asking for and "looping" Plaintiff into the discussion. Exhibit A-11 (WHEELER-00000115).

- <u>4/18/17</u> – Plaintiff texts Wheeler: "Tell Katrina [Pierson] that I said hi and let her know that ***we are working on the case together***." Exhibit A-1 at 48

(WHEELER-00000919).

- 4/23/17 – Plaintiff sends Wheeler an email saying: "Good luck tomorrow morning. DellaCamera is either ***helping us*** or we will go after him as being part of the coverup." Exhibit A-13 (WHEELER-00000174).

- 4/25/17 – Wheeler describes meeting with DellaCamera to Plaintiff, and Plaintiff responds, "a natural next step is Sy Hersh." Exhibit A-1 at 56 (WHEELER-00000927).

- 5/4/17 – Plaintiff writes to Wheeler: **"Sadly, Adam and Malia and I lost on one story today because we didn't go out it aggressively enough. Once we get the story out, you will be one of the most recognize names in America. I'm just saying this is a reminder encouragement. Please call me after you meet with Dee O. The main goal with him is to get him to get the FBI record and give us a wink to go story that the emails are there." Exhibit A-1 at 63 (WHEELER-00000934).**

- 5/11/17 – Wheeler speaks with DellaCamera again and reports back to Plaintiff. Exhibit A-1 at 66 (WHEELER-00000937).

- 5/15/17 – Plaintiff texts Wheeler: "Just had a meeting I need to tell you about." Later that day, after Wheeler goes on local affiliate Fox 5 in DC and Aaron Rich expresses his dissatisfaction, Plaintiff responds: "I sure hope this article gets published early tomorrow nobody should call Aaron. He really doesn't have any credibility because from the beginning he tried managing what we saw but we didn't see and *what __we__ wrote on*." Exhibit A-1 at 66-69 (WHEELER-00000937-40).

- 5/15/17 – Plaintiff writes an email to various Fox News producers about the Rich story: "The story is up or will be up very early tomorrow morning. Rod Wheeler is up and ready to give interviews. There's more to come on the story but for now this is a massive story there's [sic] going to be talked about for a long time. If you have any questions about the story or more information needed, call me at 972-XXXXXXX. ***I'm actually the one who's been putting this together but as you know I keep my name out of things because I have no credibility.*** One of the big conclusions we need to draw from this is that the Russians did not hack our computer systems and ste[a]l emails and there was no collusion like trump with the Russians." Exhibit A-9 (WHEELER-00000591).

- 5/16/17 – Plaintiff to Wheeler: "I'm not sure what's happening with ***__our__ story***." Wheeler asks Plaintiff for permission for what to say about the article when he goes on Fox shows later that day. Plaintiff says "somehow ***we*** *need to retain*

*ownership of the story*." Wheeler says he did not get the story Zimmerman submitted and asks Plaintiff to send it to him. Exhibit A-1 at 74-75 (WHEELER-00000945-46).

**Plaintiff called multiple in-person and Zoom meetings with Wheeler and Zimmerman and directed parts of the FNN investigation by, among other things, putting Wheeler in contact with witnesses.**

- 3/14/17 – Plaintiff schedules a Zoom meeting with Plaintiff, Wheeler, and Zimmerman. Exhibit A-10 (WHEELER-00000104).

- 3/29/17 – Plaintiff sends an email requesting a four-way zoom for the next day with Zimmerman, Wheeler, and Fox News' Adam Housley. In it, Plaintiff states: "*We* are on the 1 yard line and *we need to take it over the goal line* and in order to do that we all need to be on a video conference as a starting point." Exhibit A-12 (WHEELER-00000128).

- 4/1/17 – Plaintiff sent Sy Hersh a text asking him to connect with Wheeler. Exhibit A-1 at 140 (WHEELER-00000130).

- 4/20/17 – Plaintiff arranges meeting with Wheeler. Exhibit A-1 at 51-53 (WHEELER-00000922-24).

**Wheeler and Zimmerman copied Plaintiff on information they were obtaining throughout their investigation.**

- 3/7/17 – 3/9/17 – emails between Zimmerman, Plaintiff, and Wheeler regarding Seth Rich. Exhibit A-2, (WHEELER-00000039, WHEELER-00000047).

- 3/13/17, 3/28/17 – Zimmerman forwards her emails with FBI to Plaintiff. Exhibit A-3, (WHEELER-00000098).

- 3/30/17 – Zimmerman forwards her emails with Maryland Police Department to Plaintiff. Exhibit A-4, (WHEELER-00000159).

- 4/27/17 – Wheeler sends Plaintiff his interview notes from his meeting with DellaCamera (and forwards them to Zimmerman as well). Exhibit A-14 (WHEELER-00000182).

**Plaintiff repeatedly asked and obtained copies of Wheeler's investigation notes (in violation of the contract) and asked for status reports at least 9 times.**

- 3/21/17 – Plaintiff asks Wheeler for his two-page summary. Exhibit A-1 at 37

(WHEELER-00000908).

- 4/18/17 – Plaintiff asks Wheeler if he will be around on Thursday – "I am meeting Sean Spicer and want you with me." He also asks for an updated list that "summarizes where things currently stand and where we are being stonewalled?" Exhibit A-1 at 46-47 (WHEELER-00000917-18).

- 4/19/17 –Plaintiff asks Wheeler is his summary done yet. "Just bullet pointed. Just want to make sure we get point to Sean easily." Exhibit A-1 at 50 (WHEELER-00000921).

- 4/26/17 – Plaintiff asks Wheeler to "update that document so we have it all in one place." And then claims he has a way to get Wheeler a position at the White House. Exhibit A-1 at 59 (WHEELER-00000930).

- 5/11/17 – Wheeler spoke with DellaCamera again. He reports back to Plaintiff by phone. Exhibit A-1 at 66 (WHEELER-00000937).

- 5/31/17 – Plaintiff continues to ask Wheeler for copies of his investigation notes. Exhibit A-1 at 93-94 (WHEELER-00000964).

- 6/4/17 – Plaintiff asks Wheeler for his completed investigation notes. Exhibit A-15 (WHEELER-00000502).

- 6/8/17 – Plaintiff texts Wheeler and asks for his notes and agrees that his notes "will not be distributed publicly." Exhibit A-1 at 95 (WHEELER-00000966).

-  6/10/17 – Plaintiff continues to ask for Wheeler's updated case notes and says that he is meeting with people from Judicial Watch and Sara Carter (also a Fox News Contributor) from Circa "who will run with this." Exhibit A-16 (WHEELER-00000805); *see also* Exhibit A-1 at 82 (WHEELER-00000972).

**Plaintiff reviewed multiple drafts of the (now retracted) FNN article prior to publication and was involved in its development.**

- 4/27/17 – Plaintiff sends Wheeler a draft of the article. Exhibit A-17 (WHEELER-00000176).

- 4/29/17 - Zimmerman sends Plaintiff a draft and says she still needs to confirm certain statements and asks Plaintiff to tell her what he thinks of the draft. Exhibit A-18 (WHEELER-00000727).

- 5/4/17 – Zimmerman sends Plaintiff an email attaching 4/29/17 email asking him

if he has "any news on the key point?" Exhibit A-19 (WHEELER-00000745).

- <u>5/11/17</u> – Zimmerman sends an email to Plaintiff and Wheeler asking them to "please ask your sources …." Exhibit A-20 (WHEELER-00000196).

- <u>5/11/17</u> – Zimmerman sends an email to Plaintiff and Wheeler asking them a series of questions about the draft, Plaintiff's alleged "source," and what she can and cannot say in the article, including: (1) Does the source(s) "know for sure that Seth Rich sent emails to Wikileaks and if so, how do they know? (2) "Did they see his emails, or drop box, or how do they know with certainty? …" (3) "Did Seth Rich sell the emails and if so, for how much, and how was the transaction completed?" (4) "Do they have any documentation they can show us or read to us that proves Seth Rich was the leaker?" (5) "Which agencies have been involved in the murder investigation …." (6) "Can we use their response in the story without attribution? And just say according to a US intelligence source?" Exhibit A-20 (WHEELER-00000196).

- <u>5/14/17</u> – Zimmerman re-sends 4/29/17 email to Plaintiff with draft. Exhibit A-21 (WHEELER-00000763).

- <u>5/15/17</u> – Zimmerman sends new draft of article to Plaintiff. Exhibit A-22 (WHEELER-00000230).

**Plaintiff put pressure on Wheeler to make or confirm statements about Rich's involvement in the DNC hack, claiming the pressure came from the White House.**

- <u>5/14/17</u> – Plaintiff texts Wheeler: "Not to add any more pressure but the president just read the article. He wants the article out immediately. It's now all up to you. But don't feel the pressure." Exhibit A-1 at 66 (WHEELER-00000937).

**Plaintiff instructed Wheeler on his narrative for interviews concerning the article.**

- <u>5/15/17</u> @ 11:49 p.m. – Plaintiff instructs Wheeler on the narrative for the morning shows: "The narrative in the interviews you might use is that your and Malia's work prove that the Russians didn't hack into the DNC and steal the emails and impact our election." … "I'm alerting Fox and Friends about the article so get ready to get up early tomorrow." Exhibit A-1 at 71-72 (WHEELER-00000942-43).

- <u>5/16/17</u> – Plaintiff advises Wheeler to "try to highlight this puts the Russian

hacking story to rest …" Exhibit A-1 at 75 (WHEELER-00000946).

Docket Entry # 96-1, Appendix to Defendants' Rule 11 Motion at pp. 1-6 (emphasis in original) (internal footnotes omitted).

In further support of their Rule 11 motion for sanctions, and specifically regarding the third alleged misrepresentation regarding Sally Davis, Defendants attached as Exhibit B to their motion the Declaration of Sally Davis ("Davis Decl."). According to Davis, Plaintiff became her financial advisor in the 1990s. *Id.*, ¶ 2. Over time, Davis worked primarily with Plaintiff's partner, Kim Sams, and Davis developed a relationship and friendship with Ms. Sams during that time and came to trust her. *Id.* When Plaintiff and Ms. Sams created Chapwood, Davis moved her account to Chapwood and continued to work primarily with Ms. Sams. *Id.*, ¶ 3.

Throughout the 2016 presidential election, Davis followed the "entire flow of misinformation, and [she] felt a particular connection to the Seth Rich controversy because [her] nephew was a congressional staffer." *Id.*, ¶ 4. When Davis learned of Plaintiff's "involvement in the controversy, [she] was upset and sent an email on August 3, 2017 to Mr. Butowsky and Ms. Sams indicating that [she] had asked Schwab to remove Chapwood as the advisor on [her] Schwab account." *Id.* The following day, Davis spoke at length with Ms. Sams, and over the course of more conversations, Ms. Sams offered to take over Davis' account. *Id.*, ¶ 5. Davis decided to "take her up on her offer and ultimately decided to keep [her] account at Chapwood." *Id.* A few days after sending the email, Davis simply changed her official financial advisor to Ms. Sams, "who had already been acting as [Davis'] primary contact for several years." *Id.* Despite her initial email, the account never left Chapwood. *Id.*, ¶ 6.

In their reply, Defendants assert Plaintiff brought this suit for improper motives: to prove a

debunked conspiracy theory. Docket Entry # 122 at. p. 2. Defendants assert Plaintiff's attempts to invoke Rule 11(c)(2)'s safe harbor provision to avoid sanctions is unavailing. *Id.* According to Defendants, Plaintiff's proposed Third Amended Complaint was made in bad faith and should not be allowed to add facts that Plaintiff was aware of before filing the original complaint. *Id.* at p. 9. Defendants seek meaningful sanctions, including dismissal of this action with prejudice. *Id.* at p. 2.

**2.     Plaintiff's assertions and evidence**

In his response, Plaintiff first explains how none of the three disputed allegations are false. According to Plaintiff, even if any are inaccurate (and thus could use clarification as provided in the proposed Third Amended Complaint), Plaintiff asserts none of the disputed allegations would have changed the Court's ruling on Defendants' motion to dismiss, because none of those allegations are central to Plaintiff's claims. Docket Entry # 110 at p. 5.

Regarding Defendants' concerns with Plaintiff's allegations (in ¶¶ 68, 74-76 of the SAC) that his involvement in the Rod Wheeler murder investigation was "limited," Plaintiff states Defendants try to conflate his involvement with Zimmerman and her Fox News story with involvement in the Wheeler murder investigation. *Id.* at p. 11. Plaintiff acknowledges he was assisting Zimmerman on the story, "and clearly he shared tips and facilitated the exchange of information between Ms. Zimmerman and Mr. Wheeler (among others)," but he states his role was limited to that. *Id.* at pp. 11-12. Plaintiff states he has sought leave to correct his complaint to acknowledge that he had relayed tips to Wheeler, but that he was not directing Wheeler's investigation. According to Plaintiff, in that sense, Plaintiff's involvement in the Wheeler investigation was, in fact, "limited." *Id.* at p. 7.

Plaintiff further asserts the changes do not affect the substance of Plaintiff's defamation

claims against Defendants. *Id.* at pp. 7-8. Plaintiff points out that all versions of the complaint quote Wheeler's statement that he "had very little communication… at all" with the person paying for the investigation, i.e., Plaintiff. *Id.* at p. 8 (citing Original Compl. at p. 40, ¶ 63). According to Plaintiff, if documentary evidence or Wheeler's investigative notes contain inconsistencies with Wheeler's quoted statements, then "it is the jury's domain to resolve those inconsistencies; [s]uch disputes cannot be resolved at the summary judgment stage, much less in response to a motion for sanctions." *Id.* at p. 11.

Regarding the allegation that Plaintiff "has never seen the contract" with the Rich family, Plaintiff states Defendants point to the following excerpt from a March 3, 2017 email from the Plaintiff to Joel Rich:

> Attached is the basic agreement for Rod [Wheeler]. With this, he can and will aggressively get you a lot of pertinent information. I said from the beginning, I will do whatever I can to help get you and your family the knowledge of what happened. After reading and 'running it by' whomever you feel needs to see it, please sign and back to me.

*Id.* at p. 13 (citing Docket Entry # 105 at p. 7). According to Plaintiff, two different contracts are under consideration, as reflected in the very documents cited by Defendants. In his declaration attached as Exhibit 11 to his response, Plaintiff states he sent Mr. Rich, as an attachment to the March 3, 2017 email and prior to the execution of any contract, a copy of Wheeler's standard retainer contract. *See* Declaration of Edward Butowsky ("Butowsky Decl.") at p. 1. So far as Plaintiff knows, that standard retainer contract was never executed. *Id.* Instead, Plaintiff later learned that Molly Rich, wife of Aaron Rich, negotiated a different contract with Wheeler. *Id.* However, Plaintiff acknowledges he first saw the completed contract in his spam filter around May 16, 2017. *Id.* at pp. 1-2. Plaintiff's counsel states Plaintiff had "absolutely no role in drafting that agreement," it is

"utterly irrelevant to the Plaintiff's claims that he did or did not see the contract between Mr. Wheeler and the Riches, and it is ludicrous to suggest that a mistake on that issue would merit death-penalty sanctions." Docket Entry # 110 at p. 14.

Finally, regarding footnote 4, Plaintiff asserts he did not misrepresent his damages. According to Plaintiff, regardless of what Sally Davis did or did not do with her investment, her email clearly illustrates the kind of damage that Defendants inflicted on Plaintiff's reputation. *Id.* at p. 16. In his declaration, Plaintiff states that while Davis decided to remain a customer with Chapwood, she was with a different advisor. Butowsky Decl. at p. 2. "Even so, Chapwood lost millions of dollars in investments from Ms. Davis and [Plaintiff] lost income as a direct result." *Id.*

In his surreply, Plaintiff objects to the new evidentiary exhibits and arguments raised in Defendants' reply. Docket Entry # 125 at p. 2. According to Plaintiff, Defendants offer eleven new exhibits in an attempt to prove that Plaintiff controlled access to witnesses and sources and thus Plaintiff's role in the murder investigation was not "limited" as alleged in the SAC. *Id.* at p. 4. Plaintiff asserts the evidence, even if properly before the Court, does not prove Defendants' point. *Id.* (further arguing Defendants still try to conflate Plaintiff's involvement in the Fox News story with his involvement in the Wheeler murder investigation). Attached as Exhibit 1 to the surreply is the Declaration of Ty Clevenger ("Clevenger Decl."), wherein Plaintiff's current lead counsel states he had no role in the drafting of the original, first, or second amended complaints and only a limited role in the drafting of the proposed Third Amended Complaint.[12] Clevenger Decl. at p. 1. According

---

[12] The original complaint filed in this case is electronically signed by Clevenger. Docket Entry # 1. The Amended Complaint is electronically signed by Steven Biss. Docket Entry # 54. The Second Amended Complaint (which is the operative pleading at issue) is electronically signed by Steven Biss. Docket Entry # 72. The proposed Third Amended Complaint is electronically signed by Steven Biss. Docket Entry # 99.

The reasonable inquiry requirement does not prevent the signing attorney from relying on representations that

to Clevenger, he was originally retained in this case for the sole purpose of getting Steven Biss,

Plaintiff's co-counsel, admitted *pro hac vice*, after which he would be fully responsible for all

aspects of Plaintiff's representation.[13] *Id.*

## B.     Applicable law

Federal Rule of Civil Procedure 11 requires, in relevant part, that "[e]very pleading, written

motion, and other paper must be signed by at least one attorney of record in the attorney's name."

*Tejero v. Portfolio Recovery Assocs., L.L.C.*, 955 F.3d 453, 458 (5th Cir. 2020) (quoting FED. R. CIV.

P. 11(a)). The signature required by Rule 11(a) "certifies that to the best of the person's knowledge,

information, and belief, formed after an inquiry reasonable under the circumstances," the paper is

not sanctionable under Rule 11(b). *Id.* Specifically, Rule 11(b) provides that by presenting a filing

to a court, attorneys and *pro se* litigants are certifying that to the best of their belief, after reasonable

inquiry, (1) the filing is not being presented for an improper purpose, such as harassment, delay, or

needlessly increasing the cost of litigation; (2) any claims, defenses, and other legal contentions are

supported by either existing law or by a nonfrivolous argument for changing existing law or

establishing new law; (3) factual contentions have evidentiary support or, if specifically so identified,

---

another person makes. *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1278 (3d Cir.1994). However, it is clear that the signer has a "personal, nondelegable responsibility" to comply with the requirements of Rule 11 before signing the document. *Id.* (quoting *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 127 (1999)); *see also Bus. Guides, Inc v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 547, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991); *see also Lipovsky v. Vilsack*, No. 4:14-CV-00047-DMB, 2015 WL 4250795, at *4 n. 4 (N.D. Miss. July 13, 2015); *see also Kaltenbach v. Lynn*, 996 F.2d 306 (5th Cir. 1993) ("The motion was prepared by another assistant district attorney, who requested that Dauterive sign the motion, because the other assistant was not admitted to practice in the Middle District of Louisiana. Dauterive asserts that he should not have been reprimanded because Dauterive inquired whether the information contained in the motion was correct and the assistant who prepared the motion assured him that it was correct. . . . The district court did not abuse its discretion in reprimanding Dauterive because Dauterive failed to make a reasonable inquiry with respect to the status of the appeal of the case prior to signing the pleading.").

[13] In Plaintiff's May 20, 2020 response to Defendants' notice of supplemental evidence in support of motion to compel, Clevenger advised the Court he had taken over the duties of lead counsel. Docket Entry # 140 at p. 1. Steven Biss is still listed on the docket as Plaintiff's counsel, along with Clevenger.

will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information. FED. R. CIV. P. 11(b).

Rule 11 imposes on trial courts an objective standard of reasonableness under the circumstances. *Business Guides, Inc. v. Chromatic Commun. Enter., Inc*., 498 U.S. 533, 111 S.Ct. 922, 931–32, 112 L.Ed.2d 1140 (1991). An attorney has a duty to conduct a "reasonable inquiry into the facts and law of a case at the time [at] which she affixes her signature on any papers to the court." *Castro & Co., L.L.C. v. Diamond Offshore Servs. Ltd.*, No. 3:18-CV-574-M, 2018 WL 6069973, at *8 (N.D. Tex. Oct. 29, 2018), *report and recommendation adopted*, No. 3:18-CV-574-M, 2018 WL 6068977 (N.D. Tex. Nov. 20, 2018) (quoting *S.E.C. v. Faulkner*, No. 3:16-cv-1735-D, 2018 WL 3708426, at *2 (N.D. Tex. Aug. 3, 2018) (quoting *Mercury Air Grp., Inc. v. Mansour*, 237 F.3d 542, 548 (5th Cir. 2001))).

In ruling on Rule 11 motions, district courts within the Fifth Circuit must determine "if the individual who has certified the document purported to be violative of Rule 11 has complied with all of the affirmative duties imposed by the rule." *Thomas v. Capital Sec. Servs., Inc*., 836 F.2d 866, 875 (5th Cir. 1988) (en banc). "The determination of whether a reasonable inquiry into the facts has been made in a case will, of course, be dependent upon the particular facts; however, the district court may consider such factors as the time available to the signer for investigation; the extent of the attorney's reliance upon his client for the factual support for the document; the feasibility of a prefiling investigation; whether the signing attorney accepted the case from another member of the bar or forwarding attorney; the complexity of the factual and legal issues; and the extent to which development of the factual circumstances underlying the claim requires discovery." *Id.* "As to the

31

determination of whether a reasonable inquiry into the law has been made, a district court may

consider the time available to the attorney to prepare the document; the plausibility of the legal view

contained in the document; the pro se status of a litigant; and the complexity of the legal and factual

issues raised." *Id.* at 875-76.

Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry

and have determined that any papers filed with the court are well grounded in fact, legally tenable,

and "not interposed for any improper purpose." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384,

393, 110 S. Ct. 2447, 2454, 110 L. Ed. 2d 359 (1990) (citing Advisory Committee Note on Rule 11,

28 U.S.C.App., p. 576). An attorney who signs the paper without such a substantiated belief "shall"

be penalized by "an appropriate sanction." *Id.* Such a sanction may, but need not, include payment

of the other parties' expenses. *Id.*

Although Rule 11 must be read in light of concerns that it will spawn satellite litigation and

chill vigorous advocacy, "any interpretation must give effect to the Rule's central goal of

deterrence." *Id.* "The purpose of the rule is to 'deter baseless filings in district court,' *Cooter & Gell*

*v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990), and 'to spare innocent parties and overburdened courts

from the filing of frivolous lawsuits,' *Zuffante v. Stephens*, No. 3:13-CV-1146-B, 2013 WL

4829193, at *1 (N.D. Tex. Sept. 9, 2013) (quoting *Kurkowski v. Volcker*, 819 F.2d 201, 204 (8th Cir.

1987))." *Budri v. FirstFleet Inc.*, No. 3:19-CV-0409-N-BH, 2019 WL 5580105, at *4 (N.D. Tex.

Sept. 20, 2019), *report and recommendation adopted*, No. 3:19-CV-00409-E-BH, 2019 WL

5578975 (N.D. Tex. Oct. 29, 2019), *appeal dismissed*, No. 19-11203, 2019 WL 8645418 (5th Cir.

Dec. 18, 2019).

After notice and opportunity to respond, courts finding a Rule 11(b) violation may impose

appropriate sanctions. *Id.* (citing FED. R. CIV. P. 11(c)(1)). These may include monetary and injunctive sanctions, and even dismissal.[14] *Id.* (citations omitted).  Rule 11 permits a court to "impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." *Tejero*, 955 F.3d at 462, n. 2 (quoting FED. R. CIV. P. 11(c)(1)).

Rule 11(c)(2) provides that a motion must be made separately from any other motion and must describe the specific sanctionable conduct. *Budri*, 2019 WL 5580105, at *5 (citing FED. R. CIV. P. 11(c)(2)). The rule contains a "safe harbor" provision that requires that the motion "be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." *Id.* This requirement is strictly construed and substantial compliance is insufficient. *Id.* (citing *Morris v. Thaler*, No. 3:12-CV-4916-N, 2013 WL 2383652, at *2 (N.D. Tex. May 31, 2013) (citing *In re Pratt*, 524 F.3d 580, 586-88 (5th Cir. 2008) (addressing "substantially identical" bankruptcy Rule 9011))). Informal notice and opportunity to withdraw is not an adequate substitute for serving a copy of the motion at least twenty-one days before filing the motion with the court. *Id.* (citing *Pratt*, 524 F.3d at 586-88 (noting courts "have continually held that strict compliance with Rule 11 is mandatory")). A motion for Rule 11 sanctions is appropriately denied when the movant fails to comply with this requirement. *Id.* (citing *Tompkins*, 202 F.3d at

---

[14] A district court must impose sanctions once a violation of Rule 11 is found, but the district court retains broad discretion in determining the "appropriate" sanction under the rule. *Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 878 (5th Cir. 1988). What is "appropriate" may be a warm friendly discussion on the record, a hard-nosed reprimand in open court, compulsory legal education, monetary sanctions, or other measures appropriate to the circumstances. *Id.* Whatever the ultimate sanction imposed, the district court should utilize the sanction that furthers the purposes of Rule 11 and is the least severe sanction adequate to such purpose. *Id.* (further noting that while district courts may theoretically still dismiss baseless claims or defenses as sanctions, "such a dismissal is now better grounded, not on misconduct, but on the merits under Rules 12, 41, 55, and 56") (citation omitted).

788). The movant has the burden to show compliance with the safe harbor provision. *Id.*; *see also Elliott v. Tilton*, 64 F.3d 213, 216 (5th Cir. 1995).

Rule 11 "sanctions are normally reserved 'for rare and exceptional case where the action is clearly frivolous, legally unreasonable, or without legal foundation or brought for an improper purpose or brought for an improper purpose.' It is an extraordinary remedy, one to be exercised with extreme caution." *Sievert v. Howmedica Osteonics Corp.*, No. 3:18-CV-2175-S, 2020 WL 2507678, at *3 (N.D. Tex. May 15, 2020) (quoting *Laughlin v. Perot*, No. CA 3-95-CV-2577-R, 1997 WL 135676, at *8 (N.D. Tex. Mar. 12, 1997) (quoting *Operating Eng'rs Pension Tr. v. A-C Co.*, 859 F.2d 1336, 1344 (9th Cir. 1988))). Courts have a duty to "impose the least severe sanction adequate" to deter future conduct. *Budri*, 2019 WL 5580105, at *4 (quoting *Mendoza v. Lynaugh*, 989 F.2d 191, 196 (5th Cir. 1993) (quoting *Akin v. Q–L Invs., Inc.*, 959 F.2d 521, 535 (5th Cir. 1992)); accord Fed. R. Civ. P. 11(c)(4)). The moving party has the burden to overcome the presumption that pleadings are filed in good faith. *Id.* (citing *Tompkins v. Cyr*, 202 F.3d 770, 788 (5th Cir. 2000)).

## C. Analysis

### 1. Safe harbor

In a "Certificate of Compliance With Rule 11" contained at the end of Defendants' Rule 11 motion for sanctions, Defendants' counsel certifies that on January 23, 2020, she caused a draft of the Rule 11 motion for sanctions to be served under Rule 5 upon Plaintiff's counsel. Docket Entry # 95 at p. 16. According to Defendants' counsel, on February 16, 2020, after the expiration of the 21-day safe harbor period, Plaintiff responded to the draft motion with proposed modifications that do not sufficiently "withdraw[] or appropriately correct[]" the challenged contentions in Plaintiff's SAC or remedy the Rule 11 violations. *Id.*

On February 18, 2020, Defendants filed their Rule 11 motion for sanctions. On the same day, Plaintiff filed his motion for leave to file his proposed Third Amended Complaint. Plaintiff suggests he is entitled to file an amended complaint to comply with Rule 11's safe harbor provisions, which were triggered by Defendants' Rule 11 motion for sanctions. As noted above, Rule 11 gives an attorney the opportunity to withdraw or correct a challenged filing by requiring a party filing a Rule 11 motion to serve the motion 21 days before filing the motion. FED. R. CIV. P. 11(c)(1)(A).

> If, during this period, the alleged violation is corrected, as by withdrawing (whether formally or informally) some allegation or contention, the motion should not be filed with the court.  These provisions are intended to provide a type of 'safe harbor' against motions under Rule 11 in that a party will not be subject to sanctions on the basis of another party's motion unless, after receiving the motion, it refuses to withdraw that position or to acknowledge candidly that it does not currently have evidence to support a specified allegation. . . . [U]nder the revision, the timely withdrawal of a contention will protect a party against a motion for sanctions.

*Elliott v. Tilton*, 64 F.3d 213, 216 (5th Cir. 1995) (quoting Proposed Amendments to Federal Rules of Civil Procedure, advisory committee's notes, reprinted in, 146 F.R.D. 401, 591 (1993)). The "purpose of the safe harbor . . . is to give the offending party the opportunity, within 21 days after service of the motion for sanctions, to withdraw the offending pleading *and thereby escape sanctions*." *Retail Flooring Dealers of Am., Inc. v. Beaulieu of Am., L.L.C.*, 339 F.3d 1146, (9th Cir.2003) (emphasis in original).

When Defendants' Rule 11 motion for sanctions was filed, the Second Amended Complaint was the operative complaint on file. Because the Court has not yet granted Plaintiff's motion for leave to file the proposed Third Amended Complaint, the Second Amended Complaint remains the operative pleading under consideration in relation to Defendants' Rule 11 motion for sanctions. Because Plaintiff did not correct or withdraw the disputed allegations contained in the Second

Amended Complaint within the twenty-one day time period provided by the rule, the Court finds Defendants properly filed their Rule 11 motion for sanctions. *Harris v. Franklin-Williamson Human Servs., Inc.*, 97 F. Supp. 2d 892, 910 (S.D. Ill. 2000).

**2.      Rule 11(b)(3)**

As noted above, sanctions under Rule 11 "may be appropriate if the Court finds that a document has been presented for an improper purpose, *see* FED. R. CIV. P. 11(b)(1); the claims or defenses of the signer are not supported by existing law or by a good-faith argument for an extension or change in existing law, *see* FED. R. CIV. P. 11(b)(2); or the allegations and other factual statements lack evidentiary support or are unlikely to do so after a reasonable opportunity for investigation, *see* FED. R. CIV. P. 11(b)(3)." *Castro & Co., L.L.C. v. Diamond Offshore Servs. Ltd.*, No. 3:18-CV-574-M, 2018 WL 6069973, at *9 (N.D. Tex. Oct. 29, 2018), *report and recommendation adopted*, No. 3:18-CV-574-M, 2018 WL 6068977 (N.D. Tex. Nov. 20, 2018).

In this case, Defendants move for sanctions against both Plaintiff and his counsel pursuant to Rule 11(b)(3).[15] According to Defendants, Plaintiff has pleaded in his SAC "three deliberate, material misrepresentations." Docket Entry # 96 at p. 5. In their response to Plaintiff's motion for leave to amend, Defendants argue the evidence shows that when Plaintiff filed his lawsuit almost

---

[15] Although Defendants mention in the relevant briefing that Plaintiff's actions caused the Court to waste judicial resources and Defendants to incur significant legal expenses (Docket Entry # 96 at p. 15) and that Plaintiff had an improper motive in filing the lawsuit (i.e., trying to prove a debunked conspiracy theory) (Docket Entry # 122 at. p. 2), Defendants confine their substantive arguments for sanctions to Rule 11(b)(3).  Even if Defendants had sufficiently raised Rule 11(b)(1) (prohibiting an attorney from filing a federal action for any improper purpose) as a ground for sanctions, the Court would note that "many plaintiffs have multiple purposes in pursuing litigation." *F.D.I.C. v. Maxxam, Inc.*, 523 F.3d 566, 577, 581 (5th Cir. 2008) (footnotes omitted). As held by the Fifth Circuit Court of Appeals, "so long as the merits of their claim, viewed objectively, are supported by a good-faith belief that the allegations are well founded and not frivolous, the subjective motivation for pursuing the claim and the multiple purposes are ordinarily of no moment." *Id.* Plaintiff indicates he is seeking damages for the injury to his reputation caused by Defendants' alleged defamation and conspiracy. *See* Docket Entry # 96, Ex. X at p. 3.

two years ago, Plaintiff knew that all of the misleading statements identified by the Rule 11 motion for sanctions were false. Docket Entry # 105 at p. 1. Defendants further assert "those statements should have been the subject of reasonable inquiry by Plaintiff's counsel in evaluating Plaintiff's claims *before* signing the original complaint, filing Plaintiff's lawsuit, and signing subsequent amended complaints." *Id.* (emphasis in original).

The Court first addresses whether sanctions could be appropriately assessed against Plaintiff under the circumstances alleged in this case. "[T]he central purpose of Rule 11 is to deter baseless filings in district court and thus . . . streamline the administration and procedure of the federal courts." *Cooter*, 496 U.S. at 393. The Fifth Circuit has explained: "Rule 11 has as its primary focal point the certification made by an attorney that he has complied with the affirmative duties imposed by the rule at the moment he affixes his signature to a pleading, motion, or other paper in a lawsuit." *In re Oracle Oil, L.L.C.*, No. CV 18-3674, 2019 WL 4209369, at *4 (E.D. La. Sept. 5, 2019) (quoting *Thomas v. Capital Sec. Servs*., Inc., 836 F.2d 866, 874 (5th Cir. 1988)). An attorney has a duty to conduct a "reasonable inquiry into the facts and law of a case at the time [at] which [he] affixes [his] signature on any papers to the court." *Mercury Air Grp., Inc. v. Mansour*, 237 F.3d 542, 548 (5th Cir. 2001) (citing *Thomas*, 836 F.2d at 884). The reasonableness of the conduct involved is to be viewed at the time counsel or the party signed the document alleged to be the basis for the Rule 11 violation. *Thomas*, 836 F.2d at 874 ("Like a snapshot, Rule 11 review focuses upon the instant when the picture is taken—when the signature is placed on the document. Rule 11 was promulgated for a particular purpose—to check abuses in the signing of pleadings.").

In their Rule 11 motion for sanctions, Defendants assert the Court can sanction a client as well as his attorney because both have a duty "to conduct a reasonable inquiry into the facts or law

before filing suit." Docket Entry # 96 at p. 5 (quoting *Skidmore Energy, Inc. v. KPMG*, 455 F.3d 564, 567 (5th Cir. 2006), *cert. denied, Skidmore Energy, Inc. v. Maghreb Petroleum Exploration, S.A.*, 549 U.S. 996 (Oct. 30, 2006)). One district court has noted that "[c]ourts have generally declined to impose sanctions on represented parties." *McCarty v. Verizon New England, Inc.*, 731 F. Supp. 2d 123, 134 (D. Mass. 2010) (citing *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 398 (6th Cir.2009), citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1336.2 (3d ed. 2004) ("Imposing a sanction on the client has met with disfavor.")). In the rare instances where courts have found it appropriate to sanction a client rather than an attorney, the client has been directly responsible for the unnecessary burden imposed on the court and the opposing party. *Id.* (citing *Independent Fire Ins. Co. v. Lea*, 979 F.2d 377, 379 (5th Cir.1992) ("[T]he 'represented party' against which sanctions are levied must be a party who had some direct personal involvement in the management of the litigation and/or the decisions that resulted in the actions which the court finds improper under Rule 11.")). Usually, this has meant factually groundless pleadings where a party has clearly lied or misrepresented facts. *Id.* at 134–35.

According to a court in this district, a client is responsible for a Rule 11 violation if the client "know[s] that the filing and signing [of a pleading, motion, or other paper] is wrongful." *SyncPoint Imaging, L.L.C. v. Nintendo of Am. Inc.*, No. 2:15CV00247-JRG-RSP, 2018 WL 6788033, at *6 (E.D. Tex. Dec. 26, 2018) (quoting *In re Motion for Sanctions Against Meyers*, No. 4:12-MC-015-A, 2014 WL 1494099, at *8 (N.D. Tex. Apr. 16, 2014), *supplemented*, No. 4:12-MC-015-A, 2014 WL 1910621 (N.D. Tex. May 9, 2014) (citing *Calloway v. Marvel Entm't Grp., a Div. of Cadence Indus. Corp.*, 854 F.2d 1452, 1475 (2d Cir. 1988) *rev'd in part sub nom Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120 (1989)))). The Second Circuit in *Calloway* explained that "where the party

does know that the filing and signing is wrongful and the attorney reasonably should know, then sanctions against both are appropriate. Where a party misleads an attorney as to facts or the purpose of a lawsuit, but the attorney nevertheless had an objectively reasonable basis to sign the papers in question, then sanctions on the party alone are appropriate." *Calloway*, 854 F.2d at 1475 (citing *Friedgood v. Axelrod*, 593 F. Supp. 395 (S.D.N.Y.1984) (plaintiff lied to attorney)).

In appropriate instances, the Fifth Circuit has held both the attorney and client jointly and severally liable. *SyncPoint*, 2018 WL 6788033, at *6 (citing *Jennings v. Joshua Indep. School Dist.*, 948 F.2d 194, 196 (5th Cir. 1991)). In *Jennings*, both attorney Gladden and client Jennings failed to conduct a reasonable inquiry into the facts or law before filing the lawsuit. *Jennings*, 948 F.2d at 197. Gladden filed the pleadings and Jennings signed a sworn affidavit to oppose the defendants' motion for summary judgment. *Id.* The court had also previously determined Jennings' only purpose in bringing this action was to harass the defendants. *Id.* (citing *Jennings v. Joshua Indep. School Dist.*, 877 F.2d 313, 320 (5th Cir.1989) (on rehearing)).

In *Skidmore*, relied upon by Defendants, the Fifth Circuit upheld a district court's award of Rule 11(b)(3) sanctions against a client (Skidmore and Geoscience) when the district court found "the bulk of [p]laintiffs' causes of action are without evidentiary support and thus appear to have been instigated as a gamble that something might come of it rather than on the basis of the facts at hand." *In re Oracle Oil*, 2019 WL 4209369, at *4 (quoting *Skidmore*, 455 F.3d at 567 (internal quotation marks, brackets, and ellipses omitted in *In re Oracle Oil*)). The Fifth Circuit in *Skidmore* explained the district court did not abuse its discretion in awarding sanctions against the client himself because the client "was entirely unable to articulate a factual nexus between any of the

Defendants and [wrongful activity the plaintiff alleged]."[16] *Id.* (quoting *Skidmore*, 455 F.3d at 568

(internal quotation marks omitted in *In re Oracle Oil*)). Notably, the district court in *Skidmore*

discussed in detail the testimony of Skidmore's owner, who assured the court that he had reviewed

the pleadings before they were filed. *Skidmore*, 455 F.3d at 568. Nevertheless, the district court

found he was unable to articulate a factual nexus between any of the defendants and any of the

"sensational allegations peppered through the complaint. . . ."[17] *Id.*

The Court finds this case distinguishable from those limited instances where the Fifth Circuit

held both an attorney and client jointly and severally liable. As explained in detail below, in view

of the parties' arguments and the record as a whole, the Court does not find that imposition of Rule

11 sanctions is appropriate against either Plaintiff or his counsel. *See Lovell Family Ltd. P'ship v.*

*LG Preston Campbell, L.L.C.*, No. 3:17-CV-625-M (BT), 2018 WL 4346725, at *2 (N.D. Tex. Aug.

10, 2018)[18],*report and recommendation adopted*, No. 3:17-CV-625-M (BT), 2018 WL 4335859

---

[16] The court in *In re Oracle Oil* distinguished the case before it from *Skidmore*, noting Oracle had articulated evidentiary support for its claims for damages even though, in granting EPI's motion for summary judgment, the court had found the evidence legally insufficient to support an element of Oracle's claim for damages. *In re Oracle Oil*, 2019 WL 4209369, at *4. The court explained that the legal insufficiency of the evidence did not mean Oracle made factually groundless allegations in its complaint. *Id.*

[17] The Fifth Circuit in *Skidmore* explained that *Thomas's* "snapshot" rule ensures that Rule 11 liability is assessed only for a violation existing at the moment of filing. *Skidmore*, 455 F.3d at 570; *see Thomas*, 836 F.2d at 884 ("Capital asserted that the plaintiffs failed to make a reasonable inquiry into either the facts or law before filing their complaint and that the action was brought and litigated in bad faith. . . . In this respect we note that, as we today hold, Rule 11 does not impose a continuing obligation on attorneys, but only a standard of good faith and reasonable investigation as of the date legal documents are signed."). Prior to that decision, attorneys in the Fifth "Circuit had a continuing obligation to review and reevaluate their positions as the litigation developed; a document that initially satisfied Rule 11 might later become the basis for sanctions if new facts were discovered or circumstances changed such that there was no longer a good faith basis for the earlier filing." *Skidmore*, 455 F.3d at 570 (citation omitted).

[18] The court in *Lovell*, noting the defendants relied heavily on the fact that the plaintiffs' counsel had been previously sanctioned, rejected the implication that sanctions were appropriate because the district court sanctioned the plaintiffs' counsel in 2014. *Lovell*, 2018 WL 4346725, at *3 (further noting the court's initial inquiry under Rule 11 is limited to the pleadings in the current case).

(N.D. Tex. Sept. 11, 2018).

Relying on extensive evidence obtained during discovery, Defendants' Rule 11(b)(3) motion for sanctions addresses three main allegations contained in the 98-page SAC, which Defendants assert are clear misrepresentations of fact. Plaintiff's counsel disputes that most of the disputed allegations are even false, but counsel still has sought leave to amend to clarify any inaccurate ones. Docket Entry # 110 at pp. 4-5 (stating Rule 11 sanctions is unwarranted where the evidence is contradictory or disputed); *see also id.* at p. 1 ("The motion relies on disputed facts that would not even be grounds for summary judgment, yet the Defendants want the Court to resolve those disputed facts in her clients' favor and then sanction the Plaintiff and his attorneys for not accepting their interpretation of the facts.").

The Fifth Circuit has stated "the standard certification for factual allegations under Rule 11(b)(3) is that there is (or likely will be) evidentiary support for the allegation, not that the party will prevail with respect to its contention." *Castro*, 2018 WL 6069973, at \*12 (quoting *Bynum v. Am. Airlines, Inc.*, 166 Fed. Appx. 730, 734 (5th Cir. 2006)). What is more, the "signing attorney has a duty of reasonable inquiry, but his signature is not a guarantee of the correctness of the legal theories argued, *City of El Paso, Tex. v. City of Socorro, Tex.*, 917 F.2d 7, 8 (5th Cir.1990), nor is it a guarantee of all alleged facts, especially if the matter is not easily discovered by extrinsic evidence, *see Smith v. Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 446 (5th Cir.1992)." *Health Net, Inc. v. Wooley*, 534 F.3d 487, 497 (5th Cir. 2008). Additionally, a Rule 11 motion that makes only "essentially summary judgment arguments about the legal and factual sufficiency of the complaint" is "not a proper invocation of the Court's discretion to impose the extraordinary remedy of sanctions for the 'rare and exceptional case where the action is *clearly* frivolous, legally unreasonable or

without legal foundation, or brought for an improper purpose.'" *Castro*, 2018 WL 6069973, at *13 (quoting *Laughlin v. Perot*, No. CA 3-95-CV-2577-R, 1997 WL 135676, at *8 (N.D. Tex. March 12, 1997) (emphasis in original)).

A district court within the Fifth Circuit has persuasively explained as follows:

> In determining whether Rule 11 sanctions should be imposed, the Court does not judge the merits of the action but rather, determines whether an attorney has abused the judicial process. *See Cooter & Gell*, 496 U.S. at 396. Rule 11 should not be used to test the legal or factual sufficiency of a party's claims. The Advisory Committee Notes for Rule 11 explain that 'Rule 11 motions . . . should not be employed . . . to test the legal sufficiency or efficacy of allegations in the pleadings; other motions are available for those purposes.' . . . In essence, 'Rule 11 should not be used to raise issues of legal sufficiency that more properly can be disposed of by a motion to dismiss, a motion for a more definite statement, or a motion for summary judgment.' 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1336 (2d ed. Supp.2003); *see also Blue v. United States Dep't of the Army*, 914 F.2d 525, 535 (4th Cir.1990) ('[C]laims that are plainly meritless should be disposed of early in the course of litigation through summary judgment or other pretrial motion[s].... As a general matter, dismissal of a frivolous ... case on the merits should be a first option, whereas imposition of sanctions should be a matter of last resort.'). A Rule 11 motion for sanctions is not a proper substitute for a motion for summary judgment.
>
> The distinct approaches that courts employ in disposing of Rule 11 and summary judgment motions underscore the meaningful differences between the purposes and standards associated with Rule 11, a rare and extraordinary remedy that governs the imposition of certain types of sanctions, and Rule 56, which governs motions for summary judgment. *See Mann v. G & G Mfg., Inc.*, 900 F.2d 953, 960–961 (6th Cir.1990). At the very least, it is well settled that a claim that has 'some plausible basis, [even] a weak one,' is sufficient to avoid sanctions under Rule 11. *United Nat. Ins. Co. v. R & D Latex Corp.*, 242 F.3d 1102, 1117 (9th Cir.2001). That is true even where the evidence is weak and could not survive summary judgment. *See Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1472 (9th Cir.1987) (reversing grant of Rule 11 sanctions where, although evidence was "weak" and could not survive summary judgment, court could not 'say that the complaint [was] so lacking in plausibility as to . . . subject [the attorney] to' sanctions). Rule 11, again, is meant to deter significant abuses of the judicial process by an attorney, not weed out his or her weak legal and factual arguments.
>
> In light of the significant differences between the procedures and standards

associated with summary judgment and those associated with the imposition of sanctions, the imposition of Rule 11 sanctions is inappropriate in this case.

*Hunger*, 2014 WL 1080765, at *5–6.

In this case, the factual allegations in Plaintiff's original complaint and live SAC are very detailed. As noted above, Defendants' Rule 11(b)(3) motion for sanctions addresses three disputed allegations out of ninety-eight pages of detailed allegations, and those disputed issues are contested or further explained in the proposed amended complaint. For example, Plaintiff argues Defendants' counsel conflates Rod Wheeler's murder investigation and the Fox News story. At the hearing, Plaintiff's counsel conceded there is overlap in the issues, but he argued those are two separate things. According to Plaintiff, Defendants' counsel focuses on whether Plaintiff had "direct" participation and whether his involvement in Wheeler's murder investigation was "limited." Plaintiff's counsel continues to assert Plaintiff's role was limited, even though Plaintiff did want the family to find Seth's murderer (as evidenced by his offer to pay); however, Plaintiff asserts his focus was on the Fox News story.  Counsel states it is not true that Plaintiff was pulling the strings on the murder investigation. According to Plaintiff's counsel, at most there is a disputed fact issue about how direct Plaintiff's role was in the murder investigation and whether that role was limited.

A district court has discretion as to whether to impose sanctions, and it need not provide detailed factual findings or legal conclusions. *Sistrunk v. Haddox*, No. 18-CV-0516, 2019 WL 1212945, at *4 (W.D. La. Feb. 26, 2019), *report and recommendation adopted*, No. 18-CV-0516, 2019 WL 1212110 (W.D. La. Mar. 14, 2019) (citing *Board of Aldermen v. State of Mississippi*, 2018 WL 4770713, *3 (5th Cir. 2018)). The best exercise of the court's discretion in these circumstances is to allow the case to go forward and permit the parties to explore the detailed factual allegations

through discovery. *Id.* It is adequate to determine that there is not a sufficient showing that Plaintiff's counsel's pre-filing investigation was lacking. *Id.*

The factors relevant to determining whether an attorney has made a reasonable inquiry into the facts sufficient to satisfy Rule 11 include: (1) the time available to the signer for investigation; (2) the extent of the attorney's reliance upon his client for the factual support for the document; (3) the feasibility of pre-filing investigation; (4) whether the signing attorney accepted the case from another member of the bar or forwarding attorney; (5) the complexity of the factual and legal issues; and (6) the extent to which development of the factual circumstances underlying the claim requires discovery. *Lovell*, 2018 WL 4346725, at *3 (citing *Thomas*, 836 F.2d at 875). Here, Plaintiff's counsel states they made a reasonable factual inquiry and did not rely exclusively on Plaintiff to support the allegations in the SAC. Docket Entry # 96, Ex. X at p. 5.

According to Plaintiff's counsel, the pre-filing investigation included a "thorough review concerning Wheeler's investigation into the murder of Seth Rich,"[19] and at the time counsel filed the SAC, they did not have the "luxury" of the documents produced by Fox News Network, LLC and Rod Wheeler referenced in Defendants' Rule 11 motion for sanctions. *Id*. at p. 4 & n. 4. Plaintiff's counsel states the SAC contains factual allegations with specific references to evidence that will be offered at trial to support Plaintiff's position concerning his involvement in Wheeler's investigation. *Id*. at p. 5. Plaintiff's counsel argues there is no violation of Rule 11(b)(3) under these circumstances. *Id*. (citing *Marchman v. Crawford*, 2018 WL 3545321, at *6 (W.D. La. 2018) ("In the present action, Marchman's factual allegations in her petition are so detailed that the Court concludes there would

---

[19] Paragraphs 68-76, 79-82, 95-98, and 101-03 of the SAC include hyperlinks to numerous primary sources that counsel represents they "carefully considered, most particularly Wheeler's own public representations." Docket Entry # 96, Ex. X at p. 4.

have been evidentiary support offered later in the litigation. Although the factual allegations do not bring Marchman's claims within the ambit of a First Amendment retaliation claim, the Court is not persuaded that Marchman's factual allegations lacked evidentiary support.").

The Court agrees. On the facts presented, the Court does not find that Plaintiff's counsel failed to conduct a reasonable investigation into the facts or the law that would justify a sanctions award. *Lovell*, 2018 WL 4346725, at *3.  Nor is the Court persuaded Plaintiff's very detailed factual allegations as a whole lacked evidentiary support.

Defendants' Rule 11 motion for sanctions focuses on limited issues and "appears to be based on disputed evidence, speculations about the contents of remaining discovery, and subjective opinions as to [Plaintiff's] intent, none of which are proper bases for Rule 11 sanctions."[20] *Sievert v. Howmedica Osteonics Corp.*, No. 3:18-CV-2175-S, 2020 WL 2507678, at *3 (N.D. Tex. May 15, 2020) (citing *Tejero*, 955 F.3d at 460-61). At an appropriate time, Defendants can file a motion for summary judgment with respect to all or certain claims. If Defendants specifically challenge Plaintiff's ability to prove specific elements of his claims, that may shift the summary judgment burden to Plaintiff to produce supporting evidence. *Sistrunk*, 2019 WL 1212945, at *4 (citing *Celtic Marine Corp. v. James C. Justice Companies, Inc.*, 760 F.3rd 477, 481 (5th Cir. 2014)). Defendants

---

[20] In their surreply in opposition to Plaintiff's motion for leave to amend, Defendants argue Plaintiff's proposed "fixes" in the proposed Third Amended Complaint continue to misrepresent essential facts, arguing "Plaintiff tries to create an artificial distinction between Wheeler's investigation and the retracted Fox News article." Docket Entry # 118 at pp. 1-2. Hinting again at an alleged improper motive, Defendants state both issues were an integral part of Plaintiff's "larger goal to prove (and publicize) that Seth Rich hacked the DNC emails." *Id.* at p. 2.

As noted above, Plaintiff insists the two issues, although overlapping, are separate. Plaintiff asserts Defendants' counsel improperly conflates the two (Plaintiff's involvement with Wheeler's murder investigation and Plaintiff's involvement with the Fox News story) in an attempt to demonstrate Plaintiff's allegations are false.

The Court finds the issue, and the others raised in the Rule 11 motion for sanctions, are disputed fact issues more properly raised in a motion for summary judgment rather than a motion for sanctions. Rule 11 should not be used to test the legal or factual sufficiency of a party's claims. *Mark's Airboats*, 2015 WL 1467097, at *4.  A Rule 11 motion for sanctions is not a proper substitute for a motion for summary judgment.  *Id.*

are attempting to do that now under the label of a motion for sanctions. *Id*.

In determining whether Rule 11 sanctions should be imposed, the court does not judge the merits of the action but rather, determines whether an attorney has abused the judicial process. The Court does not find such abuse of the judicial process here.  In sum, the Court does not find the circumstances warrant a sanction under Rule 11, which is "an extraordinary remedy, one to be exercised with extreme caution." *Hunger*, 2014 WL 1080765, at *3 (quoting *Laughlin v. Perot*, No. 3:95–cv–2577–R, 1997 WL 135676, at *8 (N.D. Tex. Mar.12, 1997)).  Accordingly, the Court recommends Defendants' claims pursuant to Rule 11(b)(3) be denied.

## V. PLAINTIFF'S MOTION FOR LEAVE TO AMEND

A.      **Applicable law**

Under Federal Rule of Civil Procedure 15(a), leave to amend should be freely given when justice requires.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Although Rule 15 does not set an absolute deadline for a motion for leave to amend, if the court issues a scheduling order that requires all pleadings to be amended by a certain date, the parties must abide by that order.  *See* FED. R. CIV. P. 16(b)(3)(A); *see also S&W Enters. v. SouthTrust Bank*, 315 F.3d 533, 536 (5th Cir.2003).

In this case, the deadline to file amended pleadings expired September 30, 2019. Therefore, before reaching the issue of whether amendment would be appropriate under Rule 15(a), the Court must consider whether, under FED. R. CIV. P. 16(b), Plaintiff has shown good cause to modify the scheduling order.  *S&W*, 315 F.3d at 536 ("Only upon the movant's demonstration of good cause to modify the scheduling order will the more liberal standard of Rule 15(a) apply to the district court's decision to grant or deny leave.").

Federal Rule of Civil Procedure 16(b) provides as follows: "A schedule shall not be modified

46

except upon a showing of *good cause* and by leave of the district judge or, when authorized by local rule, by a magistrate judge." FED. R. CIV. P. 16(b) (emphasis added).  The Fifth Circuit has stated four factors trial courts must consider when determining whether good cause exits to allow a deviation from the court's scheduling order: (1) the explanation for the failure to [amend within the deadline]; (2) the importance of the [modification of the deadline]; (3) potential prejudice in allowing the [modification]; and (4) the availability of a continuance to cure such prejudice. *Reliance Ins. Co. v. The Louisiana Land & Exploration Co.*, 110 F.3d 253, 257 (5th Cir.1997); *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir. 1990).

**B.    Good cause analysis under Rule 16(b)**

In assessing good cause, the trial court primarily considers the diligence of the party seeking to alter the existing schedule.  *See Deghand v. Wal-Mart Stores, Inc.*, 904 F. Supp. 1218, 1221 (D. Kan.1995).  The party's explanation for seeking relief from the schedule must demonstrate that it could not have met the deadline despite its diligence. Plaintiff points out his proposed amendment was prompted by Defendants' service of their draft Rule 11 motion for sanctions in late January 2020, well outside the amendment deadline. Plaintiff states he is attempting in good faith to address Defendants' purported concerns. Plaintiff essentially argues that, in fairness, he should be allowed to amend his SAC because his motion for leave to amend was filed as contemplated by the safe harbor provided by Rule 11.

Defendants oppose Plaintiff's motion for leave to amend, stating Plaintiff cannot demonstrate the good cause required for amendment. Defendants contend Plaintiff's motion is not fixing or clarifying but rather "tries to camouflage his misrepresentations and his counsel's failure to properly investigate them." Docket Entry # 118 at p.1. The Court has already considered this argument in its

discussion above on Defendants' Rule 11 motion for sanctions regarding the SAC.

After careful consideration, the Court finds that good cause exists for Plaintiff to be granted leave to amend the SAC. Because the amendment was prompted by the January 2020 Rule 11 motion for sanctions, the September 19, 2019 deadline for amendment could not be met despite the diligence of the party seeking the extension.

The Court has also considered the remaining three factors in determining whether good cause exists to allow a deviation from the Court's scheduling order: importance of the modification, potential prejudice in allowing the modification, and availability of a continuance to cure any prejudice. Having considered all four factors, the Court is of the opinion Plaintiff has demonstrated good cause for extending the deadline for amending pleadings.

**C.      Analysis under Rule 15(a)**

Even if the Court were to find good cause to amend the Third Amended Scheduling Order, Defendants assert Federal Rule of Civil Procedure 15 does not support granting leave to file an amendment that was unduly delayed, made in bad faith, or fails to cure patent deficiencies. Docket Entry # 105 at pp. 4-5. Defendants assert the Court can infer bad faith in seeking leave to amend where the party seeking leave knew of the facts underlying the claim at the time the party filed the original pleading yet delayed in amending. Docket Entry # 118 at p. 1. According to Defendants, evidence related to the proposed amendments was accessible to Plaintiff from before this lawsuit was filed and Plaintiff delayed in seeking leave to amend.

Defendants rely on *Priester v. Deutsche Bank Nat'l Tr. Co.*, No. 4:16-CV-449, 2017 WL 2821715 (E.D. Tex. June 30, 2017), wherein Judge Mazzant stated as follows:

Courts in this circuit infer bad faith in seeking amendment where the party seeking

48

leave to amend knew of the facts underlying the claim at the time the party filed the original pleading and yet delayed in amending. *See, e.g., In re Southmark Corp*., 88 F.3d 311, 316 (5th Cir. 1996) (upholding denial of leave to amend where party 'sought leave to add both a fact of which it had been aware since before it filed its original complaint and a cause of action based on the identical, known facts [underlying] its original complaint'); *Starling v. Fuller*, 74 F.3d 1236, *2 & n.1 (5th Cir. 1995) (unpublished) (finding district court did not abuse discretion in finding plaintiffs exhibited bad faith in seeking amendment where plaintiffs knew of the facts underlying the added claim 'well before [they] filed their original complaint'); *Ameristar Jet Charter, Inc. v. Signal Composites, Inc*., No. 3:98-cv-1360-L, 1999 WL 508411, at *4 (N.D. Tex. July 16, 1999) (denying leave to amend to join new party). Courts also consider whether the party has offered a 'reasonable explanation for its delay in amending its complaint.' *In re Southmark*, 88 F.3d at 316 (noting 'in exercising . . . discretion to deny leave to amend a complaint, a trial court may properly consider (1) an "unexplained delay" following an original complaint, and (2) whether the facts underlying the amended complaint were known to the party when the original complaint was filed'). Here, Plaintiffs filed suit in June 2016. Plaintiffs were aware of HWA and any claims they might have against it at that time. Further, courts examine the context of a party's request for leave to amend to determine the party's underlying motive in seeking leave. *See, e.g., Wimm v. Jack Eckerd Corp*., 3 F.3d 137, 139-42 (5th Cir. 1993) (upholding district court's denial of leave to amend where 'plaintiffs knew of the facts underlying their [newly raised] claim before this action commenced' and where plaintiffs waited to file leave to amend until after defendant filed a motion for summary judgment); *Smith v. Chrysler Grp., LLC*, No. 1:15-cv-218, 2016 WL 7743688, at *4 (E.D. Tex. Aug. 12, 2016) (denying leave to amend and finding plaintiff's 'failure to plead a cause of action that was readily apparent at the outset of the case strongly suggest[ed] either a lack of diligence . . . or bad faith' where plaintiff 'admit[ted] that the facts supporting [her] breach of contract claim were apparent when she filed suit' but waited until after the court granted summary judgment against her on other claims).

*Id*. at *7.

The Court finds the *Priester* case distinguishable. In that case, which had been removed to federal court based on diversity jurisdiction, the Court found the plaintiffs had improperly joined the non-diverse defendants and dismissed the non-diverse defendants from the lawsuit. *Id*. at *2. Following the filing of the original defendants' motion for judgment on the pleadings which raised res judicata arguments, the plaintiffs filed an amended complaint on March 17, 2017, purporting to

assert claims against the previously-dismissed defendants as well as new claims against the SPS defendants and attempting to join an additional non-diverse defendant HWA. *Id*. The Deutsche Bank and SPS defendants filed a motion to dismiss, which originally sought, among other things, dismissal under Rule 11; however, those defendants later withdrew the part of their motion to dismiss brought pursuant to Rule 11. Cause No. 4:16-cv-00449 (Docket Entry #s 69, 72). Thereafter, the plaintiffs filed a partially unopposed motion for miscellaneous relief, wherein they agreed to strike the parties previously dismissed by the Court but argued the balance of the amended complaint should stand. Cause No. 4:16-cv-00449 (Docket Entry # 74 at p. 3). The parties apparently agreed the scheduling order should have been amended to permit the parties to adjust the additional defendants. *Id.* at pp. 7-8.

The magistrate judge recommended the plaintiffs' motion be granted in part and denied in part and that the plaintiffs' first-filed amended complaint be stricken. Cause No. 4:16-cv-00449 (Docket Entry # 82). The magistrate judge held the plaintiffs knew or should have known they had claims, if any, against HWA prior to filing suit in the instant case, but the plaintiffs raised no claims against HWA in the original petition. *Id*. at pp. 5-6. That the plaintiffs later attempted to join HWA only after the defendants removed the case and the Court denied remand, appeared primarily to the magistrate judge to be "a last-ditch effort to destroy the Court's jurisdiction over this case." *Id*. at p. 6.  Additionally, the magistrate judge found the plaintiffs were dilatory in seeking amendment. *Id.* at p. 9.

The magistrate judge then addressed the plaintiff's new claims against SPS under the FDCPA and TDCA and against Deutsche Bank under the TDCA. *Id.* at p. 12. The magistrate judge considered the Rule 16(b) "good cause" factors and concluded that the plaintiffs should be permitted

leave to amend to assert TDCA claims against Deutsche Bank and SPS. *Id.* at p. 16. (further stating the Court expressly did not permit leave to amend to assert any other claims (including the alleged FDCPA claims), or any additional claims against any other party or non-party (including HWA, any non-diverse Defendant already dismissed from this action, and/or any other Defendant)). Before District Judge Mazzant considered the plaintiffs' objections to the magistrate judge's report and recommendation, the plaintiffs filed their Second Amended Complaint.

In adopting the magistrate judge's report and recommendation, Judge Mazzant noted that no party objected to the magistrate judge's recommendations that the first-filed amended complaint be stricken or that leave to add the TDCA claims pleaded in the amended complaint against SPS and Deutsche Bank should be granted. Thus, the Court adopted these findings and proceeded to evaluate the plaintiffs' objections regarding the FDCPA claims against HWA and SPS and the denial of leave to join HWA. *Priester*, 2017 WL 2821715, at *3.

In considering the plaintiffs' delay and motive, Judge Mazzant stated the magistrate judge had "documented well both the context of Plaintiffs' request for leave to amend and Plaintiffs' apparent motive in seeking leave (i.e., to destroy jurisdiction)." *Id.* at *7. Judge Mazzant agreed with the magistrate judge's conclusion that the plaintiffs' tactics and representations militated heavily in favor of denying amendment. *Id.* at *8. Therefore, the Court denied the plaintiffs' request to amend in order to join HWA as a party to the lawsuit. *Id.*

Here, the Court does not find Plaintiff's tactics militate in favor of denying amendment under Federal Rule of Civil Procedure 15. Rule 11 requires a party seeking sanctions thereunder to first serve the "challenged lawyer" with a sanctions motion, describing the specific conduct which allegedly violates Rule 11, after which the "challenged lawyer has a 21-day 'safe harbor' to withdraw

or amend" the allegedly deficient pleading. *Cotto v. City of New York*, No. 16 CIV. 8651 (NRB), 2018 WL 3094915, at *3 (S.D.N.Y. June 20, 2018) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 150 (2d Cir. 2009) (citing FED. R. CIV. P. 11(c)(2))). That is precisely what occurred here. Defendants notified Plaintiff's counsel of alleged deficiencies in the SAC, and Plaintiff's counsel "sought to rectify those deficiencies by filing a motion for leave to amend," which was filed on the same day as Defendants' Rule 11 motion for sanctions. Even though Plaintiff's counsel was required under the Court's scheduling order to seek leave to amend the allegedly deficient SAC (and thus the SAC remained the operative pleading after the 21-day safe harbor period), the fact remains Plaintiff's counsel did take action to try to rectify Defendants' purported concerns with the SAC. Under these circumstances, the Court does not find any bad faith on the part of Plaintiff's counsel for seeking leave to amend. Nor does the Court find amendment would be futile. Therefore, Plaintiff's motion for leave to file his proposed Third Amended Complaint is granted pursuant to Federal Rule of Civil Procedure 15(a).

## VI. CONCLUSION

Based on the foregoing analysis, it is hereby

**RECOMMENDED** that Defendants' Motion for Sanctions Pursuant to Rule 11 for Violations Committed by Plaintiff and His Counsel (Docket Entry # 96) be **DENIED**.

<u>Objections</u>

Within fourteen (14) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge.   28 U.S.C.A. 636(b)(1)(C).

A party's failure to file written objections to the findings, conclusions and recommendations

contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court.  *Douglass v. United Servs. Auto. Ass'n.*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

      **ORDERED** that Plaintiff's Motion for Leave to File Third Amended Complaint (Docket Entry # 98) is **GRANTED.**

      **SIGNED** this 1st day of September, 2020.

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE